**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| TIMOTHY KYLES (B-11702), | Civil Action No. 15-CV-8895 |
| Plaintiff, | Honorable Judge Amy J. St. Eve |
| v. | **JURY TRIAL DEMANDED** |
| FRED BEAUGARD, KAREN M. RABIDEAU, TARRY WILLIAMS, WILLIAM BROWN, TRALON DURRETT, SALVADOR A. "TONY" GODINEZ, JOHN R. BALDWIN, KATHY BOGGESS, MAURICE LAKE, KEVIN LASKEY, CYNTHIA HARRIS, JOSHUA CLEMENTS, LESLIE TURNER, AND NICHOLAS LAMB | |
| Defendants. | |

**FIFTH AMENDED COMPLAINT**

Plaintiff Timothy Kyles ("Kyles"), by his attorneys, brings this Fifth Amended

Complaint against Defendants and states as follows:

**THE PARTIES**

1.      Plaintiff Kyles is, and was at all times relevant to the allegations in this

Complaint, an Illinois resident and an inmate within the correctional system operated by the

Illinois Department of Corrections (the "IDOC").  Kyles's prisoner number is #B-11702.

2.      Kyles was incarcerated at the maximum security Menard Correctional Center

("Menard CC") in Menard, Illinois, from approximately 2011 to January 2012.

3.      In January 2012, IDOC transferred Kyles to the maximum security Stateville

Correctional Center ("Stateville CC") in Joliet, Illinois.

4.      On or about September 23, 2015, IDOC transferred Kyles to the medium security Hill Correctional Center in Galesburg, Illinois, where he is presently incarcerated.

5.      Defendant Salvador A. "Tony" Godinez ("Godinez") was the Director of the IDOC at all times relevant to the allegations in this Complaint.  Godinez is sued in his individual and official capacities.

6.      As IDOC Director, Godinez was responsible for overseeing the management and operations of the correctional centers run by IDOC, including Stateville CC during the time that Kyles was incarcerated there.

7.      Defendant John R. Baldwin ("Baldwin") is the Director of the IDOC.  Baldwin is sued in his official capacity.

8.      As IDOC Director, Baldwin is responsible for overseeing the management and operations of the correctional centers run by IDOC.

9.      Defendant Tarry Williams ("Williams") was the Warden of Stateville CC during the period relevant to the allegations in this Complaint.  Williams is sued in his individual and official capacities.

10.     As Warden of Stateville CC, Williams was employed by IDOC and responsible for the safety and well-being of the inmates incarcerated at Stateville CC, including the disciplinary confinement decisions affecting the inmates and the processes in place for protecting inmates designated to be in Protective Custody.

11.     Defendant Nicholas Lamb ("Lamb") was, during the period relevant to the allegations in this Complaint, Warden No. 2 of Operations and/or Assistant Warden of Operations at Stateville CC.  Lamb is sued in his individual capacity.

12.     On information and belief, Lamb was responsible for the safety and well-being of the inmates incarcerated at Stateville CC, including the disciplinary confinement decisions affecting the inmates and the processes in place for protecting inmates designated to be in "Protective Custody."

13.     Defendant Fred Beaugard ("Beaugard") was a Correctional Officer employed by IDOC at Stateville CC during the relevant period when Kyles was incarcerated there. Beaugard is sued in his individual capacity.

14.     As a Correctional Officer, Beaugard was responsible for monitoring and ensuring the safety and security of inmates at Stateville CC.

15.     On information and belief, from at least October 24, 2014, until at least November 10, 2014, Correctional Officer Beaugard was assigned to the Internal Affairs Unit at Stateville CC.

16.     Defendant Karen M. Rabideau ("Rabideau") was the Placement Officer employed by IDOC at Stateville CC during the relevant period when Kyles was incarcerated there. Rabideau is sued in her individual capacity.

17.     As Placement Officer, Rabideau was responsible for inmate cell assignments at Stateville CC.

18.     Defendant William Brown ("Brown") was a Correctional Lieutenant employed by IDOC at Stateville CC during the relevant period when Kyles was incarcerated there. Brown is sued in his individual capacity.

19.     On information and belief, during the period relevant to the allegations in this Complaint, Brown worked in the Segregation Unit of Stateville CC, where he was responsible for the safety and security of inmates.

20.     Defendant Tralon Durrett ("Durrett") was a Correctional Sergeant employed by IDOC at Stateville CC during the relevant period when Kyles was incarcerated there.  Durrett is sued in his individual capacity.

21.     On information and belief, during the period relevant to the allegations in this Complaint, Durrett worked in the Segregation Unit of Stateville CC, where he was responsible for the safety and security of inmates.

22.     Defendant Kathy Boggess ("Boggess") was the administrative assistant for the Adjustment Committee and employed by IDOC at Stateville CC during the relevant period when Kyles was incarcerated there.  Boggess is sued in her individual capacity.

23.     Defendant Leslie Turner ("Turner") was the head investigator with the Internal Affairs Division and employed by IDOC at Stateville CC.  Turner is sued in his individual capacity.

24.     On information and belief, during the period relevant to the allegations in this Complaint, Turner was responsible, in part, for determining whether individual inmates at Stateville CC should be granted Protective Custody status.

25.     Defendant Joshua Clements ("Clements") worked in the Internal Affairs Division and was employed by IDOC at Stateville CC.  Clements is sued in his individual capacity.

26.     On information and belief, during the period relevant to the allegations in this Complaint, Clements was responsible, in part, for determining whether individual inmates at Stateville CC should be granted Protective Custody status.

27.     Defendant Major Maurice Lake ("Lake") was a Shift Supervisor employed by IDOC at Stateville CC during the relevant period when Kyles was incarcerated there.  Lake is sued in his individual capacity.

28.     On information and belief, during the period relevant to the allegations in this Complaint, Lake had the authority to direct other Correctional Officers to write Offender Disciplinary Reports, also commonly referred to as "tickets," with respect to inmates at Stateville CC.

29.     Defendant Major Kevin Laskey ("Laskey") was a Shift Supervisor employed by IDOC at Stateville CC during the relevant period when Kyles was incarcerated there.  Laskey is sued in his individual capacity.

30.     On information and belief, during the period relevant to the allegations in this Complaint, Laskey had the authority to direct other Correctional Officers to write Offender Disciplinary Reports, also commonly referred to as "tickets," with respect to inmates at Stateville CC.

31.     Defendant Cynthia Harris ("Harris") was, at all times relevant to the allegations in this Complaint, a Correctional Counselor employed by the IDOC at Stateville CC.

32.     On information and belief, Harris was responsible for reviewing grievances submitted by inmates in the Segregation Unit.  She is sued in her individual capacity.

33.     At all times relevant to this Complaint, the Defendants acted under color of law.

## JURISDICTION AND VENUE

34.     This case arises under the First and Eighth Amendments to the United States Constitution, and is expressly authorized by 42 U.S.C. § 1983 as a civil action to redress the deprivation of rights under color of state law.  Accordingly, this Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.

35.     Venue is proper in the Northern District of Illinois under 28 U.S.C. § 1391(b) because the events forming the basis of this Complaint occurred in this District.

## FACTUAL ALLEGATIONS

### Kyles's Designation as a "Protective Custody" Inmate

36.     In 2011, while he was an inmate at Menard CC, Kyles was approached by a group of inmates who were members of the Gangster Disciples, a prominent and violent criminal gang with members in many IDOC correctional centers.  At the time, Kyles was affiliated with the Gangster Disciples.  The inmates gave Kyles more than 20 contraband knives and shivs, which they directed Kyles to hide in his cell for them.

37.     Kyles was nervous that prison officers would discover the contraband weapons in his cell.  Kyles voluntarily turned them in to prison authorities.  By this act, Kyles renounced his gang affiliation and became a "declared enemy" of the Gangster Disciples.

38.     Thereafter, to protect Kyles from the Gangster Disciples, Kyles was moved to the Segregation Unit at Menard CC and placed in a single cell without a cellmate.

39.     In January 2012, Kyles was transferred to Stateville CC by the IDOC.

40.     At Stateville CC, Kyles feared that inmates affiliated with the Gangster Disciples would learn what he had done at Menard CC.

41.     Because of this fear, Kyles applied for "Protective Custody," or "P.C.," status at Stateville CC, which is a designation for inmates that need to be protected from other inmates and housed separately from the general population.

42.     In 2012, the Internal Affairs Division at Stateville CC, where Defendants Beaugard, Turner, and Clements were assigned, granted Kyles's application for Protective Custody status.

43.     Kyles thereafter was housed in the Protective Custody Unit at Stateville CC.

### Diagnosis and Treatment of Kyles's Mental Illness at Stateville CC

44.     When Kyles was moved to Stateville CC in 2012, he was seen by a psychologist (Dr. Larry) and a psychiatrist (Dr. Kartan), each of whom was employed or contracted by the IDOC to evaluate Kyles's mental health.

45.     These doctors diagnosed Kyles with mental illness, including bipolar mania with psychotic features and recommended that he attend monthly mental health counseling sessions.

46.     Throughout his incarceration at Stateville CC, Kyles attended counseling sessions with various mental health professionals, including psychiatrists, psychologists, and counselors.

47.     Kyles generally had a counseling session once a month, but sometimes, the sessions were less frequent.

48.     The mental health professionals consistently diagnosed Kyles with mental illness, including bipolar mania with psychotic features.

49.     During his counseling sessions, Kyles was told to notify Stateville CC staff if he felt he was being provoked by another staff member or if he believed he was having a mental health episode.

50.     Kyles also met with a Stateville CC psychiatrist or other mental health doctor on about a monthly basis.

51.     The doctor typically prescribed Kyles medication for his mental illness and frequently would adjust the medications and dosages prescribed to him.

52.     Kyles had not taken medication for his mental illness prior to being transferred to Stateville CC in January 2012.  Kyles struggled to adjust to the effects of the frequently changing prescribed medications and dosages.

53.     Common side effects of Kyles's prescribed mental health medications were that they made him extremely drowsy, caused him to sleep 12-13 hours per day, and it was difficult to wake him.

54.     For example, when taking the medications, Kyles would commonly sleep through multiple meals at a time, and his meal trays would pile up untouched outside his cell.

### Kyles Complains About a Correctional Officer and in Retaliation Is Placed in Segregation with a General Population Inmate.

55.     On or about October 24, 2014, one of the Stateville Correctional Officers, Officer Juborek, first name unknown, ("Juborek"), threatened to put contraband in Kyles's cell and thereby jeopardize Kyles's "good time" credits.

56.     Kyles felt provoked by Juborek's comments and reported the incident to Beaugard.

57.     Kyles begged Beaugard not to let Officer Juborek write him up based on Juborek's false claim that Kyles had contraband, saying:  "Big B, you know I can't go to 'seg' because those guys [the Gangster Disciples] are after me.  So don't let Juborek hook me up."

58.     Kyles also explained to Beaugard that Kyles had been instructed by his mental health counselors to notify staff when he felt provoked.

59.     Beaugard responded by instructing Kyles to return to his cell and said that he "would take care of it."

60.     On information and belief, Beaugard told Defendants Williams, Lake, and/or Laskey that Kyles had complained of Juborek provoking him.

61.     Kyles went back to his cell but was summoned to the Internal Affairs Division at Stateville CC about ten minutes later.

62. At the Internal Affairs Division, Defendants Turner and Clements questioned Kyles about his complaint concerning Officer Juborek. Kyles answered their questions and signed a written statement memorializing his complaint.

63. On information and belief, after Kyles spoke to Defendants Turner and Clements, Defendants Beaugard, Turner, and Clements, as well as Defendants Williams, Lake, and/or Laskey, conferred and agreed that a false Disciplinary Report, or "ticket," should be written against Kyles in order to send him to segregation in retaliation for his complaint against Officer Juborek.

64. On information and belief, Defendants Beaugard, Turner, and Clements, as well as Defendants Williams, Lake, and/or Laskey, knew that Kyles was a Protective Custody inmate when they made the decision to send Kyles to segregation.

65. Beaugard then wrote Ticket #201403345/1-STA (the "Ticket") for two offenses, "Intimidation or Threats" and "Dangerous Communications," in retaliation for Kyles's complaints about Juborek.

66. On the Ticket, Defendant Beaugard noted that Kyles was "SMI," or "severely mentally ill."

67. After giving his statement to Defendants Turner and Clements, Kyles waited at Internal Affairs to be taken back to his cell. Instead, Defendants Beaugard and Brown arrived and told Kyles that Beaugard had written the Ticket against Kyles and, as a result, Kyles was being sent to the Segregation Unit.

68. Kyles feared that his life would be in danger if he was placed in the Segregation Unit, particularly because inmates from Menard CC—including some of the Gangster Disciples that Kyles had turned in and other inmates that knew about the incident with the contraband

weapons—had since been transferred to Stateville CC and were being held in the Segregation Unit.

69.     Kyles told Defendants Beaugard and Brown that "the mob is gonna have me killed if you put me in segregation, you can't put me in the cell with anybody."

70.     Defendant Brown responded by telling Kyles to "shut the hell up," and suggested that, "as big as you are," Kyles should "fight" his cellmate.

71.     Kyles waited in the shower of the Segregation Unit to receive a cell assignment.

72.     On information and belief, because he was placed in segregation as a means of temporary confinement pending investigation and a hearing on the Ticket against him, Kyles did not lose Protective Custody status.

73.     Under 20 Ill. Admin. Code 504.620, "[p]rior to assigning offenders to a double cell, a review shall be conducted to determine whether there are reasons why the offenders should not be double celled.  Medical and mental health concerns shall be considered in making this determination."

74.     Additionally, IDOC Administrative Directive 05.03.107 establishes a written procedure for double celling offenders in segregation and protective custody.  Pursuant to Part II.F. of that Directive:

> The Chief Administrative Officer of each facility with segregation and protective custody units designed to double cell offenders shall develop a written policy that includes, but is not limited to, the following for routine segregation and protective custody placement.
>
> . . .
>
> 3.     An Offender Special Placement Double Cell Assessment, DOC 0303, shall be initiated and completed by documenting review of the offender data system of record, the offender's master file, medical and mental health records and intelligence information.

4.      Upon completion of the DOC 0303, the Chief Administrative Officer shall review the DOC 0303 and make a final determination as to whether the offender is a good candidate for double celling. . . .

5.      Prior to housing two offenders in a cell, the respective Lieutenant or above shall review the DOC 0303 for each offender. The review shall consider compatibility contraindications such as difference in age or physical size; security threat group affiliation; projected release dates; security issues; medical or mental health concerns; history of violence with cell mates; reason for segregation or protective custody placement; racial issues and significant negative life changes, such as additional time to serve, loss of spouse or children, etc.

. . .

b.      If it is determined that the two offenders can be celled together, the respective Lieutenant or above shall:

. . .

(2)      Within 72 hours after placement in a segregation or protective custody double cell, perform a suitability review of the double cell placement and document accordingly on the DOC 0303.  If it is determined the placement of either offender is not appropriate, the cell house Lieutenant shall be contacted immediately to ensure alternate cell placement occurs.

. . .

**NOTE:**  The review in Paragraph II.F.5. shall be conducted prior to offenders receiving new cell mates.

. . .

7.      A new DOC 0303 shall be completed each time an offender is placed in segregation or protective custody.

75.      On information and belief, Stateville CC does not currently, and did not during the relevant period when Kyles was incarcerated there, adopt or implement adequate classification, assessment, and screening procedures in compliance with the above-mentioned

Rule and Directive for the assignment of cells in the Segregation Unit to Protective Custody inmates in segregation for investigatory or temporary confinement purposes.

76.     On information and belief, inmates at Stateville CC that are designated as Protective Custody and that are placed in segregation for investigative or temporary confinement purposes, such as Kyles, are routinely placed in segregation in double-cells with general population cellmates.

77.     On information and belief, Defendant Godinez knew Stateville CC had a policy and practice of housing Protective Custody inmates placed in segregation for investigative or temporary confinement purposes with general population inmates.

78.     On information and belief, Defendant Baldwin currently knows that Stateville CC has a policy and practice of housing Protective Custody inmates placed in segregation for investigative or temporary confinement purposes with general population inmates.

79.     It was the responsibility of Godinez, and it is the current responsibility of Baldwin, to ensure that IDOC correctional centers, including Stateville CC, comply with the above-mentioned Rule and Directive.

80.     It was the responsibility of Defendants Williams and Rabideau to ensure that the assignment of cells to all inmates complied with the above-mentioned Rule and Directive.

81.     It was the responsibility of Williams and Rabideau, or one of their designees, to assign Kyles to a cell in the Segregation Unit.

82.     On information and belief, Williams and Rabideau did not comply with the above-mentioned Rule and Directive when assigning Kyles to a segregation cell on October 24, 2014.

83.     On information and belief, Defendants knew that Kyles was a Protective Custody inmate.

84.     On information and belief, Defendants knew that Kyles had been diagnosed with mental illness.

85.     On information and belief, Defendants knew that Kyles took prescribed medication to address his mental illness.

86.     On information and belief, Defendants Williams and Rabideau knew that Kyles had complained about a correctional officer and that the Ticket was subsequently written against Kyles in retaliation for his complaint.

87.     Williams and Rabideau or their designees assigned Kyles to a double-cell in the Segregation Unit with inmate Jorge Pena as his cellmate.

88.     On information and belief, Pena is incarcerated for murder.

89.     On information and belief, at the time that Kyles was placed in the segregation cell with Pena, Pena was a general population inmate and a member of the Saint Disciples, which is a criminal gang affiliated with the Gangster Disciples.

90.     On information and belief, Pena had been sentenced to six months in segregation as punishment for conduct in furtherance of a "security threat group," or prison gang, because Pena had been found with gang literature for the Gangster Disciples in his possession.

91.     Upon being placed in the cell with Pena, Kyles informed Defendant Durrett that he was a Protective Custody inmate and should be housed alone.  Durrett responded:  "Ms. Rabideau do all the moves.  Ain't nothing we can do for you.  Plus you were just down there with the lieutenant.  He knows you are P.C.  What you want me to do?"

92.     On or about the first or second day that Kyles was in segregation, Warden Administrative Assistant Kevin Sinor ("Sinor") and Warden Administrative Assistant Laris, first name unknown, ("Laris"), stopped by Kyles's cell when they were making rounds in the Segregation Unit.

93.     Kyles informed Sinor and Laris that he was a P.C. inmate and that he should not be in a double-cell with Pena.

94.     Sinor and Laris agreed with Kyles, saying that Kyles's placement in segregation and with Pena was "not right" and that they would do what they could to get Kyles released from segregation.

95.     On information and belief, Sinor and Laris made phone calls to Defendant Warden Tarry Williams to request that Kyles be released from segregation.

96.     On or about the first or second day that Kyles was in segregation, Defendants Williams and/or Lamb also stopped by Kyles's cell.

97.     Kyles informed Williams and/or Lamb that he was a P.C. inmate and that he should not be in a double-cell with Pena.

98.     Williams and/or Lamb agreed with Kyles and said that Kyles's placement in segregation and with Pena was "not right."

**Kyles's General Population Cellmate Physically and Sexually Abuses Him.**

99.     On information and belief, Pena wanted to establish his dominance over Kyles in order to prove his value to the Saint Disciples and Gangster Disciples.

100.    Throughout the time that they were celled together in segregation, Pena attacked, beat, and berated Kyles.  Kyles did not fight back, which caused Pena to attack and ridicule him more.

101.    On one occasion, Pena pushed Kyles to the ground and stood on top of him, announcing to the rest of the inmates in the gallery:  "I'm standing on this big ass coward in here!"

102.    Pena also took Kyles's food as soon as it was pushed through the chuckhold.  He read Kyles's mail to see if Kyles had filed any reports about him.  He refused to allow Kyles to sleep on the bunk bed, causing Kyles to have to sleep on the floor on multiple occasions.

103.    Kyles informed Defendant Durrett about Pena's abusive conduct towards him while Kyles was in segregation.

104.    Defendant Durrett did nothing, but, instead, responded:  "You're too big to be playing that P.C. bullshit.  Fight back 'cause they ain't moving you."

105.    This prompted Pena to say to Kyles:  "I told you that all you P.C. motherfuckers ain't got shit coming in [general] population, period!"

106.    While Kyles was held in segregation, Correctional Officers escorted a nurse to Kyles's segregation cell each day, so that the nurse could give Kyles his prescribed mental health medications.

107.    Kyles was required to take the medications in the presence of the Correctional Officers and nurse, who confirmed that Kyles had taken the medications by watching him place the medications into his mouth and then looking in his mouth to confirm that he had swallowed them.

108.    These medications caused Kyles to be extremely lethargic, sleeping deeply for 12-13 hours, and not easily awakened.  When Kyles was awake, he was extremely lethargic and could not protect himself from Pena's attacks.

109.    One night, Kyles awoke and discovered that Pena was raping him.

110.     Kyles was raped by Pena two times while in segregation.

111.     After the second time Pena raped him, Kyles stopped taking his prescribed mental health medications so that he could fight Pena off and prevent future assaults.

112.     Kyles was worried that other inmates at Stateville CC would find out that he had been raped, and that he would become a target for future sexual assaults.

113.     While in segregation, Kyles told only two people that he had been raped: Defendants Brown and Durrett.

114.     Neither Brown nor Durrett intervened in response to Kyles's complaints about abuse by Pena.

115.     When Kyles told Durrett that Pena raped him, beat him, and took his food, Durrett laughed and said: "That is what happens to P.C. motherfuckers who try to have my officers investigated by Internal Affairs."

116.     When Kyles told Brown that Pena raped him, beat him, and took his food, Brown took no action either to investigate or intervene but simply replied that Kyles should "stop lying."

117.     Neither Brown nor Durrett told medical professionals that Kyles had been raped or otherwise attempted to procure medical care for Kyles.

118.     Kyles complained about Pena's conduct to Brown and Durrett several times, but Defendants never did anything about it.

119.     Kyles eventually stopped verbally complaining to Brown and Durrett because they took no action and Pena became increasingly aggressive about Kyles's complaints.

120.     On or around October 29, 2014, Kyles filed an emergency grievance with Defendant Williams, complaining that he was a P.C. inmate that had been wrongly placed in a cell with a general population inmate.

121.     Williams did not respond to this grievance or Kyles's allegations therein in any way.

122.     While he was still in segregation, Kyles also wrote several letters to Defendant Rabideau, informing her that he was a P.C. inmate that had been wrongly placed in a double-cell with a general population inmate in the Segregation Unit.

123.     Defendant Rabideau did not respond to any of the letters or Kyles's allegations therein in any way.

124.     On or around November 5, 2014, Kyles filed a grievance alleging that Pena had abused him.

125.     On information and belief, the grievance was delivered to Defendant Harris.

126.     Defendant Harris did not respond to the grievance.

**Kyles's Disciplinary Ticket Is Expunged But Kyles Remains Held in Segregation.**

127.     While Kyles was in segregation, Hearing Officer Range, first name unknown, investigated the disciplinary Ticket against Kyles.

128.     Hearing Officer Range interviewed Defendant Beaugard, who, on information and belief, admitted that the charges set forth in the Ticket were unfounded and that he had been instructed to write the Ticket to punish Kyles for complaining about Officer Juborek's conduct.

129.     On November 5, 2014, the Adjustment Committee held a hearing on the Ticket. Kyles attended the hearing.

130.   At the hearing, the Adjustment Committee heard evidence from Hearing Officer Range regarding his investigation concerning the Ticket and his interview of Defendant Beaugard.

131.   At the hearing, the Adjustment Committee concluded that the charges against Kyles were "unsubstantiated" and expunged the Ticket.

132.   The Adjustment Committee further said that it was sorry that Kyles had been placed in segregation and that it would get him out.

133.   Defendant Brown subsequently informed Kyles that he would be released from segregation on November 6, 2014.

134.   Kyles was not released from segregation on November 6, 2014.

135.   Defendant Brown knew that Kyles was not released from segregation on November 6, 2014.

136.   On November 6, 2014, Correctional Officer Hail, first name unknown, informed Kyles that his date for release from segregation had been changed and that he now would be released on November 7.

137.   On November 7, 2014, Defendant Harris confirmed to Kyles that he should be released from segregation on that day.

138.   Kyles was not released from segregation on November 7, 2014.

139.   Defendants Brown and Harris knew that Kyles was not released from segregation on November 7, 2014.

140.   On November 10, 2014, the Adjustment Committee, through Defendant Boggess, informed Defendant Rabideau that Kyles had been found "not guilty" on the Ticket and should be released from segregation.

141.    On or about November 10, 2014, Kyles was released from segregation.

142.    On information and belief, Kyles was unjustly kept in segregation until November 10, 2014, even though the Adjustment Committee expunged the disciplinary Ticket against him on November 5, 2014, in further retaliation for having complained about Officer Juborek.

**Kyles Suffers Severe Emotional Distress**

143.    The experience of being confined in segregation with Pena was traumatic for Kyles.

144.    Kyles was raped by Pena while under the effect of a variety of medications for mental illness, which were prescribed to Kyles by IDOC-retained medical doctors and delivered to him and taken by him in segregation in the presence of Correctional Officers.

145.    Kyles was required at times by Pena, under threat of violence, to sleep on the floor of the cell instead of his bed.

146.    Kyles lost weight during the period that he was in segregation, in part because Pena at times took Kyles's food provisions.

147.    Kyles suffered extreme humiliation and hunger as a result of the physical and mental abuse from Pena and suffered thoughts of suicide.

148.    Kyles has since been diagnosed by IDOC-retained medical doctors and/or mental health counselors as suffering from post-traumatic stress disorder as a result of being held in segregation with Pena from October 24 until November 10, 2014.

**FIRST CLAIM FOR RELIEF**

**Violation of the First Amendment of the United States Constitution for Retaliation (Against Defendants Williams, Rabideau, Beaugard, Brown, Durrett, Boggess, Lake, Laskey, Clements, and Turner)**

149.    Kyles repeats and realleges each Paragraph of this Fifth Amended Complaint as if set forth fully herein.

150.    Pursuant to the First Amendment and 42 U.S.C. § 1983, Kyles has a right to engage in protected speech without fear of retaliation by governmental agents and/or actors.

151.    Kyles engaged in lawful, constitutionally protected free speech when he told Defendant Beaugard that Officer Juborek was provoking him.

152.    Defendants were aware that Kyles complained to Defendant Beaugard about Officer Juborek's conduct.

153.    In response to Kyles's exercise of protected speech, Defendants, individually and in conspiracy, deprived Kyles of his rights in a manner likely to deter further protected speech, including by:  writing the baseless disciplinary Ticket against Kyles because of his complaint about Officer Juborek; placing Kyles in segregation while the baseless disciplinary Ticket was investigated; housing Kyles with an aggressive, Gangster Disciples-affiliated, general population cellmate (Jorge Pena) while Kyles was in segregation; and keeping Kyles in segregation for at least five days after the disciplinary Ticket was found to be unsubstantiated and expunged.

154.    On information and belief, Kyles's above-described exercise of his right to protected speech was a motivating factor in these Defendants' unlawful actions, which were taken in retaliation for Kyles's exercise of protected speech.

155.    As a direct and/or proximate result of the Defendants' retaliatory actions, Kyles suffered injury and damages.

### SECOND CLAIM FOR RELIEF

### Violation of the Eighth Amendment of the United States Constitution for Failure to Protect (Against Defendants Williams and Rabideau)

156.    Kyles repeats and realleges each Paragraph of this Fifth Amended Complaint as if set forth fully herein.

157.     Pursuant to the Eighth Amendment and 42 U.S.C. § 1983, Kyles has a right to be protected from other inmates that present substantial threats to his safety.

158.     Defendants knew and consciously disregarded the substantial risks to the safety of inmates, such as Kyles, designated as Protective Custody and placed in segregation cells with general population cellmates.

159.     By failing to adopt and implement adequate classification, assessment, and screening procedures for assigning cells to Protective Custody inmates placed in segregation for investigative or temporary confinement purposes at Stateville CC, Defendants were deliberately indifferent to the substantial risk that Kyles (and other similarly situated inmates) would suffer harm when placed in segregation for investigative or temporary confinement purposes.

160.     Defendants knew and consciously disregarded the substantial risk to Kyles's safety if he was placed in segregation in a cell with Pena.  The Defendants, acting individually and in conspiracy, failed to reasonably adopt or employ adequate screening and assessment procedures for assigning Protective Custody inmates to segregation cells, despite the significant and obvious risk that Kyles—a Protective Custody inmate who regularly took a variety of prescribed medications to treat his mental illness—would be subjected to serious harm by being confined with Pena—an aggressive general population inmate with a history of violence, and who was affiliated with the criminal gang that was a known and direct threat to Kyles.

161.     In failing to properly screen, assess, and assign Kyles to a segregation cell, these Defendants were deliberately indifferent to the substantial risk that Kyles would suffer serious harm.

162.     As a direct and/or proximate result of the Defendants' failure to protect Kyles by adopting and implementing adequate classification, assessment, and screening procedures, Kyles

was unlawfully subjected to an unreasonable risk of serious harm, and, in fact, suffered serious

harm and damages.

## THIRD CLAIM FOR RELIEF

### Violation of the Eighth Amendment of the United States Constitution for Failure to Protect (Against Defendants Williams, Rabideau, Beaugard, Brown, Durrett, Harris, Clements, Turner, and Lamb)

163.    Kyles repeats and realleges each Paragraph of this Fifth Amended Complaint as if set forth fully herein.

164.    Pursuant to the Eighth Amendment and 42 U.S.C. § 1983, Kyles has a right to be protected from other inmates that present substantial threats to his safety.

165.    Defendants, acting individually and in conspiracy, failed to react to the significant and obvious risks that Kyles would be subjected to serious harm, including by initially assigning Pena as Kyles's cellmate in segregation, and by thereafter failing to change Kyles's cell assignment under the circumstances, which included:  that Kyles informed Defendants that he was a Protective Custody inmate and needed to be housed either in a single cell or with another Protective Custody inmate; that Kyles informed Defendants that certain members of the general population were out to injure or kill him; that Pena was affiliated with the same criminal gang for whom Kyles was a "declared enemy"; that Kyles informed Defendants that he had been assaulted by Pena while in segregation; that Defendants knew that Kyles was diagnosed as being severely mentally ill; and that Defendants knew that Kyles took prescribed medications for mental illness that impaired his ability to defend himself.

166.    In failing to protect Kyles from the repeated instances of physical and mental abuse from Pena despite the above-alleged facts, Defendants were deliberately indifferent to the substantial risk that Kyles would suffer serious injury.

167.     As a direct and/or proximate result of the Defendants' failure to protect Kyles

from Pena, Kyles was unlawfully subjected to an unreasonable risk of serious harm, and, in fact,

suffered actual serious harm and damages.

### FOURTH CLAIM FOR RELIEF

### Violation of the Eighth Amendment of the United States Constitution for Deliberate Indifference to Kyles's Serious Medical Needs (Against Defendants Brown and Durrett)

168.     Kyles repeats and realleges each Paragraph of this Fifth Amended Complaint as if

set forth fully herein.

169.     Pursuant to the Eighth Amendment and 42 U.S.C. § 1983, Kyles has a right to

adequate access to medical care.

170.     Rape is an objectively serious injury.

171.     Defendants Brown and Durrett, individually and in conspiracy, deprived Kyles of

access to adequate medical care in violation of his constitutional rights by failing to report that

Kyles had been raped to health care authorities and by failing to connect Kyles with health care

authorities, among other actions, after he informed them that he had been raped by Pena.

172.     Brown and Durrett, individually and in conspiracy, deprived Kyles of timely

access to medical care, which was necessary to address the injuries suffered by Kyles as a result

of being raped.  Kyles has suffered unnecessary injury as a result of not receiving such medical

care, including suffering from post-traumatic stress disorder and suicidal thoughts.

173.     Brown and Durrett knew or reasonably should have known that Pena's acts of

rape presented a substantial risk of serious harm to Kyles's health because Kyles told Brown and

Durrett that he had been raped.

174.    By failing to provide access to medical care after Kyles told them that he had

been raped, Brown and Durrett acted with deliberate indifference to Kyles's medical needs and

caused him to suffer harm.

175.    As a direct and/or proximate result of the Defendants' failure to provide Kyles

with access to medical care, Kyles suffered injury and damages.

### FIFTH CLAIM FOR RELIEF

### Violation of the Eighth Amendment of the United States Constitution for Failure to Intervene
### (Against All Defendants Except Baldwin and Godinez)

176.    Kyles repeats and realleges each Paragraph of this Fifth Amended Complaint as if

set forth fully herein.

177.    Pursuant to the Eighth Amendment and 42 U.S.C. § 1983, Kyles has a right to be

protected from other inmates that present substantial threats to his safety.

178.    Defendants knew that Kyles's rights were being violated in numerous ways,

including:  by placing Kyles in segregation on false charges of misconduct in retaliation for

Kyles complaining about a Correctional Officer; by placing Kyles in a segregation cell with a

violent, general population inmate (Pena), who was affiliated with the criminal gang that was out

to injure or harm Kyles, even though Kyles had been granted Protective Custody status to keep

him safe from that gang; because Kyles reported being raped and beaten by Pena while confined

in segregation; and by keeping Kyles in segregation under these circumstances for at least five

days after the disciplinary Ticket against him was found to be unsubstantiated and expunged.

179.    Defendants had the realistic opportunity to intervene to prevent or stop these

constitutional violations, and unreasonably failed to do so.

180.    The misconduct of Defendants was objectively unreasonable and was undertaken

intentionally and/or with willful indifference to Kyles's constitutional rights.

- 24 -

181.    As a result of Defendants' failure to intervene, Kyles's constitutional rights were violated and he suffered injury and damages.

## SIXTH CLAIM FOR RELIEF

### Civil Conspiracy under 42 U.S.C. § 1983
### (Against All Defendants Except Baldwin and Godinez)

182.    Kyles repeats and realleges each Paragraph of this Fifth Amended Complaint as if set forth fully herein.

183.    Defendants acted in concert with one another to accomplish one or more unlawful purposes by unlawful means.

184.    Defendants reached agreements among themselves to subject Kyles to unlawful retaliation and to deprive him of his right to be free from unreasonable harm, in violation of his constitutional rights, in the manner described above in this Fifth Amended Complaint.

185.    In furtherance of this conspiracy, and as set forth in this Fifth Amended Complaint, each of the Defendants committed overt acts and/or was an otherwise willful participant in unlawful joint activity.

186.    As a direct and proximate result of the illicit agreement referenced above, Kyles's rights were violated and he suffered injury and damages.

## SEVENTH CLAIM FOR RELIEF

### State Law Claim for Intentional Infliction of Emotional Distress
### (Against All Defendants Except Baldwin)

187.    Kyles repeats and realleges each Paragraph of this Fifth Amended Complaint as if set forth fully herein.

188.    The acts of the Defendants as set forth above were both extreme and outrageous.

189.    Defendants intended to cause, and/or acted in reckless disregard of the probability that they would cause, severe emotional distress to Kyles.

190.    Defendants' misconduct caused Kyles severe emotional distress, including causing him to suffer from suicidal thoughts and develop post-traumatic stress disorder.

191.    The misconduct was undertaken with malice, willfulness, and/or reckless indifference to Kyles's rights, as well as his emotional and mental health.

192.    As a direct and/or proximate result of the misconduct described above, Kyles suffered serious emotional and mental injury and damages.

### EIGHTH CLAIM FOR RELIEF

**State Law Claim for Civil Conspiracy**
**(Against All Defendants Except Baldwin and Godinez)**

193.    Kyles repeats and realleges each Paragraph of this Fifth Amended Complaint as if set forth fully herein.

194.    Defendants as set forth above acted in concert with one another to accomplish one or more unlawful purposes by unlawful means.  Defendants reached agreements among themselves to subject Kyles to unlawful retaliation and to deprive him of his right to be free from unreasonable harm, in violation of his constitutional rights, in the manner described above in this Fifth Amended Complaint.

195.    In furtherance of a conspiracy to subject Kyles to retaliation and to deprive Kyles of his right to be free from unreasonable harm while in State custody, Defendants committed overt acts and were otherwise willful participants in unlawful joint activity.

196.    The misconduct described above was undertaken with malice, willfulness, and/or reckless indifference to Kyles's rights.

197.    As a direct and proximate result of the illicit agreements referenced above, Kyles's rights were violated and he suffered injury and damages.

## NINTH CLAIM FOR RELIEF

### Monell Liability
### (Against Defendants Baldwin and Godinez)

198.    Kyles repeats and realleges each Paragraph of this Fifth Amended Complaint as if set forth fully herein.

199.    The misconduct described in this Fifth Amended Complaint was undertaken pursuant to the policy and practice of Defendants Baldwin and Godinez in that:

    a.    As a matter of widespread practice so prevalent, entrenched, and well-known as to comprise policy, Defendants encourage, and are thereby the moving force behind, the very sorts of constitutional violations at issue here by failing to terminate or discipline IDOC employees who fail to comport with constitutional standards in the assignment of Protective Custody inmates placed in segregation for investigative or temporary confinement purposes to segregation cells, and by approving, condoning, and/or turning a blind eye to the routine assignment of inmates designated as Protective Custody and detained in segregation for investigative or temporary confinement purposes to double-cells with general population inmates;

    b.    Defendants Baldwin and Godinez possess and did possess, respectively, final policy-making authority over IDOC correctional centers, including Stateville CC;

    c.    Defendants Baldwin and Godinez delegate and have delegated, respectively, final policy-making authority to subordinates who perpetrated unconstitutional treatment of Protective Custody inmates at Stateville CC, including Kyles;

    d.    Defendant Godinez, pursuant to his final policy-making authority, ratified both his subordinates' unconstitutional treatment of Kyles at Stateville CC and the impermissible basis for the same;

    e.    Defendant Baldwin, pursuant to his final policy-making authority, has ratified, and continues to ratify, the impermissible basis for the unconstitutional treatment of Kyles, as described in this Fifth Amended Complaint, and of other IDOC inmates that are designated as Protective Custody and placed in segregation for investigative or temporary confinement purposes at Stateville CC;

    f.    The aforementioned policies, practices, and customs individually and together have been maintained and/or implemented with deliberate indifference by Defendants Baldwin and Godinez, have encouraged other Defendants to commit the aforesaid wrongful acts against Kyles (and other similarly situated inmates) at Stateville CC, and, therefore, constitute a direct and proximate cause of the complained of constitutional violations and injuries.

200.    The above actions by Defendants Baldwin and Godinez have violated the Eighth Amendment rights of Kyles and other similarly situated Protective Custody inmates.

## REQUEST FOR RELIEF

WHEREFORE, Kyles requests that this Court enter judgment in his favor and against the Defendants and award the following relief:

    a.    Compensatory damages to compensate Kyles for his pain and suffering in an amount to be determined at trial, jointly and severally against all Defendants;

    b.    Punitive damages in an amount to be determined at trial, jointly and severally against all Defendants;

c.  Equitable relief in the form of an order requiring that Kyles be housed for the remainder of his incarceration in either Dixon Special Treatment Center in Dixon, Illinois, or, alternatively, in an IDOC correctional center with appropriate separate housing for inmates designated as Protective Custody;

d.  An award of costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988;

e.  And any other relief that this Court deems proper.

## **DEMAND FOR JURY TRIAL**

Kyles hereby demands trial by jury on all issues so triable.


Dated:  November 30, 2016                     Respectfully submitted,


                                              s/Michael S. Ferrell
                                              _____
                                              Michael S. Ferrell
                                              Kelly M. Marino
                                              JONES DAY
                                              77 West Wacker
                                              Chicago, Illinois 60601
                                              Telephone:  (312) 782-3939
                                              Facsimile:  (312) 782-8585
                                              mferrell@jonesday.com
                                              kbonovich@jonesday.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing Fifth Amended Complaint has been filed electronically on November 30, 2016.  Notice of this filing will be sent to all active parties by operation of the Court's electronic filing system, which will send notification of such filing by email to all counsel of record in the above-captioned proceeding.  Defendants not named in the Third Amended Complaint will be served pursuant to Federal Rule of Civil Procedure 4(c)(3) by service from the U.S. Marshals Service.

/s/ *Michael S. Ferrell*

NAI-1502271321v3