THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |
|---|---|
| TIMOTHY KYLES, | No. 15 C 8895 |
| Plaintiff, | Honorable Amy J. St. Eve |
| v. | Judge Presiding |
| FRED BEAUGARD, *et al.*, |  |
| Defendants. |  |

### PLAINTIFF'S RESPONSE TO DEFENDANTS' LOCAL RULE 56.1 FILING & PLAINTIFF'S LOCAL RULE 56.1 STATEMENT OF ADDITIONAL FACTS

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1(b)(3), Plaintiff Timothy Kyles ("Plaintiff" or "Kyles") hereby responds to Defendants' Local Rule 56.1(a) Statement of Material Facts filed on June 22, 2017 (Dkt. No. 169) ("Defs.' SOF"). All facts admitted herein are admitted for purposes of the present motion only, and not for purposes of trial.

### STATEMENT OF MATERIAL FACTS

**I.    The Parties**

**FACT NO. 1.**  *Plaintiff is, and was at all times relevant to the allegations in the Complaint, an inmate within the custody of the Illinois Department of Corrections ("IDOC").  (Ex. 1 ¶ 1.)*

**RESPONSE TO FACT NO. 1:**  Admitted.

**FACT NO. 2.**  *Defendants are or were IDOC employees at all times relevant to the allegations in Plaintiff's Complaint.  (Ex. 1 at 2–5.)*

**RESPONSE TO FACT NO. 2:**  Admitted.

**II.    Venue and Jurisdiction**

**FACT NO. 3.**  *The alleged incidents occurred at Stateville Correctional Center when Plaintiff was incarcerated there in 2014.  (See generally, Ex. 1.)*

**RESPONSE TO FACT NO. 3:**  Admitted in part.  Kyles admits that his Fifth Amended Complaint brings claims arising from Defendants' conduct from approximately October 24, 2014

through November 10, 2014 while Kyles was incarcerated at Stateville Correctional Center. To

the extent Defendants imply in this statement that only those "incidents" that occurred at

Stateville CC are relevant to this action, Kyles disputes such implication. Kyles also alleges that

he was incarcerated at Menard Correctional Center ("Menard CC") from approximately 2011 to

January 2102, and incidents that occurred there led Kyles to apply for and receive Protective

Custody status when he subsequently arrived at Stateville CC. (Def. Ex. 1 ¶¶ 3, 36-37, 40-42.)[1]

In addition, at Hill Kyles received a diagnosis of suffering from post-traumatic stress disorder

caused by Pena's abuse of Kyles while they were housed together in segregation. (Pl. Ex. R.)[2]

**FACT NO. 4.** *Plaintiff filed a § 1983 complaint alleging Defendants violated his constitutional rights. (Ex. 1.)*

**RESPONSE TO FACT NO. 4:** Admitted in part. Kyles's Fifth Amended Complaint also

alleges a state law claim for intentional infliction of emotional distress, as well as state and

federal law claims for civil conspiracy, which the Court dismissed on June 13, 2017. (Def. Ex. 1

¶¶ 187-197.)

## III.    IDOC Grievance Process

**FACT NO. 5.** *Inmates at Stateville are provided access to the facility's Inmate Handbook. (Ex. 4 ¶ 2; Ex. 2 at 13–19:19.)*

**RESPONSE TO FACT NO. 5:** Admitted.

**FACT NO. 6.** *The Inmate Handbook contains the grievance procedure the inmates are required to follow to resolve their disputes within the facility. (Ex. 4 ¶ 2; Ex. 2 at 18–23:18; 1–19:19.)*

**RESPONSE TO FACT NO. 6:** Admitted in part. Kyles admits that the "Inmate Handbook"

contains part of the grievance procedure in place at Stateville Correctional Center. (Pl. Ex. A

(2013 version of the Illinois Department of Corrections Stateville Correctional Center Offender

Orientation Manual General Population & Segregation, which Defendants refer to as the "Inmate

---

[1] The exhibits to Defendants' Local Rule 56.1 Filing are referred to herein as "Def. Ex."

[2] The exhibits to Plaintiffs' Response to Defendants' Local Rule 56.1 Filing & Plaintiff's Local Rule 56.1 Statement of Additional Facts are referred to herein as "Pl. Ex."

Handbook").) The Inmate Handbook also refers inmates to "DR 504" "[f]or more information on the grievance process." (Pl. Ex. A at 000378.) Illinois Administrative Code 504 sets forth additional requirements of the grievance process, including procedures for filing a grievance to be handled on an emergency basis. (IL Admin. Code 504.840; *see also generally* 504.800 et al.)

**FACT NO. 7.** *Inmates may also request further information regarding the grievance[] procedure from their counselors. (Ex. 4 ¶ 2.)*

**RESPONSE TO FACT NO. 7:** Admitted in part. Kyles admits that Anna McBee ("McBee") states in her declaration that inmates may request further information regarding the grievance procedure from their counselors, but denies that McBee's statement is sufficient to establish the underlying fact. Further, to the extent that Defendants imply in this statement that counselors consistently or reliably assist inmates with the grievance process, Kyles denies such implication.

**FACT NO. 8.** *An inmate prepares a grievance by filling out a grievance form. (Ex. 4 ¶ 3; Ex. 5 ¶ 2; Ex. 2 at 21–22:18.)*

**RESPONSE TO FACT NO. 8:** Admitted.

**FACT NO. 9.** *In circumstances where an inmate writes a grievance related to the conditions of confinement, the first step is [to] provide the original grievance to the assigned correctional counselor within 60 days after the discovery of the incident, occurrence, or problem that gives rise to the grievance. (Ex. 4 ¶ 3; see also Ex. 5 ¶ 2; Ex. 2 at 23:18; 6–10:19.)*

**RESPONSE TO FACT NO. 9:** Admitted in part. Kyles admits that, generally, the first step of filing a grievance related to the conditions of confinement is to provide a grievance to the assigned correctional counselor within 60 days after the discovery of the incident, occurrence, or problem that gives rise to the grievance. Kyles notes, however, that the Inmate Handbook does not specify the time limit during which an inmate must provide the grievance to the assigned correctional counselor. (Pl. Ex. A at 000378.) Further, Kyles notes that, pursuant to Illinois Administrative Directive 504.810, "if an offender can demonstrate that a grievance was not timely filed for good cause, the grievance shall be considered." (Illinois Administrative Code 504.810(a).) Kyles also notes that there are other procedures applicable to grievances related to

conditions of confinement in Illinois Administrative Directive 504.800 et al., including emergency grievances.  Finally, Kyles disputes the use of the word "original" to qualify "grievance" in this statement, as it makes the statement ambiguous and misleading.

**FACT NO. 10.**  *After the counselor receives and reviews the grievance, the counselor writes a response and returns the original to the inmate.  (Ex. 4 ¶ 3; see also Ex. 5 ¶ 2.)*

**RESPONSE TO FACT NO. 10:**  Disputed.  Kyles admits that McBee states in her declaration that "[a]fter the counselor receives and reviews [the grievance], the counselor writes a response and returns the original to the inmate."  (Def. Ex. 4 ¶ 4.)  Kyles further admits that, in order for the inmate to be able to continue the grievance process, the counselor must respond to and return the grievance to the inmate because "[a]ll grievances, except those regarding disciplinary infractions, require a counselor response **prior** to filing the grievance with the Grievance Officer."  (Pl. Ex. A at 378 (emphasis in original).)  To the extent that Defendants imply in this statement that counselors in every case or consistently receive grievances that inmates deposit in their cell bars for institutional mail pickup, or that counselors in every case or consistently respond to and return the grievances they do receive from inmates, Kyles disputes such implications and denies that McBee's statement is sufficient to support the same.  Kyles also notes that Sherry Benton's ("Benton") declaration does not support this statement, as she attests only that "[g]enerally, an inmate must first attempt to resolve grievances through his counselor."  (Def. Ex. 5 ¶ 2.)

**FACT NO. 11.**  *If an inmate is dissatisfied with the counselor's response, he submits the original grievance to the Grievance Office for review.  (Ex. 4 ¶ 4; Ex. 5 ¶ 2; Ex. 2 at 23:18, 1– 2:19.)*

**RESPONSE TO FACT NO. 11:**  Admitted in part.  Kyles disputes the use of the word "original" to qualify "grievance" in this statement, as that makes the statement ambiguous and misleading. Further, to the extent that Defendants imply in this statement that counselors in every case or consistently respond to grievances, Kyles disputes such contention or implication.

**FACT NO. 12.**  *The Grievance Office maintains a log at Stateville of every grievance an inmate submits to the Grievance Office.  (Ex. 4 ¶¶ 4; 11.)*

**RESPONSE TO FACT NO. 12:**  Disputed.  Kyles admits that McBee states in her declaration that "[t]he Grievance Office maintains a log at Stateville of every grievance an inmate submits to the Grievance Office," (Def. Ex. 4 ¶ 4), and that "[i]n an emergency grievance situation, the grievance is logged and forwarded on to the [Chief Administrative Officer] to be reviewed."  (*Id.* ¶ 11.)  However, Kyles denies McBee's attestations are sufficient to establish the underlying facts.

**FACT NO. 13.**  *When a grievance is received in the Grievance Office it is logged on that date, stamped, and assigned a number.  (Ex. 4 ¶ 5.)*

**RESPONSE TO FACT NO. 13:**  Admitted in part.  Kyles admits that McBee states in her declaration that "[w]hen a grievance is received in the Grievance Office it is logged on that date, stamped and assigned a number", but denies that McBee's attestation is sufficient to establish the underlying fact or any implication that in every case when a grievance is received in the Grievance Office it is logged on that date, stamped, and assigned a number.   (Def. Ex. 4 ¶ 5.)

**FACT NO. 14.**  *It is then placed in the order it is received pending review and response.  (Ex. 4 ¶ 5.)*

**RESPONSE TO FACT NO. 14:**  Admitted in part.  Kyles admits that McBee states in her declaration that the grievance "is then placed in the order it is received pending review and response" but denies that McBee's attestation is sufficient to establish the underlying fact or any implication that in every case a grievance is placed in the order it was received pending review and response.   (Def. Ex. 4 ¶ 5.)

**FACT NO. 15.**  *In an emergency grievance situation, the grievance is logged and forwarded on to the Chief Administrative Officer ("CAO") to be reviewed.  (Ex. 4 ¶ 11; Ex. 5 ¶ 5.)*

**RESPONSE TO FACT NO. 15:**  Disputed.  While Kyles admits that McBee states in her declaration that "[i]n an emergency grievance situation, the grievance is logged and forwarded on to the CAO to be reviewed," (Def. Ex. 4 ¶ 11) this statement conflicts with Kyles's testimony

and the declaration of Benton. Neither Kyles nor Benton state that emergency grievances are logged before they are forwarded to the Chief Administrative Officer. Benton states in her declaration that inmates may request a grievance be handled on an emergency basis "by forwarding the grievance *directly to* the CAO rather than to a counselor or grievance officer." (Def. Ex. 5 ¶ 5 (emphasis added).) Similarly, Kyles testified that "[e]mergency grievances [go] directly to the Warden" and "[b]ypass everybody." (Def. Ex. 2 at 58:6-11.)

**FACT NO. 16.** *If it is determined not to be an emergency, the grievance is returned to the Grievance Office, recorded, and then returned to the inmate through the institutional mail system. (Ex. 4 ¶ 11; Ex. 5 ¶ 5.)*

**RESPONSE TO FACT NO. 16:** Disputed. While McBee states in her declaration that "[i]f it is determined not to be an emergency, the grievance is returned to the Grievance Office, recorded, and then returned to the inmate through the institutional mail system," this is not sufficient to establish the underlying fact and is not supported by Benton's declaration. (Def. Ex. 4 ¶ 11.) Benton states in her declaration only that: "An inmate may request a grievance handled on an emergency basis by forwarding the grievance directly to the CAO rather than to a counselor or grievance officer. If the CAO determines that there is a substantial risk of imminent personal injury or other serious or irreparable harm to the inmate, the grievance may be handled on an emergency basis. . . . If the CAO determines that the issue should not be handled on an emergency basis, the inmate is required to resubmit his grievance through the non-emergency grievance process[.]" (Def. Ex. 5 ¶ 5.)

**FACT NO. 17.** *For non-emergency grievances, the Grievance Officer may personally interview the inmate or witnesses or both as deemed appropriate and obtain relevant documents to determine the merits of the inmate's grievance. (Ex. 5 ¶ 2.)*

**RESPONSE TO FACT NO. 17:** Admitted in part. Kyles admits that Benton states in her declaration that "[t]he Grievance Officer may personally interview the inmate and/or witnesses as deemed appropriate and obtain relevant documents to determine the merits of the inmate's grievance." (Def. Ex. 5 ¶ 2.) To the extent that Defendants imply in this statement that the

- 6 -

Grievance Officer always interviews the inmate or witnesses and obtains relevant documents to determine the merits of the inmate's grievance, Kyles denies such implication.

**FACT NO. 18.** *After completing such an investigation, the Grievance Officer's conclusions, and if appropriate, recommended relief, is forwarded to the CAO. (Ex. 5 ¶ 2.)*

**RESPONSE TO FACT NO. 18:** Admitted in part. Kyles admits that "[u]pon completion of [the] investigation, the Grievance Officer's conclusions and, if appropriate, recommended relief, is [sic] forwarded to the CAO." (Def. Ex. 5 ¶ 2.) To the extent that Defendants imply in this statement that the Grievance Officer always investigates an inmate's grievance, Kyles denies such implication.

**FACT NO. 19.** *The CAO at Stateville is the Warden, who was Tarry Williams at the time. (Ex. 4 ¶ 8; Ex. 1 ¶ 9.)*

**RESPONSE TO FACT NO. 19:** Admitted.

**FACT NO. 20.** *The CAO may delegate the responsibility of reviewing grievances to another person or persons or designate another person or persons to perform this responsibility. (Ex. 4 ¶ 8; Ex. 5 ¶ 2.)*

**RESPONSE TO FACT NO. 20:** Admitted.

**FACT NO. 21.** *The CAO or CAO's designee's decision is then submitted to the grieving inmate. (Ex. 5 ¶ 2.)*

**RESPONSE TO FACT NO. 21:** Admitted in part. Kyles admits that the CAO or CAO's designee may provide his or her decision on a grievance to the grieving inmate, but denies any implication that in every case the CAO or CAO's designee submits or provides a decision on a grievance to the grieving inmate.

**FACT NO. 22.** *If, after receiving the CAO's decision, the inmate feels the issues are unresolved, he may appeal in writing to the IDOC Director by submitting the Grievance Officer's report, and CAO's decision. (Ex. 5 ¶ 3; see also Ex. 2 at 2–5:19.)*

**RESPONSE TO FACT NO. 22:** Admitted.

**FACT NO. 23.** *The Administrative Review Board ("ARB"), as the Director's designee, reviews the appeal and submits a written report of its findings and recommendations to the Director or Director's designee. (Ex. 5 ¶ 3; see also Ex. 1 at 2–5:19.)*

**RESPONSE TO FACT NO. 23:** Admitted.

**FACT NO. 24.** *Certain issues may be filed in a grievance directly to the ARB, rather than first through a counselor or grievance officer, including decisions regarding protective custody placement, including continued placement in or release from protective custody. (Ex. 5 ¶ 4.)*

**RESPONSE TO FACT NO. 24:** Admitted.

IV.    **Plaintiff's Grievances**

**FACT NO. 25.** *There are no grievances from Plaintiff from October 2014 through January 2015. (Ex. 4 ¶ 6; Ex. 5 ¶ 7.)*

**RESPONSE TO FACT NO. 25:** Disputed. Kyles testified that he submitted an emergency grievance on or around October 29, 2014, and submitted multiple grievances on December 22, 2014, by placing said grievances in the bars of his cell for pickup by the institutional mail at Stateville. (Def. Ex. 2 at 254:11-22, 19:20-20:7 20:23-21:6, 21:10-17.) Consistent with the same, another Stateville inmate at the time, Corwyn Brown ("Inmate Brown") testified that after being released from segregation Kyles told him that he (Kyles) had submitted an emergency grievance while in segregation, and later (but still within the applicable sixty (60) day period) that he (Kyles) had submitted the December 2014 Grievances. Defendants' SOF 25 is also inconsistent with evidence that, on January 19, 2015 and January 20, 2015, Kyles submitted grievances concerning the conduct at issue in this lawsuit. (Pl. Ex. F, J, & K.) Kyles admits that McBee states in her declaration that, according to her review of "the grievance log from October 2014 through January 2015," "the Grievance Office did not receive any grievances from Mr. Kyles during that timeframe." (Def. Ex. 4 ¶ 6.) Kyles further admits that Benton states in her declaration that "the ARB did not receive any grievances or grievance related documents from Mr. Kyles during [the October 2014 through January 2015] timeframe." (Def. Ex. 5 ¶ 7.) However, McBee and Benton's statements are facially insufficient to establish the disputed underlying fact as to whether Kyles submitted grievances from October 2014 through January 2015.

**FACT NO. 26.**  *There are no emergency grievances from Plaintiff from October 2014 through January 2015.  (Ex. 4 ¶ 12; Ex. 5 ¶ 7.)*

**RESPONSE TO FACT NO. 26:**  Disputed.  Kyles testified that he submitted  an emergency grievance on or around October 29, 2014, by depositing it in the bars of his cell for pickup by the institutional mail at Stateville.  (Def. Ex. 2 at 254:11-15, 20:18-22.)  Consistent with the same, Inmate Brown testified that once released from segregation Kyles told him that he (Kyles) had filed an emergency grievance while still in segregation.  (Def. Ex. 3 at 54:24-56:18, 57:6-10, 122:5-16.)  Kyles admits that McBee states in her declaration that "[a]ccording to [her] review of" "the grievance log from October 2014 through January 2015," "the Grievance Office did not receive any emergency grievances from Mr. Kyles,"  (Def. Ex. 4 ¶ 12) and Benton states in her declaration that, according to her review of "the ARB records for all grievances, including emergency grievances, filed by inmate Timothy Kyles (B 11702) from October 2014 through January 2015," "the ARB did not receive any grievances or grievance related documents from Mr. Kyles during that timeframe."  (Def. Ex. 5 ¶ 7.)  However, McBee and Benton's statements are facially insufficient to establish the disputed underlying fact as to whether Kyles submitted any emergency grievances from October 2014 through January 2015.

**FACT NO. 27.**  *The Grievance Office did receive Plaintiff's three grievances dated February 17, 2015, which the Grievance Office received on February 23, 2015.  (Ex. 4 ¶ 6; see also Ex. 5 ¶ 7.)*

**RESPONSE TO FACT NO. 27:**  Admitted in part.  Kyles admits to receiving a response indicating that his February 17, 2015 resubmission of the December 22, 2014 grievances were received by the Grievance Office, and that such response indicated a receipt date of February 23, 2015.  Kyles has no knowledge as to the actual date of receipt by the Grievance Office, nor why it would purportedly take six days for Kyles's resubmitted grievances to be delivered from his cell at Stateville to the Grievance Office at Stateville.

**FACT NO. 28.**  *These three grievances were time stamped and assigned the following numbers: 711, 712, and 713.  (Ex. 4 ¶ 6.)*

**RESPONSE TO FACT NO. 28:** Admitted in part. Kyles admits the resubmitted February 17, 2015 grievances were time stamped and assigned the referenced numbers. Kyles has no knowledge as to any implied accuracy of such time stamping nor why it would purportedly take six days for the grievances to be delivered from his cell to the Grievance Office at Stateville.

**FACT NO. 29.** *Plaintiff's grievance 711 ("Grievance 711") claimed he turned in two grievances on December 22, 2014, but never received a response. (Ex. 4 ¶ 7; Ex. 2 at 14–19:30; 5–9:31)*

**RESPONSE TO FACT NO. 29:** Admitted.

**FACT NO. 30.** *Plaintiff's Grievance 711 did not claim that Plaintiff filed any other grievance at any other point that went unanswered. (Ex. 4 ¶ 7; Ex. 2 at 14–19:30; 5–9:31.)*

**RESPONSE TO FACT NO. 30:** Admitted in part. Grievance 711 concerned grievances that Kyles submitted on December 22, 2014 only. To the extent that Defendants imply in this statement that Kyles submitted no additional grievances other than the two grievances discussed in Grievance 711, Kyles denies such implication.

**FACT NO. 31.** *Plaintiff attached copies of these two grievances (i.e., grievances 712 and 713) he claimed he sent on December 22, 2014 to Grievance 711. (Ex. 4 ¶ 7; Ex. 2 at 23:32; 1–7:33; 1–9:35; 19–23:55; 1–2:56.)*

**RESPONSE TO FACT NO. 31:** Admitted in part. Kyles admits that he attached Grievance 712 and Grievance 713 to Grievance 711. Kyles further admits that Grievance 712 and Grievance 713 reflect the substance of grievances that he submitted on December 22, 2014. (*See* Pl. Ex. D.) To the extent Defendants imply in this statement that Kyles did not submit any grievances on December 22, 2014, Kyles denies such implication.

**FACT NO. 32.** *Plaintiff's grievance 712 is effectively a re-write of a grievance he wrote on December 22, 2014. (Ex. 2 at 5–16:37.)*

**RESPONSE TO FACT NO. 32:** Admitted.

**FACT NO. 33.** *Plaintiff's grievance 712 ("Beaugard Grievance") claims correctional Officer Beaugard wrote him a disciplinary ticket on October 24, 2014 for which Plaintiff spent 17 days in segregation for, and he should not have received that ticket. (Ex. 4 ¶ 9; Ex. 2 at 21–23:37; 1–12:38*

**RESPONSE TO FACT NO. 33:**  Admitted in part.  Kyles's Grievance 712 states that Kyles

"went to [Defendant] Beaugard . . . and requested help" in regard to improper conduct by Officer

Juborek.  Grievance 712 further states Defendant Beaugard "wrote [] a ticket" against Kyles that

was knowingly false and served as the purported basis for immediately placing him in a

segregation cell with a gang affiliated general population inmate (Pena) on charges of

"intimidation and threats and dangerous communications."  (Pl. Ex. H.)  Grievance 712 also

states that such charges were "expunged from [Kyles's] record", and that Warden Assistants

Kevin Sinor and Laris (first name unknown) as well as Defendant Tarry Williams, indicated

while Kyles was being held in segregation that what had happened to him "was not right."  (*Id.*;

*see also* Def. Ex. 2 at 38:9-12; 40: 5-20; 43:19-44:45:1.) Grievance 712 further states Kyles "was

let out of [segregation] after 17 days."  (Pl. Ex. H.)  Kyles disputes and does not adopt

Defendants' characterization of this grievance as the "Beaugard Grievance."  (*Id.*)

**FACT NO. 34.**  *Plaintiff's grievance 713 ("Rabideau Grievance") is essentially a rewrite of the December 22, 2014 grievance involving Karen Rabideau.  (Ex. 2 at 14–23:56; 1–7:57.)*

**RESPONSE TO FACT NO. 34:**  Admitted in part.  Kyles admits that Grievance 713 is

essentially a rewrite of one of the December 22, 2014 Grievances that Kyles timely submitted by

depositing it in the bars of his cell for pickup by the Stateville institutional mail service. (Pl. Ex.

I.)  Kyles disputes and does not adopt Defendants' characterization of this grievance as the

"Rabideau Grievance."

**FACT NO. 35.**  *Plaintiff's grievance 713 claimed he spent an extra [f]ive days in segregation because Placement Officer Rabideau did not want to move him and Lieutenant Brown and Correctional Harrington informed he would be released.  (Ex. 4 ¶ 10; Ex. 2 at 4–23:54; 1–9:55.)*

**RESPONSE TO FACT NO. 35:**  Admitted in part.  Kyles's Grievance 713 describes the

circumstances in which Kyles "was released from [segregation] due to mistreatment of the rules

by staff."  (Pl. Ex. I.)  Grievance 713 further states Defendant Rabideau was the Placement

Officer and Defendant Brown was the lieutenant in the Stateville Segregation Unit.  *Id.*

Grievance 713 further states that Defendant Brown told Kyles that Defendant Rabideau said he would be released from segregation on Thursday, November 6, 2014, although Kyles was not released and returned to protective custody until November 10, 2014, and that Kyles's release from improper confinement in segregation was unlawfully delayed "on purpose" after the ticket against him was found to be facially unsubstantiated on November 5, 2014. *Id.*

**FACT NO. 36.** *Plaintiff appealed grievances 712 and 713 to the ARB, but not 711. (Ex. 5 ¶ 7.)*

**RESPONSE TO FACT NO. 36:** Admitted.

**FACT NO. 37.** *Plaintiff asked Brown to write grievances for him to add more details. (Ex. 3 at 21–24:80; 1–10:81.)*

**RESPONSE TO FACT NO. 37:** Admitted in part. Kyles admits that he wanted Inmate Brown to draft grievances for him because he believed Inmate Brown was more experienced at writing grievances and would incorporate more detail. (Def. Ex. 3 at 80:18-81:3.) After he was released from segregation, Kyles told Inmate Brown certain details about what had happened to him while he was in segregation. (*Id.* at 79:12-80:6.) To the extent that Defendants imply in SOF No. 37 that any of the grievances written by Kyles lacked sufficient detail, Kyles denies such implication.

**FACT NO. 38.** *Brown wrote a grievance on June 24, 2014 ("Improper Placement Grievance") backdated to January 19, 2014 on behalf of Plaintiff grieving that Plaintiff should not have been placed with a general population inmate on October 24, 2014 while in temporary confinement. (Ex. 3 at 23–24:74; 1–8:75; Ex. 5 ¶ 11.)*

**RESPONSE TO FACT NO. 38:** Admitted in part. The events at issue in the Fifth Amended Complaint did not begin to occur until October 2014. Kyles admits that, on June 24, 2015, Inmate Brown wrote a grievance on behalf of Kyles, which reflected the content of grievances that Kyles had previously submitted on December 22, 2014, January 19, 2015, and February 17, 2015. (Pl. Ex. F & J; Def. Ex. 3 at 70:2-7, 72:16-73:13, 83:11-85:3; Def. Ex. 3 at ECF 47-49; Def. Ex. 3 at Ex. 4.) Consistent with the same, the June 24, 2015 grievance stated that Kyles had previously submitted other grievances regarding the issues cited therein. (Pl. Ex. J.) The events

described in the June 24 grievance include, among other things, that:  on October 24, 2014, Defendant Rabideau improperly placed Kyles, a protective custody inmate, in segregation in a cell with Jorge Pena, a general population inmate and known gang affiliate; Pena had been placed in segregation for activity on behalf of a Security Threat Group (STG) aligned with the Gangster Disciples, from whom Kyles was in protective custody; Pena aggressively accosted and physically attacked Kyles while in segregation; Kyles told the Gallery Officer that he was protective custody ("PC") and should be moved but the Officer did nothing; Kyles told Defendants Lt. Brown and Sgt. Durrett that he could not be placed in a cell with a general population cellmate but they did not protect him; Kyles submitted an emergency grievance on October 29, 2014 to the Chief Administrative Officer, who was the Stateville Warden and Defendant Tarry Williams, but received no response; Kyles tried to talk to Defendants Durrett and Brown on several occasions about his situation but stopped because Pena became more aggressive when he did so; Kyles wrote multiple letters to Defendants Rabideau and Williams explaining his situation but received no response; and protective custody inmates, who are in the segregation unit under investigation and/or temporary confinement status, like Kyles, are routinely housed improperly in cells with general population inmates at Stateville.  *Id.*  Kyles signed and submitted the grievance to the IDOC Director on June 24, 2015 with a cover letter explaining that he had previously submitted the grievance over the same incident "multiple times" with no response.  *Id.*  Kyles disputes and does not adopt Defendants' characterization of this grievance as the "Improper Placement Grievance."

**FACT NO. 39.**  *The Improper Placement grievance is effectively a rewrite of the January 19, 2014 grievance.  (Ex. 3 at 12–21:77.)*

**RESPONSE TO FACT NO. 39:**  Admitted in part.  Kyles admits that the June 24, 2015 grievance reflects the content in grievances that Kyles had previously submitted on December 22, 2014, January 19, 2015, and February 17, 2015.  (Pl. Ex. F & J; Def. Ex. 3 at 70:2-7, 72:16-

73:13, 83:11-85:3; Def. Ex. 3 at ECF 47-49; Def. Ex. 3 at Ex. 4.)  Consistent with the same,

Inmate Brown testified that the dates on the upper right-hand corner of the June 24, 2015

grievances refer to the dates on which previous grievances on the same subject matter were

submitted by Kyles.  (Def. Ex. 3 at 121:17-122:17; Def. Ex. 3 at Ex. 4.)

**FACT NO. 40.**  *Brown wrote another grievance on June 24, 2014 ("Beaugard Grievance 2")
backdated to January 20, 2014 on behalf of Plaintiff regarding approaching Beaugard and
improperly receiving a ticket.  (Ex. 3 at 10–24:83; 1–11:84; Ex. 5 ¶ 11.)*

**RESPONSE TO FACT NO. 40:**  Admitted in part.  The events at issue in the Fifth Amended

Complaint did not begin to occur until October 2014.  Kyles admits that on June 24, 2015,

Inmate Brown wrote another grievance on behalf of Kyles, which reflected the content in

grievances that Kyles previously submitted on December 22, 2014, January 20, 2015, and

February 17, 2015.  (Pl. Ex. F & K; Def. Ex. 3 at 83:11-85:3; Def. Ex. 3 at ECF 50-52; Def. Ex.

3 at Ex. 5.)  The events described in the referenced grievance include, among other things, that:

on October 24, 2014, Beaugard wrote a false ticket based on Kyles's complaints about another

correctional officer (Juborek) and had Kyles walked to segregation; Kyles was a PC inmate but

was nevertheless improperly placed in segregation in a cell with Jorge Pena, a general population

inmate and known gang affiliate; Pena had been sent to segregation for activity on behalf of a

Security Threat Group (gang); Pena abused Kyles while they were celled together in segregation;

and Kyles told Defendants Lt. Brown and Sgt. Durrett that he could not be placed in a cell with a

general population cellmate but they did not protect him.  (Pl. Ex. F & K; Def. Ex. 3 at ECF 50-

52; Def. Ex. 3 at Ex. 5.)  Kyles signed and submitted the grievance to the IDOC Director on June

24, 2015 with a cover letter explaining that he had previously submitted grievances on the same

incident "multiple times" with no response.  (Pl. Ex. F & K.)  Kyles disputes and does not adopt

Defendants' characterization of this grievance as the "Beaugard Grievance 2."

**FACT NO. 41.**  *The IDOC employees identified in the Grievances were the same as those in the
alleged January 19 and 20 grievances.  (Ex. 3 at 9–24:87; 1–10:88.)*

**RESPONSE TO FACT NO. 41:**  Disputed.  Kyles objects to the use of the term "Grievances" as vague and ambiguous.  To the extent Defendants imply in this statement that only those IDOC employees named in the June 24, 2015 grievances can be defendants in this litigation, Kyles denies such implication.  Kyles's grievances – all of them – are regarding and related to the same events underlying this litigation, which involves the knowingly false disciplinary ticket written against Kyles on October 24, 2014, and his immediate placement and retention in segregation after complaining about Officer Juborek, and his improper placement in segregation with Pena, a general population inmate and known gang affiliate, who then physically and sexually assaulted Kyles.  Kyles submitted multiple grievances concerning these events.  (Pl. Ex. E, H, I, J, & K.) The IDOC employees involved in those events, including the officers that wrote, approved, and signed the false disciplinary ticket, and those responsible for improperly placing and holding Kyles in a segregation cell with Pena, were aware of the practice and policy at Stateville of housing protective custody inmates in segregation with general population inmates and were aware that Kyles's had been assaulted by Pena in segregation. As such, Defendants were on notice of the events at issue in this litigation and are proper Defendants in the same.

**FACT NO. 42.**  *When Brown wrote the Grievances he wanted to make sure he identified the proper IDOC employees involved to ensure they received notice.  (Ex. 3 at 13–21:85; 5–20:86.)*

**RESPONSE TO FACT NO. 42:**  Admitted in part.  Kyles admits that he included sufficient detail in the grievances he submitted to put the IDOC on notice of the allegations and misconduct to be investigated. To the extent Defendants imply in this statement that the IDOC grievance procedure requires inmates to identify the "proper IDOC employees" involved in the grieved incident, there is no such requirement, and Kyles denies such implication, and SOF No. 42 is insufficient to establish any such requirement.

**FACT NO. 43.**  *Brown identified these IDOC employees based on what Plaintiff told him.  (Ex. 3 at 23–24:85; 1–3:86.)*

**RESPONSE TO FACT NO. 43:** Admitted in part. To the extent Defendants imply in this statement that the IDOC employees identified in the grievances drafted by Inmate Brown were the only IDOC employees involved in the incidents underlying this litigation, or the only individuals about whom the IDOC had notice regarding their involvement in the same, Kyles denies any such implications.

## V. Grievance Officer's Report

**FACT NO. 44.** *On March 31, 2015, Grievance Officer McBee considered Grievance 711. (Ex. 4 ¶ 7.)*

**RESPONSE TO FACT NO. 44:** Admitted.

**FACT NO. 45.** *Given that Plaintiff failed to provide sufficient evidence to prove his claim, McBee recommended that no action be taken in regards to Grievance 711 and reported these findings and recommendations to the CAO. (Ex. 4 ¶ 7.)*

**RESPONSE TO FACT NO. 45:** Kyles disputes that he failed to provide sufficient evidence to prove his claim. Kyles admits that McBee attested in her declaration that she recommended no action be taken in regards to Grievance 711, and reported her findings and recommendations to the CAO, in which she stated "[g]iven that Mr. Kyles failed to provide sufficient evidence to prove [the] claim [alleged in the grievance]." (Def. Ex. 4 ¶7.)

**FACT NO. 46.** *On March 31, 2015, Grievance Officer McBee considered the Beaugard Grievance. (Ex. 4 ¶ 9.)*

**RESPONSE TO FACT NO. 46:** Kyles admits only that in McBee's declaration she states that, on March 31, 2015, she "considered grievance 712 submitted by Mr. Kyles." (Def. Ex. 4 ¶9.) Kyles disputes and does not adopt Defendants' characterization of this grievance as the "Beaugard Grievance."

**FACT NO. 47.** *McBee found that Plaintiff failed to provide any sufficient evidence to prove any misconduct, and recommended to the CAO no action be taken in regards to the Beaugard Grievance. (Ex. 4 ¶ 9.)*

**RESPONSE TO FACT NO. 47:** Kyles admits only that McBee states in her declaration that she "found that Mr. Kyles failed to provide any sufficient evidence to prove any staff

misconduct" and "[a]ccordingly, [she] recommended [to the CAO that] no action be taken in regards to grievance 712." (Def. Ex. 4 ¶9.) Kyles disputes and does not adopt Defendants' characterization of this grievance as the "Beaugard Grievance."

**FACT NO. 48.** *On March 31, 2015, McBee considered Plaintiff's the Rabideau Grievance. (Ex. 4 ¶ 10.)*

**RESPONSE TO FACT NO. 48:** Kyles admits only that McBee states in her declaration that, on March 31, 2015, she "considered grievance 713 submitted by Mr. Kyles." (Def. Ex. 4 ¶10.) Kyles disputes and does not adopt Defendants' characterization of this grievance as the "Rabideau Grievance."

**FACT NO. 49.** *McBee found that Plaintiff failed to provide any sufficient evidence to prove any staff misconduct, and recommended to the CAO no action be taken in regards to the Rabideau Grievance. (Ex. 4 ¶ 10.)*

**RESPONSE TO FACT NO. 49:** Kyles admits only that McBee states in her declaration that she "found that Mr. Kyles failed to provide any sufficient evidence to prove any staff misconduct" and "[a]ccordingly, [she] recommended [to the CAO that] no action be taken in regards to grievance 713." (Def. Ex. 4 ¶10.) Kyles disputes and does not adopt Defendants' characterization of this grievance as the "Rabideau Grievance."

## VI.   ARB Return of Grievances

**FACT NO. 50.** *Plaintiff appealed the Beaugard and Rabideau Grievances, but not Grievance 711 to the ARB. (Ex. 5 ¶ 7.)*

**RESPONSE TO FACT NO. 50:** Admitted in part. Kyles admits that he appealed Grievance 712 and Grievance 713 to the ARB, and that he did not appeal Grievance 711 to the ARB. (Pl. Ex. D, H, & I.) Kyles disputes the need for him to appeal Grievance 711 to the ARB because he received the remedy that he sought by that grievance—that Stateville respond to Grievances 712 and 713. (Pl. Ex. D.) Kyles disputes and does not adopt Defendants' characterization of these grievances as the "Beaugard and Rabideau Grievances."

**FACT NO. 51.**  *On May 6, 2015, Benton reviewed Plaintiff's Beaugard Grievance and the corresponding Grievance Officer's Report, but did not address it further because she found he submitted it outside the timeframe allowed under Department Rule 504.  (Ex. 5 ¶ 8.)*

**RESPONSE TO FACT NO. 51:**  Kyles admits only that Benton states in her Declaration that she "reviewed grievance 712 by Mr. Kyles and the corresponding Grievance Officer's Report"; and that:  "Given that Mr. Kyles' February 17, 2015 grievance 712 was submitted 60 days after the October 24, 2014 incident, I determined that Mr. Kyles did not submit this grievance in accordance with Department Rule 504.  Thus, I did not further address this grievance."  (Def. Ex. 5 ¶ 8.)  Kyles disputes that he did not submit the substance of Grievance 712 and 713 within the time limits allowed under Department Rule 504.  As Kyles testified, he submitted an emergency grievance while in segregation, and submitted grievances on December 22, 2014, that were substantively the same as those re-submitted on January 19 and 20, 2015 and June 24, 2015, and then also on February 17, 2015, which Stateville eventually numbered as Grievance 712 and 713.  (Def. Ex. 2 at 14:22-15:14, 254:11-15, 20:8-10; Pl. Ex. F, J, K, H, & I.)  Consistent with the same, Kyles notes, that in the Return of Grievance form, Benton states the grievance was "served 12/22/14."  (Pl. Ex. H.)  Kyles further notes that the Return of Grievance form for this grievance states Grievance 712 was dated "12/22/14" and "2/17/15."  *Id.*

**FACT NO. 52.**  *Benton, however, indicated she would consider the issue as Plaintiff mentioned he submitted a grievance timely.  (Ex. 5 ¶ 8.)*

**RESPONSE TO FACT NO. 52:**  Admitted in part.  Kyles admits that, in her Declaration, Benton states that she "indicated . . . that [she] would consider the issue as Plaintiff mentioned that he did submit a grievance timely."  (Def. Ex. 5 at ¶8.)

**FACT NO. 53.**  *Benton indicated to Plaintiff that she would consider the issue by writing a strikethrough the word "issue" and writing in "grv", which is shorthand for grievance, and noting at the bottom of the page an instruction that he should send her the timely grievance he references, if he has not done so already.  (Ex. 5 ¶ 8.)*

**RESPONSE TO FACT NO. 53:**  Kyles admits only that, in her declaration Benton states that she indicated she "would consider the issue . . . by writing a strikethrough the word 'issue' and

- 18 -

writing in 'grv,' which is shorthand for grievance . . . [and noting] at the bottom of the page an instruction to Mr. Kyles that he should send me the timely grievance he references, if he has not done so already."  (Def. Ex. 5 ¶ 8.)  Kyles denies that Benton's statements are sufficient to establish the underlying facts.  Because Kyles's original timely submitted December 22, 2014 grievances were not returned to him by the counselor at Stateville, after being deposited in the bars for pickup by the institutional mail, Stateville denied Kyles the opportunity to provide Benton with copies of the timely submitted yet un-responded to December 22, 2014 grievances. (Def. Ex. 2 at 20:8-10; *see also* Pl. Ex. D.)  Kyles further notes that at the time it was the practice and/or policy at Stateville that inmates were not permitted to make copies of grievances without a counselor's response.  (Def. Ex. 2 at 29:17-30:1, 58:19-23, 215:17-216:3; Def. Ex. 3 at 111:9-17.)

**FACT NO. 54.**  *Plaintiff did not appeal a timely grievance to the ARB regarding the ticket Beaugard wrote him on October 24, 2014.  (Ex. 5 ¶ 8.)*

**RESPONSE TO FACT NO. 54:**  Disputed.  Although Benton's states in her declaration "[t]here is no record in the ARB that Plaintiff submitted a timely grievance," (Def. Ex. 5 ¶ 8), Kyles denies this statement is sufficient to establish the underlying fact.  Kyles was not able to appeal the emergency grievance that he submitted in October 2014, or the grievances that he submitted on December 22, 2014, because he did not receive responses to those grievances from the Chief Administrative Officer and counselor, respectively.  (Def. Ex. 2 at 18:18-19:19; Def. Ex. 4 ¶ 4.)  Kyles, however, did timely appeal to the ARB the first grievance response he received from Stateville, which was to the February 17, 2015, re-filing of the grievances (Grievance 712 and Grievance 713).  (Pl. Ex. H & I.)  Kyles also sent grievances dated March 28, 2016 and April 22, 2016, directly to the ARB.  (Def. Ex. 2 at ECF 99-100; Pl. Ex. N; Pl. Ex. O.)

**FACT NO. 55.**  *On May 6, 2015, Benton reviewed Plaintiff's Rabideau Grievance and corresponding Grievance Officer's Report, but did not address it further because she found he submitted it outside the timeframe allowed under Department Rule 504.  (Ex. 5 ¶ 9.)*

**RESPONSE TO FACT NO. 55:**  Kyles admits only that Benton states in her declaration that: she "reviewed" Grievance 713 "and the corresponding Grievance Officer's Report"; and that "[g]iven that Mr. Kyles' February 17, 2015 grievance 713 was submitted 60 days after his release on November 10, 2014, I determined that Mr. Kyles did not submit this grievance in accordance with Department Rule 504.  Thus, I did not further address this grievance."  (Def. Ex. 5 ¶ 9.)  Kyles notes, however, that the actual Return of Grievance form for Grievance 713 states that the grievance was dated "12-22-14" and "2-17-15."  (Pl. Ex. I.)

**FACT NO. 56.**  *Benton, however, indicated she would consider the issue as Plaintiff mentioned he submitted a grievance timely.  (Ex. 5 ¶ 9.)*

**RESPONSE TO FACT NO. 56:**  Admitted in part.  Kyles admits that, in her declaration, Benton states that she "indicated . . . that [she] would consider the issue as Plaintiff mentioned that he did submit a grievance timely."  (Ex. 5 ¶ 9.)  Kyles notes, however, that there is no such language on the Return of Grievance form provided by Benton.  (Def. Ex. 5 at Ex. B.)

**FACT NO. 57.**  *Benton indicated to Plaintiff that she would consider the issue by writing a strikethrough the word "issue" and writing in "grv", which is shorthand for grievance.  (Ex. 5 ¶ 9.)*

**RESPONSE TO FACT NO. 57:**  Admitted in part.  Kyles admits that, in her declaration, Benton states that she indicated that she "would consider the issue . . . by writing a strikethrough the word 'issue' and writing in 'grv,' which is shorthand for grievance."  (Def. Ex. 5 ¶ 9.)  Kyles, however, denies that Benton's statement is sufficient to establish the underlying fact.

**FACT NO. 58.**  *Plaintiff did not appeal a timely grievance regarding the 5 days extra he spent in segregation.  (Ex. 5 ¶ 9.)*

**RESPONSE TO FACT NO. 58:**  Disputed.  Although Benton states in her declaration that "[t]here is no record in the ARB that Plaintiff submitted a timely grievance," (Def. Ex. 5 ¶ 9), Kyles denies that this statement is sufficient to establish the underlying fact.  Kyles was not able

to appeal the emergency grievance that he submitted in October 2014, or the grievances that he submitted in December 2014, because he did not receive responses to those grievances from the Chief Administrative Officer and counselor, respectively. (Def. Ex. 2 at 18:18-19:19; Def. Ex. 4 ¶ 4.) Kyles, however, appealed Grievance 713 to the ARB. (Pl. Ex. I.)

**FACT NO. 59.** *On June 24, 2015, Plaintiff submitted grievances directly to the ARB without counselor responses or Grievance Officer and CAO's responses, which the ARB received on July 28, 2015. (Ex. 5 ¶ 10.)*

**RESPONSE TO FACT NO. 59:** Admitted in part. To the extent Defendants imply in such statement that Kyles's submission of these grievances was in any way improper, Kyles denies such implication. Kyles also lacks knowledge as to why the grievances he submitted on June 24, 2015 purportedly were not received by the ARB until July 28, 2015.

**FACT NO. 60.** *These grievances, however, do not fall into any of the exceptions allowing an inmate to send grievances directly to the ARB bypassing the counselor, grievance officer, and CAO's responses, including the exception for decisions regarding protective custody placement, including continued placement in or release from protective custody. (Ex. 5 ¶ 11.)*

**RESPONSE TO FACT NO. 60:** Disputed. According to the ticket written by Defendant Beaugard and approved by Defendants Lake, Laskey, Clements, Turner, and Williams, Kyles should be placed in segregation for investigative purposes. (Pl. Ex. Q.) As such, Kyles's grievances regarding the issues in this litigation fall into the exception for protective custody decisions because Kyles retained his protective custody status when he was placed in segregation for investigative purposes. (Pl. Ex. P at 19:20-24, 22:4-23:6, 33:19-34:14, 73:16-23; Pl. Ex. P at Ex. 4.)

**FACT NO. 61.** *The exception to send grievances directly to the ARB regarding protective custody decisions does not apply to these grievances, because Plaintiff was not in protective custody at the time of the issues since his protective custody was terminated when he was assigned to temporary confinement on October 24, 2014. (Ex. 5 ¶ 11.)*

**RESPONSE TO FACT NO. 61:** Disputed. According to the ticket written by Defendant Beaugard and which led to Kyles's placement in segregation, Kyles was placed in segregation for investigative purposes. (Pl. Ex. Q.) Kyles did not lose protective custody status when he was

sent to segregation for investigative purposes. (Pl. Ex. P at 19:20-24, 22:4-23:6, 33:19-34:14, 73:16-23; Pl. Ex. P at Ex. 4.)

**FACT NO. 62.** *On August 13, 2015, Benton considered the two grievances Plaintiff sent directly to the ARB on June 24, 2015, and responded by requesting additional required information, including the grievance with the counselor's response, and Grievance Officer and CAO's responses. (Ex. 5 ¶ 12.)*

**RESPONSE TO FACT NO. 62:** Admitted in part. The Return of Grievance form to which Benton cites at Exhibit D to her declaration does not request additional information, let alone the additional "required" information suggested by this statement.

**FACT NO. 63.** *Plaintiff never provided the information Benton requested for his June 24, 2015 grievances. (Ex. 5 ¶ 13.)*

**RESPONSE TO FACT NO. 63:** Disputed. The Return of Grievance form cited at Exhibit D to Benton's declaration does not request additional information, let alone the additional "required" information suggested by this statement. Kyles was not able to provide the original grievances, in any event, because he did not receive responses to the Emergency Grievance or the December 22, 2014 Grievances from the Chief Administrative Officer and counselor, respectively. (Def. Ex. 2 at 18:18-19:19.)

## PLAINTIFF TIMOTHY KYLES'S STATEMENT OF ADDITIONAL FACTS

1.    Per the protocol for sending grievances at Stateville, an inmate writes a grievance, deposits it in the bars of his cell, and it is picked up by the institutional mail service for delivery. (Def. Ex. 2 at 17:3-10.)

2.    The policy and practice at Stateville at the relevant time was that the law library would not copy a grievance for an inmate unless it had a counselor's response at the bottom. (Def. Ex. 2 at 29:17-30:1, 58:19-23, 215:17-216:3; Def. Ex. 3 at 111:9-17.)

3.    On October 27, 2014, Kyles sent a letter to Defendant Rabideau stating he was "a P.C. Inmate" that had been placed in a segregation cell with "a gang member that is 1st

cousins of the [Gangster Disciples]," who was attacking him and taking his food.  (Pl. Ex. B; Def. Ex. 2 at ECF 101; Def. Ex. 2 at 213:2-214:3, 214:21-215:3.)

4.    On November 3, 2014, Kyles sent a letter to Defendant Rabideau, stating he was "still in seg with" the gang member who "did stuff."  (Pl. Ex. C; Def. Ex. 2 at ECF 102; Def. Ex. 2 at 216:21-217:9, 219:1-6.)

5.    In addition to the October 27 and November 3 letters, Kyles wrote other letters to Defendant Rabideau while he was in segregation on October 25, 26, 27 ,and 28, which he sent to her by depositing the letters in the prison bars for pick up by the institutional mail, but he was able to make copies of only two such letters (October 27 and November 3) because the law library came around his cell in segregation before he deposited the letters in the bars.  (Pl. Ex. C; Def. Ex. 2 at 212:3-20, 217:10-218:6.)

6.    At some point between October 27, 2014 and November 3, 2014, while Kyles was being held in segregation at Stateville, Kyles filed an emergency grievance to Defendant Williams.  (Def. Ex. 2 at 14:22-15:14, 254:11-15.)

7.    While Kyles was in segregation, he spoke to Defendant Lamb and told him that he was in segregation due to a false ticket.  (Def. Ex. 2 at 263:3-264:1.)

8.    The same day that Kyles was released from segregation, he spoke to fellow Stateville inmate Corwyn Brown and told Brown that he had filed a grievance while he was in segregation.  (Def. Ex. 3 at 54:24-56:18, 57:6-10, 122:5-16.)

9.    In the emergency grievance, Kyles alleged that, although he had Protective Custody status, he had been placed in a cell with Jorge Pena, a general population inmate and known gang affiliate, who was abusing him.  (Def. Ex. 2 at 15:15-16:3; 129:13-130:8; 131:6-133:6.)

10.   Kyles filed the emergency grievance by placing it in the bars for mail pickup, per protocol.  (Def. Ex. 2 at 16:22-17:10.)

11.    Kyles saw an officer pick up his emergency grievance and put it in the officer's bag.
       (Def. Ex. 2 at 17:18-18:5.)

12.    Kyles did not receive a response to the emergency grievance.  (Def. Ex. 2 at 16:20-21,
       30:2-4.)

13.    Kyles does not have a copy of the emergency grievance because he did not receive a
       response to it and at the time the Stateville law library practice was not  to make copies of
       a grievance without a counselor response.  (Def. Ex. 2 at 29:17-30:4, 58:19-23.)

14.    On December 22, 2014, Kyles submitted multiple grievances concerning the events
       underlying this action.  (Def. Ex. 2 at 20:8-10.)

15.    Kyles did not receive responses to the grievances that he submitted on December 22,
       2014.  (See Pl. Ex. D (Grievance 711, stating that Kyles wrote grievances on or about
       December 22, 2014, which were either destroyed or refused to have been heard by the
       counselor, and seeking an investigation as to what happened to those grievances.).)

16.    On January 19, 2015, Kyles submitted a grievance relating to his placement in
       segregation with a general population cellmate as a result of the ticket written by
       Defendant Beaugard.  (Pl. Ex. E & F.)

17.    The content of the January 19, 2015 grievance reflected subject matter covered by
       Kyles's December 22, 2014 grievances.  (Pl. Ex. E & F; Def. Ex. 3 at 70:2-71:14, 72:5-
       14, 122:17-123:17; Def. Ex. 3 at ECF 47-49.)

18.    On January 20, 2015, Kyles submitted a grievance relating to his placement in
       segregation with a general population cellmate as a result of the ticket written by
       Defendant Beaugard.  (Pl. Ex. F & K.)

19.    The content of the January 20, 2015 grievance reflected subject matter covered by
       Kyles's December 22, 2014 grievances.  (Pl. Ex. F & K; Def. Ex. 3 at 122:17-123:17;
       Def. Ex. 3 at ECF 50-52.)

20.     Kyles did not receive a response to his initial submission of the January 19, 2015 and

        January 20, 2015 grievances.  (*See* Pl. Ex. E, F, & K.)

21.     On February 17, 2015, Kyles submitted a grievance, which was marked Grievance 711

        and which stated that he had written grievances on or about December 22, 2014, that he

        was attaching copies representing those grievances, that he believed the counselor had

        destroyed or refused to hear the December grievances, and that he requested an

        investigation on what happened to those grievances.  (Pl. Ex. D.)

22.     One of the grievances that Kyles attached to Grievance 711 was marked as Grievance

        712 and stated:

> On October 24th 2014 I went to Fred Beaugard a C/O at Stateville
> CC for help about another C/O picking at me trying to provoke me.
> I was told by my doctors to report to a C/O if I felt provoked by
> anybody; and they would come see me.  I do take psychotropic
> drugs for Parinoia Skizoo [sic] with Psyco [sic] Features.  And
> iwent to him and requested help.  And he wrote me a ticket, and I
> was placed in seg for [Charge No.] 206 Intimidation or Threats and
> Dangerous Communications, which was expunged from my record.
> Administrative Laris and Sinor and Warden T. Willimas said that it
> was not right what happen [sic] to me and I was let out of seg after
> 17 days.  Note this is my second grievance on this issue.  Just
> would like a response that I can further proceed.

(Pl. Ex. H; *see also generally* Pl. Ex. D.)

23.     On the upper left-hand corner of Grievance 712, Kyles noted that this was a Second

        Grievance and dated it with both the current date (2-17-15) and the date on which he filed

        the original grievance (12-22-14).  (Pl. Ex. H.)

24.     The other grievance that Kyles attached to Grievance 711 was marked as Grievance 713

        and stated:

> On the date of 11-5-14, I was released from seg due to
> mistreatment of the rules by staff.  On a Wednesday, K. Rabideau
> was the Placement Officer.  Lt. Brown was the Lt in F-Hoes and he
> told me that K. Rabideau said I'll be out Thursday.  Thursday came
> around C/O Hail said that it was changed to Friday 7th.  I still was
> not released from seg.  [My release] was not until Monday the 10th

of November.  K. Rabideau Placement C/O did this on purpose.  I spent a [sic] extra 5 days in Solitary Confinement out of hate by her.  Just would like a responds [sic] so that I can further my complaint / *note this is my second grievance on this issue.

(Pl. Ex. I; *see also generally* Pl. Ex. D.)

25.  On the upper left-hand corner of Grievance 713, Kyles dated the grievance with both the current date (2-17-15) and the date on which he filed the original grievance (12-22-14). (Pl. Ex. I.)

26.  Neither Counselor Miles, Grievance Officer McBee, nor Chief Administrative Officer Williams raised the timeliness of Grievance 712 or Grievance 713 in their responses to or recommendations concerning Grievance 712 and Grievance 713 when they addressed those grievances on the merits.  (Pl. Ex. H & I.)

27.  Kyles timely appealed the Chief Administrative Officer's decisions on both Grievance 712 and Grievance 713, and the ARB dismissed these appeals as untimely. (Pl. Ex. H & I.)

28.  On June 24, 2015, Kyles re-filed grievances that he had previously submitted on December 22, 2014, January 19, 2014, January 20, 2014, and February 17, 2015 by sending them directly to the Illinois Department of Corrections Acting Director.  (Pl. Ex. F, J, & K; Def. Ex. 3 at 70:2-7, 72:16-73:13, 83:11-85:3; Def. Ex. 3 at Exs. 4 & 5.)

29.  The June 24, 2015 grievances described, among other things, that:  Beaugard wrote a ticket based on Kyles's complaints about another correctional officer and had Kyles walked to segregation; on October 24, 2014, Karen Rabideau placed Kyles, a P.C. inmate, in segregation in a cell with Jorge Pena, a general population inmate; Pena was a general population inmate who had been sent to segregation for activity on behalf of a Security Threat Group (STG) aligned with the declared enemies of Kyles; Pena aggressively accosted and physically attacked Kyles; Kyles told the Gallery Officer that he was PC

and should be moved but the Officer did nothing; Kyles told Lt. Brown and Sgt. Durrett

that he could not be placed in a cell with a general population cellmate but they did not

help him; Kyles submitted an emergency grievance on October 29, 2014 to the Chief

Administrative Officer, who was the Stateville Warden, but received no response; Kyles

tried to talk to Durrett and Brown on several occasions about his situation but stopped

because Pena became more aggressive when he did so; Kyles wrote multiple letters to

Rabideau and Williams explaining his situation but received no response; and protective

custody inmates, who are in the segregation unit under investigation and/or temporary

confinement status, like Kyles, are housed in cells with general population inmates at

Stateville CC.

(Pl. Ex. F, J, & K; Def. Ex. 3 at Exs. 4 & 5.)

30.     Kyles filed the June 24, 2015 grievances because he was not getting responses on prior

        grievances.  (Def. Ex. 3 at 82:5-83:6; Def. Ex. 3 at Exs. 4 & 5; Pl. Ex. F.)

31.     On or about September 23, 2015, Kyles was transferred from Stateville Correctional

        Center in Joliet, Illinois, to Hill Correctional Center, in Galesburg, Illinois, and received

        the Inmate Handbook a/k/a Orientation Manual applicable to that facility.  (Def. Ex. 2 at

        13:13-23; *see generally* Pl. Ex. L; *see also* Pl. Ex. L at 52.)  Per the Handbook, offender

        grievances related to allegations of sexual abuse shall not be subject to any filing time

        limit.  (Pl. Ex. M.)

32.     While at Hill, on March 9, 2016, Kyles was diagnosed with post-traumatic stress disorder

        as a result of having been sexually assaulted by Pena.  (Pl. Ex. R.)

33.     On March 28, 2016, Kyles submitted an emergency grievance to the Warden of Hill CC,

        with a copy to Defendant Baldwin, IDOC Director, which stated:

> On or about October 2014, I was a [sic] inmate at Stateville CC
> classified as a [sic] approved Protective Custody inmate, also
> deemed mentally ill by health care professionals.  I was placed in

temporary confinement with a general population inmate who beat me and raped me while I was on my medication, at that time my medication was Rispidal, Rimmrum, and Tegretall.  I couldn't help myself.  Placing me in seg was done in retaliation for reporting staff to I.A. (Internal Affairs) and the displinary [sic] ticket states this.  I reported the beating and rape to staff.  I was laughed at and nothing was done.  I was released from temporary confinement and placed back in Protective Custody because the ticket was expunged (not guilty).  I tryed [sic] several times to report this issue by way of grievances, by sending grievances to Springfield only to have them returned.  I then filed a civil complaint Kyles v. Beaugard et al., Case No. 1:15-CV-08895.  That's pending now.  I was transferred here to Hill CC where I talked to [a] mental health care professional, by way of video satellite where I told my issue to my doctor.  Since I've been diagnosed as having P.T.S.D. Post Tramatic [sic] Stress Disorder and I'm taking medication for that also Zoloft 100mg.  Because its [sic] like I'm reliving what happen [sic] to me at Stateville CC over and over again.  The hate is building.  I don't trust my cell-mates, I can't sleep and I'm having thoughts of hurting one of them.  I need help.

(Pl. Ex. N.)

34.    The ARB reviewed the March 2016 Grievance and found it to be untimely, despite the

Hill rule at the time that there are no time limits for filing grievances related to sexual

assault.  (Pl. Ex. N.)

35.    On April 22, 2016, Kyles submitted a grievance, stating:

On or about October 2014 I was a [sic] inmate at Stateville Correctional Center, classified as a [sic] approved Protective Custody inmate.  Also deemed mentally ill by mental health care professionals.  And was told if I had a problem with staff or inmates to report it with a staff member and I'll be helped.  On or about October 2014, I was being harassed by C/O Juborek so I reported him to C/O Beaugard, Fred, who was a part of Internal Affairs.  He told me he would take care of my problem, but later he wrote me a displinary [sic] ticket in retaliation for reporting another officer.

I was placed on temporary confinement and place [sic] in population seg with a general population inmate.  (Karen Rabideau) was the placement officer and she knew I was a Protective Custody inmate also mentally ill and she knew according to the rules administrative [sic] that she could not house a [sic] inmate that's in Protective Custody and mentally ill in the same cell with general population.  But did anyway, and while I was in that cell I was beat

[sic] and raped while on my medication.  I was on Taratol, Rispidin, and Ridrum at that time.  I report the rape to Lt. Brown the [illegible].  He told me to stop lieing [sic] big as you are.  I also told Sgt. Durrant.  He laugh [sic] at me and said 'This is what happen [sic] to P.C. mother fuckers who report my officers to IA (Internal Affairs).  This is my 8th grievance filed on this issue.  Since I've been diagnosed as having P.T.S.D.  I'm taking medication now.  But it's like I'm reliving what happen [sic] to me over and over again.  I can't sleep and I don't trust my cell-mates when I take my medication cause [sic] what happen [sick] to me.  I'm now sending this grievance to Director John Baldwin certified mail from Hill Correctional Center.

(Pl. Ex. O.)

36.   In response to this April 2016 grievance, a PREA investigation was conducted by Defendant Major Laskey, despite his clear conflict as the Stateville Major responsible for approving the October 24, 2014 unsubstantiated disciplinary ticket against Kyles and the decision to immediately place Kyles in segregation on investigative status, where despite his PC status Kyles was improperly celled for seventeen (17) days with general population inmate Pena, a known gang affiliate who sexually assaulted Kyles.  (Pl. Ex. O.)

37.   An inmate assigned protective custody status does not lose that status when sent to segregation for investigative purposes.  (Pl. Ex. P at 19:20-24, 22:4-23:6, 33:19-34:14, 73:16-23; Pl. Ex. Q at IDOC 000519, 000521.)

38.   Based on the findings of the PREA investigation, IDOC denied Kyles's April 2016 grievance.  (Pl. Ex. O.)

39.   If the inmates that he was helping did not receive responses to prior grievances, Inmate Brown instructed them to mark the dates on which they had filed the previous grievances on their subsequent grievances concerning the same subject matter.  (Def. Ex. 3 at 122:17-123:17.)

40.     The ticket and incident report for which Kyles was sent to segregation in October 2014 bear the following names on their faces:  Defendants Beaugard, Laskey, Lake, Turner, Clements, and Williams.  (Pl. Ex. Q.)

Dated: July 21, 2017                                    Respectfully submitted,


                                                        /s/ Kelly M. Bonovich
                                                        Michael S. Ferrell (06277458)
                                                        mferrell@JonesDay.com
                                                        Kelly M. Bonovich (6293296)
                                                        kbonovich@jonesday.com
                                                        Sarah J. Gallo (6320644)
                                                        sarahgallo@jonesday.com
                                                        Juan C. Arguello (6320230)
                                                        jarguello@Jonesday.com
                                                        JONES DAY
                                                        77 West Wacker
                                                        Chicago, IL  60601.1692
                                                        Telephone:    +1.312.782.3939
                                                        Facsimile:    +1.312.782.8585

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing **Plaintiff's Response to Defendants' Local Rule 56.1 Filing & Plaintiff's Local Rule 56.1 Statement of Additional Facts** has been filed electronically on July 21, 2017.  Notice of this filing will be sent to all active parties by operation of the Court's electronic filing system, which will send notification of such filing by email to all counsel of record in the above-captioned proceeding.

*/s/ Sarah J. Gallo* _____