**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| TIMOTHY KYLES, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 15-cv-8895 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| FRED BEAUGARD, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Timothy Kyles was a Protective Custody inmate at Stateville Correctional Center. He needed Protective Custody after disavowing his former gang, the Gangster Disciples, and turning in their contraband. In 2014, after a negative interaction with a guard, Stateville officials stripped Kyles of his Protective Custody status and placed him in the Segregation Unit in a cell with another inmate.

That inmate, it turns out, was a member of the Maniac Latin Disciples, a gang aligned with the Gangster Disciples. Over the next two weeks, that inmate allegedly abused him, repeatedly, including raping him twice.

Kyles filed this section 1983 action against the six corrections officers responsible for putting and keeping him in the cell with his attacker. Relevant here, Kyles alleged retaliation in violation of the First Amendment, failure to protect in violation of the Eighth Amendment, and intentional infliction of emotional distress under state law. The case went to trial on those claims.

At the end of a two-week trial, a jury returned a mixed verdict. The jury found against Kyles on his First Amendment retaliation claim as to all Defendants. But on the failure-to-

protect claim and the intentional infliction of emotional distress claim, the jury found in favor of Kyles and against five Illinois Department of Corrections employees: Defendants Karen Rabideau, Tarry Williams, Tralon Durrett, William Brown, and Leslie Turner.

After hearing testimony about the sexual assaults and Defendants' conduct, the jury awarded damages. The jury awarded Kyles $2,250,000 in compensatory damages, plus $700,000 in punitive damages.

At the close of Kyles's case-in-chief, Defendants orally moved for judgment as a matter of law. The Court deferred ruling on the motion and granted the parties leave to file a written motion and responses after the jury returned its verdict.

For the following reasons, Defendants' motion under Rule 50(a) is denied.

## Background

Plaintiff Timothy Kyles has been incarcerated with the Illinois Department of Corrections ("IDOC") for more than twenty years. The case arises out of his treatment as an inmate at Stateville Correctional Center in 2014.

In June 2014, Kyles was placed in Protective Custody status at Stateville. An inmate receives Protective Custody status when he (and IDOC) fears for his safety from other inmates, including organized gang violence within the prison. As a Protective Custody inmate, Kyles was housed in X-House, separate from the prison's general population.

Kyles needed Protective Custody after disavowing his former gang, the Gangster Disciples. He had affiliated with the Gangster Disciples since his youth. But in 2011, Kyles turned in contraband possessed by Gangster Disciple members while he was incarcerated at another IDOC facility. *See* Trial Tr., at 244:3-6 (Dckt. No. 590). Kyles testified that he applied

for Protective Custody status to separate himself from gang members who might seek violent retribution for his betrayal. *Id.* at 244:9-14.

On October 24, 2014, Kyles was on his way to eat lunch in the dining hall when he realized that he had forgotten his ID and other personal items. *Id.* at 248:25 – 249:5. He informed a Correctional Officer, Derek Jaburek, that he needed to go back to his cell. *Id.*

Kyles testified that Jaburek grew frustrated with him for taking his time to retrieve his ID. That frustration led to a veiled threat. Jaburek reportedly told Kyles: "You may come back and find something in the cell that don't supposed to be there." *Id.* at 249:9-10.

Kyles understood Jaburek's statement as a threat to plant contraband in his cell. *Id.* at 249:13-18. So, he approached Officer Fred Beaugard in the dining area and told him about the encounter. *Id.* at 250:7-8. Kyles felt that he needed to tell someone who he knew, and testified that he and Beaugard had a good relationship. *Id.* at 250:7-23.

Beaugard assured Kyles that he would "take care of it." *Id.* at 251:15-16. Beaugard then escorted Kyles back to his cell. *Id.* at 251:24-25.

About fifteen minutes later, Lieutenant Calvin Bell visited Kyles and told him that the Office of Internal Affairs wanted to see him. *Id.* at 250:5-7. Bell escorted Kyles to Internal Affairs, where Defendant Leslie Turner, the chief investigator at Stateville, was waiting to meet him. *Id.* at 254:11-13.

Turner admonished Kyles that he "can't go around threatening people." *Id.* at 254:18-19. Kyles said that he hadn't threatened anyone, and then he went to a back office to give a formal statement to another officer, Joshua Clements. *Id.* at 255:4-5.

When Kyles had finished giving his statement to Officer Clements, he returned from the back office and found Turner and Beaugard there waiting for him. *Id.* at 256:17-22. Turner told Kyles that he was being sent to the Segregation Unit. *Id.* at 256:8-9.

Stateville sent inmates to the Segregation Unit when they were under investigation for disciplinary charges. So Kyles was confused. He asked why he was being sent to Segregation, and Turner told him that Beaugard had written Kyles a disciplinary ticket. *Id.* at 256:10-14. Kyles turned to Beaugard to ask why, but Beaugard gave no answer. *Id.*

Several officers, including Bell, Beaugard, Defendant Tralon Durrett, and Defendant William Brown, escorted Kyles to the Segregation Unit. Kyles testified that along the way, Beaugard simply told him, "It's bigger than me." *Id.* at 257:12-13.

Kyles further testified that he told Durrett, "I can't handle a [cellmate], man. You know I'm PC. You know I'm Protective Custody, man." *Id.* at 258:5-6. Durrett replied that cellmate decisions were not his responsibility. *Id.* at 258:15-16. Rather, Defendant Karen Rabideau, the placement officer at Stateville, was in charge of all cell placements. *Id.* Durrett told Kyles that Rabideau knew about his Protective Custody status. *Id.*

As it turned out, Karen Rabideau was not at work on October 24, 2014. *See* Trial Tr., at 236:18-22 (Dckt. No. 591). In her place, Jerry Baldwin, a correctional casework supervisor, was handling inmate movement and cell placements that day. *Id.* Baldwin handled Kyles's cell placement after his transfer to the Segregation Unit. *Id.*

There was an open cell in the Segregation Unit when Kyles arrived, but Baldwin placed Kyles with an inmate from general population, Jorge Pena. *Id.* at 279:16 – 280:3. Pena was serving a sentence for first-degree murder. *See* Trial Tr., at 220:12-13 (Dckt. No. 593). He was

4

also a member of the Maniac Latin Disciples, a gang aligned with the Gangster Disciples, the gang that Kyles had disavowed. *Id.* at 204:2-5.

Kyles and Pena shared a cell in the Segregation Unit from October 24, 2014, to November 10, 2014. *See* Trial Tr., at 110:21-23 (Dckt. No. 594). During their more than two-week double-cell placement, Pena verbally berated Kyles, took his food, and raped him twice.

Kyles testified that he made repeated attempts to notify prison officials about his attacker, both before and after the rapes. He filed grievances, wrote letters, and spoke to prison officials who passed by his cell when he got a chance. None took immediate action.

Specifically, Kyles testified that within days after arriving in Segregation, he filed an emergency grievance with Defendant Tarry Williams, the Stateville Warden. *See* Trial Tr., at 74:5-8 (Dckt. No. 591). That grievance informed the Warden that Kyles was a Protective Custody inmate placed in a cell with a general population inmate, and that he feared for his life. *Id.* at 27:21-25. He never received a response.

Kyles also wrote a number of letters to Defendant Karen Rabideau. At trial, Kyles testified that the letters informed Rabideau that he was a Protective Custody inmate sharing a cell with a general population inmate, and that Pena was beating him and taking his food. *Id.* at 29:13-18.

In a letter dated November 3, 2014, which was admitted at trial, Kyles wrote to Rabideau: "I'm writing to let you know that I'm still in seg with this Satan Disciple. I'm a protective custody inmate. I wrote to you on or about October 25, 26, 27, 28th asking for your help and to be moved. He did stuff. Please help me." *Id.* at 39:2-7. Kyles testified that he placed the letters in the institutional mail, but never received a response. *Id.* at 39:17 – 40:8.

At trial, Kyles testified about what he meant when he wrote that his cellmate "did stuff." Kyles testified that he was referring to when Pena "raped [him] while [he] was on the medication." *Id.* at 40:15-17. Kyles testified that he used the phrase "did stuff," instead of "he raped me," because he was "in a maximum security prison" and was "not going to tell [Rabideau], an officer," that he had been raped. *Id.* at 40:15-21. He was "not going to tell anybody that this man did this to me. I'm in a maximum security. You've got to understand where I'm coming from. It's not going to happen. I'm not going to be a victim to everybody else." *Id.* at 40:21-25.

Kyles also sought help from other Stateville officers who walked by his cell in the Segregation Unit. On one occasion, he told Sergeant Durrett that Pena had raped him. Kyles testified that Durrett told him, "This is what happens to PC motherfuckers who would try to have my officers investigated." *Id.* at 43:3-5.

Around the same time, Kyles told Lieutenant Brown something similar as he was making the rounds. He told Brown, "this guy, he's doing stuff. He raped me in here man. He taking [sic] my food." *Id.* at 44:1-2. Brown responded that Kyles "need[ed] to fight back and stop lying." *Id.* at 44:3-4.

On November 5, 2014, Stateville's Adjustment Committee found the charges against Kyles in Officer Beaugard's disciplinary ticket to be "unsubstantiated." Recall, the disciplinary ticket involved the allegation that Kyles had threatened Officer Jaburek in some fashion. *See* Pl.'s Ex. 64, Adjustment Committee Final Summary Report. The Committee recommended that the ticket be expunged. Five days later, on November 10, Kyles was moved out of Segregation and returned to the Protective Custody Unit.

A little less than a year later, Kyles brought this action under 42 U.S.C. § 1983 and Illinois state law. He filed quite a few complaints, bringing quite a few claims against quite a few people.

After amending his complaint six times, he sued Beaugard, Rabideau, Williams, Brown, Durrett, John Baldwin, Maurice Lake, Kevin Laskey, Joshua Clements, and Turner. He alleged (1) retaliation under the First Amendment; (2) failure to protect under the Eighth Amendment; (3) deliberate indifference under the Eighth Amendment; (4) failure to intervene under the Eighth Amendment; (5) intentional infliction of emotional distress under state law; (6) and an unconstitutional policy at Stateville concerning its treatment of Protective Custody inmates.

At summary judgment, Judge Lee (this Court's predecessor, before reassignment) narrowed the case significantly. He allowed Kyles to go forward on his (1) First Amendment retaliation claim against Beaugard, Turner, and Durrett; (2) Eighth Amendment failure-to-protect claim against Williams, Rabideau, Durrett, and Brown; (3) intentional infliction of emotional distress claim against Beaugard, Turner, Durrett, Brown, Williams, and Rabideau; and (4) unconstitutional policy claim as to John Baldwin (the IDOC Director) in his official capacity. *See* 11/18/20 Mem. Opin. & Order (Dckt. No. 367).

After reassignment to this Court in September 2022, the case narrowed even further. This Court granted Defendants' pretrial motion to dismiss the policy claim as moot. *See* 2/6/23 Mem. Opin. & Order (Dckt. No. 509). Only three claims remained: the retaliation claim, the failure-to-protect claim, and the intentional infliction of emotional distress claim.

Trial took place from February 13 to February 22, 2023, spanning seven trial days. *See* Dckt. Nos. 533, 536, 539, 547, 550, 565, 571. The jury heard from numerous live witnesses,

including Kyles and each of the Defendants. The jury heard from medical providers and expert witnesses. The jury also heard from other witnesses by deposition designations.

The jury even heard the in-court testimony of Kyles's alleged attacker, Jorge Pena. He denied ever attacking Kyles, and he strongly denied ever raping him. Pena testified about how homosexuality is flatly prohibited by the Maniac Latin Disciples. *See* Trial Tr., at 216:20 – 217:25 (Dckt. No. 593) ("It's – you can't – it's not a part of it. It's, like, you're done . . . . Anything with homosexuality, it's a no."). Members risked getting kicked out of the gang – or even physical violence – if they were suspected of engaging in homosexual conduct. *Id.*

That said, Pena wasn't shy about testifying about his propensity for violence. He described a few violent interactions that he had had in prison, when someone had disrespected him. One incident occurred when another inmate named Dickey "disrespected" Pena by calling him "a bitch." *Id.* at 221:15. After Dickey called Pena a bitch, Pena "instantly attacked him in the yard." *Id.* at 221:17. Pena later said that he "beat on [Dickey] like a drum board." *Id.* at 221:19-23. Dickey "was larger than" Pena, but the size disparity did not give Pena any hesitation before attacking him. *Id.* at 221:22-25.

Another incident occurred when a different inmate called Pena "a faggot." *Id.* at 222:1-3. Pena was "wearing a blue shirt" and the inmate "made a comment about something about the guy – the blue shirt being a faggot." *Id.* at 222:13-15. Pena testified that he did not "recall exactly what the man said, but along the line he disrespected me and I attacked him." *Id.* at 222:16-17. Like Dickey, this inmate was larger than Pena. *Id.* at 222:20-21. And like the incident with Dickey, the inmate's size did not cause Pena to hesitate when deciding to attack him. *Id.* at 222:22-23.

In addition to the testimony, the parties presented dozens of exhibits. *See* 2/21/23 Exhibit List (Dckt. No. 562).

On February 24, 2023, after two days of deliberations, the jury returned a mixed verdict. The jury found for all three Defendants (Turner, Beaugard, and Durrett) on the First Amendment retaliation claim. *See* Jury Verdict, at 2 (Dckt. No. 579).

On the Eighth Amendment failure-to-protect claim, the found in favor of Kyles across the board. The jury returned a verdict against Defendants Rabideau, Williams, Durrett, and Brown. *Id.*

On the intentional infliction of emotional distress claim, the jury returned a mixed verdict. The jury found in favor of Kyles for four of the six Defendants. The jury returned a verdict against Defendants Williams, Turner, Durrett, and Brown, but returned a verdict in favor of Defendants Beaugard and Rabideau. *Id.*

In the end, the jury awarded Kyles $2,950,000 in damages. *Id.* at 4–7. Of that, $2,250,000 were compensatory. The jury awarded $700,000 in punitive damages, consisting of $300,000 against Durrett, and $400,000 against Brown.

At the close of Kyles's case-in-chief, Defendants orally moved for judgment as a matter of law. *See* Trial Tr., at 148:23 – 149:5 (Dckt. No. 593). That motion is now before the Court.

## Legal Standard

### I.     Nature of the Motion

As a preliminary matter, the parties debate whether the motion falls under Federal Rule of Civil Procedure 50(a) or 50(b). *See* Defs.' Mem. in Supp. of Judgment as a Matter of Law (hereinafter "Defs.' Mem."), at 1 (Dckt. No. 553) (describing the motion as falling under Rule 50(a)); Pl.'s Resp., at 2 (Dckt. No. 582) ("Plaintiff believes Defendants' written Rule 50(a)

9

Motion should be treated as a renewed motion for judgment as a matter of law after trial pursuant to Rule 50(b).").

After Kyles rested his case-in-chief on February 16, 2022, Defense counsel orally moved for judgment as a matter of law under Rule 50. *See* Trial Tr., at 148:23 – 149:5 (Dckt. No. 593). Defense counsel made a brief oral argument on the motion before the Court. *Id.* at 148:23 – 154:7, 257:8 – 262:21. Plaintiff's counsel responded orally. *Id.* at 263:5 – 266:11.

The Court did not rule on the motion then and there. Instead, it took the oral motion under advisement, and granted the parties leave to file written motions and responses. *Id.* at 266:17-19.

Defense counsel filed a written motion and a supporting brief a few days later. *See* Defs.' Mtn. (Dckt. No. 552); Defs.' Mem. (Dckt. No. 553). Trial continued, and the Court waited to set the rest of the briefing schedule until after the jury returned its verdict on February 24, 2023. *See* 2/24/23 Order (Dckt. No. 573).

Defense counsel did not renew its motion under Rule 50(b) after the jury returned its verdict. Instead, both parties followed the briefing schedule set by the Court with respect to the Rule 50(a) motion. Plaintiff filed his response on March 10 (Dckt. No. 582), and Defendants filed a reply on March 24 (Dckt. No. 583).

On April 5, 2023, Plaintiff filed a motion for leave to file a sur-reply, which the Court granted. *See* 4/7/23 Order (Dckt. No. 585). Plaintiff timely filed his sur-reply on April 7, 2023. *See* Pl.'s Sur-Reply (Dckt. No. 587).

The character of a motion under Rule 50 turns on the timing of the motion. A party raises a Rule 50(a) motion during trial. As the rule states, "[a] motion for a judgment as a matter of law may be made at any time *before* the case is submitted to the jury." *See* Fed. R. Civ. P.

10

50(a)(2) (emphasis added). So, if the motion comes before the case reaches the jury, it falls under Rule 50(a).

That is true regardless of the timing of the Court's ruling or the briefing schedule set by the Court. The Court need not rule on a Rule 50(a) motion right away, and it does not need to act before the case is submitted to the jury.

The Court *can* make a ruling right then and there, but it doesn't have to. Rule 50 states that "if a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court *may* resolve the issue against the party; and grant a motion for judgment as a matter of law." *See* Fed. R. Civ. P. 50(a) (emphasis added) (internal section headings omitted).

But a district court may decide not to rule on the motion right away. If the district court declines to grant the motion, the case is deemed to have been submitted to the jury subject to any legal questions raised in the motion. *See* Fed. R. Civ. P. 50(b).

A Rule 50(b) motion, by contrast, necessarily comes after the close of trial. The rule's title says it all: "Renewing the Motion *After* Trial." *See* Fed. R. Civ. P. 50(b) (emphasis added). Rule 50(b) requires a second motion – a *new* motion – after trial.

The text of the rule confirms that the title means what it says. It provides that, "[n]o later than 28 days *after* the entry of judgment . . . the movant may file a renewed motion for judgment as a matter of law." *Id.* (emphasis added) A party must *renew* its motion for judgment as a matter of law for the motion to fall under Rule 50(b).

In other words, the passing of time alone does not transform a motion under Rule 50(a) into a motion under Rule 50(b). Only a new motion can do that. Without a new motion after trial, Rule 50(b) doesn't come into play.

Here, Defendants' motion is properly viewed as a Rule 50(a) motion. Defendants made only one motion for judgment as a matter of law. That motion came during trial, at the close of Plaintiff's case-in-chief, before the case went to the jury. Defense counsel never renewed the motion after trial, so there is no Rule 50(b) motion for this Court to consider.

The Court's post-trial briefing schedule does not change the result. The fact that the Court's ruling comes after trial doesn't change it, either. Defendants' motion was a pre-jury-deliberation motion, not a post-verdict motion, so it was a motion under Rule 50(a), not Rule 50(b). The motion could not have been a motion under Rule 50(b), because a motion under Rule 50(b) comes after, not before, a jury verdict.

Holding onto a Rule 50(a) motion, and keeping it in the Court's back pocket until the jury returns a verdict, does not convert it to a Rule 50(b) motion. It is still a pre-verdict motion. *See Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 399–400 (2006) ("Federal Rule of Civil Procedure 50 sets forth the procedural requirements for challenging the sufficiency of the evidence in a civil jury trial and establishes two stages for such challenges – prior to submission of the case to the jury, and after the verdict and entry of judgment. Rule 50(a) allows a party to challenge the sufficiency of the evidence prior to submission of the case to the jury, and authorizes the district court to grant such motions at the court's discretion. . . . Rule 50(b), by contrast, sets forth the procedural requirements for renewing a sufficiency of the evidence challenge after the jury verdict and entry of judgment."); 9B Charles Alan Wright *et al.*, Federal Practice and Procedure § 2537 (3d ed. 2022) ("Either party may make a renewed motion for judgment as a matter of law during the trial, *which technically is a Rule 50(a) motion*, or after trial, which will be made under Rule 50(b).") (emphasis added); *see also id.* at § 2521 ("Rule 50(a) provides for a motion for judgment as a matter of law, a motion that may be made at any

time before submission of the case to the jury."); *Holder v. Illinois Dep't of Corr.*, 751 F.3d 486, 491–92 (7th Cir. 2014). Either way, the question is the sufficiency of the evidence at the close of a plaintiff's case.

The bottom line is that Defendants moved for judgment as a matter of law under Rule 50(a), not 50(b).

## II.    Legal Standard for a Rule 50(a) Motion

In any event, it's a wash. The standard is the same whether the motion falls under Rule 50(a) or 50(b). *See* Wright *et al.*, *supra*, at § 2524 ("It equally is settled by a myriad of judicial decisions that the standard in passing on that question is the same whether it arises in the procedural context of a motion for judgment as a matter of law prior to the submission of the case to the jury under Rule 50(a) or in the context of a renewed motion for judgment as a matter of law after the jury has returned a verdict under Rule 50(b)."); *id.* at § 2537 ("The standard for granting a renewed motion for judgment as a matter of law under Rule 50(b) is precisely the same as the standard for granting the pre-submission motion under Rule 50(a)."); *Baugh v. Cuprum S.A. De C.V.*, 2015 WL 9304338, at *2 n.2 (N.D. Ill. 2015) ("The same standard governs both types of Rule 50 motions.").

Rule 50 permits a court to override a jury's verdict and enter judgment as a matter of law when "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." *See* Fed. R. Civ. P. 50(a)(1).

Rule 50 imposes a "high bar." *Ruiz-Cortez v. City of Chicago*, 931 F.3d 592, 601 (7th Cir. 2019). "Only if no rational jury could have found for the nonmovant may [a court] disturb the jury's verdict." *Id.* A district court must not set aside a jury verdict lightly.

The district court must "give the nonmovant 'the benefit of every inference' while refraining from weighing for [itself] the credibility of evidence and testimony." *Id.* (quoting *Equal Emp. Opportunity Comm'n v. Costco Wholesale Corp.*, 903 F.3d 618, 621 (7th Cir. 2018)). The court looks at the "entire trial," but it "must 'disregard all evidence favorable' to the movant that 'the jury is not required to believe.'" *Id.* (quoting *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150–51 (2000)).

The question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The Court may grant judgment as a matter of law only when "there can be but one reasonable conclusion as to the verdict." *Id.* at 250.

## Analysis

Defendants moved for judgment as a matter of law on behalf of Defendants Rabideau, Williams, Turner, Durrett, and Brown, as to all claims against them. *See* Defs.' Mem. (Dckt. No. 553). For whatever reason, Defense counsel made no motion on behalf of Defendant Beaugard (but the jury sided with him on both counts, so any such argument would have been moot). The Court addresses each argument in turn.

## I. First Amendment – Retaliation

Defendants began with an argument that is no longer a live issue. They challenged the sufficiency of the evidence on the First Amendment retaliation claims against Defendants Turner and Durrett.

Again, Defendants made an oral motion under Rule 50(a) and submitted their memorandum before the case was submitted to the jury. But the jury ultimately returned verdicts

in favor of both Turner and Durrett on the First Amendment claims. *See* Jury Verdict, at 2 (Dckt. No. 579).

Defendants' arguments are therefore moot in light of the jury verdicts in their favor. *See* Fed. R. Civ. P. 50(b), Advisory Committee Notes ("Often it appears to the court or to the moving party that a motion for a judgment as a matter of law made at the close of the evidence should be reserved for a post-verdict decision. This is so because a jury verdict for the moving party moots the issue . . . .").

## II.     Eighth Amendment – Failure to Protect

Next, Defendants raise arguments about the Eighth Amendment failure-to-protect claims against Rabideau, Williams, Durrett, and Brown.

The Eighth Amendment's prohibition on cruel and unusual punishment requires prison officials to avoid "the unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 102–03 (1976) (quotation marks omitted). Therefore, although "[t]he Constitution 'does not mandate comfortable prisons,' . . . it [does not] permit inhumane ones" either. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)).

The obligation to head off unnecessary suffering broadly demands that prison officials "'take reasonable measures to guarantee the safety of . . . inmates'" in the face of known peril, regardless of its source. *Farmer*, 511 U.S. at 832 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)). In particular, this duty "requires prison officials 'to protect prisoners from violence at the hands of other prisoners.'" *Brown v. Budz*, 398 F.3d 904, 909 (7th Cir. 2005) (quoting *Farmer*, 511 U.S. at 833).

To establish an Eighth Amendment violation based on a failure to protect, "an inmate must show that a defendant was deliberately indifferent to 'an excessive risk to inmate health or

safety.'" *Sinn v. Lemmon*, 911 F.3d 412, 419 (7th Cir. 2018) (quoting *Gevas v. McLaughlin*, 798 F.3d 475, 480 (7th Cir. 2015)).

The claim includes two components: "(1) 'the harm to which the prisoner was exposed must be an objectively serious one'; and (2) judged subjectively, the prison official 'must have actual, and not merely constructive, knowledge of the risk.'" *Id.* (quoting *Gevas*, 798 F.3d at 480). Actual knowledge is required. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

Here, the jury found in favor of Kyles on his Eighth Amendment failure-to-protect claims against Defendants Rabideau, Williams, Durrett, and Brown. *See* Jury Verdict, at 2 (Dckt. No. 579). Specifically, the jury concluded that each Defendant was aware of a strong likelihood that Kyles would be seriously harmed as the result of an assault by another inmate while Kyles was double-celled with Pena in the Segregation Unit, and that each Defendant consciously failed to take reasonable measures to prevent the assault. *See* Jury Instructions, at 40 (Dckt. No. 568).

Defendants make two arguments in favor of judgment as a matter of law on the Eighth Amendment claims. First, as to Defendants Rabideau and Williams, they argue that there was insufficient evidence of their personal involvement in Kyles's cell placement with Pena. *See* Defs.' Mem., at 7–8 (Dckt. No. 553). Second, as to Defendants Durrett and Brown, they argue the claims fail because Kyles suffered no injury after they became aware of Pena's risk to Kyles. *Id.* at 8–9.

The Court will address the evidence against each Defendant, one at a time.

### A.    Defendant Rabideau

Defendants first argue that the jury lacked a sufficient evidentiary basis to find Karen Rabideau liable for the Eighth Amendment violation.

Rabideau was the placement officer at Stateville Correctional Center at the time.  *See* Trial Tr., at 227:2-4 (Dckt. No. 593).  In that role, she was in charge of moving inmates between cells.  *Id.* at 227:5-8.  It was her job to keep track of which cells were open, and who went where.  *Id.*

Again, to prevail on an Eighth Amendment failure-to-protect claim, a plaintiff must show that he (1) suffered an objectively "sufficiently serious" injury and (2) was "incarcerated under conditions posing a substantial risk of serious harm."  *Farmer*, 511 U.S. at 834.  Additionally – like any claim under the Eighth Amendment – the plaintiff must show that the defendant acted with deliberate indifference.  *Id.* at 847.

As to Rabideau, Defendants make two arguments.  First, they argue that Rabideau never had any personal involvement in Kyles's cell placement with Pena.  *See* Defs.' Mem., at 7 (Dckt. No. 553).  They point to the fact that Rabideau was not at Stateville on the day of the placement, and that Baldwin, not Rabideau, recommended Kyles's placement with Pena.  *Id.*

Second, Defendants argue that a jury could not find Rabideau liable because there is no evidence that she "had knowledge Pena posed a specific threat at the time of Plaintiff's placement."  *Id.* at 7–8.  In Defendants' view, Kyles never spoke or wrote to Rabideau before his placement.  *Id.* at 8.  And "there is no evidence . . . Rabideau knew that Pena was a member of the Maniac Latin Disciples, that they were a Gangster Disciples' affiliate or of Plaintiff's alleged need for protection from the Gangster Disciples due to a 2011 incident at Menard [Correctional Center]."  *Id.*  Finally, Defendants argue that a reasonable jury could not conclude that Rabideau

17

ever received the grievance letters that Kyles mailed, because Rabideau testified that she never saw the letters. *Id.*

The jury saw and heard enough evidence to support a verdict against Rabideau. It is true that Rabideau was not at Stateville on the day when Baldwin placed Plaintiff in a cell with Pena. And there was no evidence that Rabideau directed him to do so, or was otherwise pulling the strings on the cell decision behind the scenes. So, the record would not support a finding that Rabideau bears responsibility for putting Plaintiff and Pena together.

Even so, the jury heard enough evidence supporting the conclusion that Rabideau was personally involved in Plaintiff's constitutional deprivations, and that she had knowledge of the threat posed by Pena.

For example, Plaintiff testified that he sent at least five letters to Rabideau – on October 25, October 26, October 27, October 28, and November 3, 2014. *See* Trial Tr., at 39:2-9 (Dckt. No. 591). He explained that he mailed the grievances in the way that prisoners typically mailed grievances. You "place it in the bars when you see them coming around with the mail bag. You hand it through the bars, they pick it up, they drop it in the bag." *Id.* at 29:23 – 318:6. And Plaintiff testified that he saw prison mail officials pick up the letters. *Id.* at 30:2-6; 39:17-22.

Plaintiff testified that his letters to Rabideau explained that he was a Protective Custody inmate, but that he had been celled with a general population inmate and "need[ed] help." *See* Trial Tr., at 29:2-22 (Dckt. No. 591); *see also id.* at 29:13-18 ("I believe I filed six or seven letters to the – to the placement officer [Rabideau], the one who places you in the cell, telling her that I was in the cell. I'm a PC, I'm in the cell with a general population inmate. I need out of the cell. I need help. He is beating me. He is taking my food. Several letters went to her.").

Plaintiff testified that in his letters, he told Rabideau that he was living with a gang member from general population (Pena) despite his Protective Custody status and that Pena was "attacking" him. *Id.* at 32:19 – 33:1. And Plaintiff told the jury that he never received a response or help from Rabideau despite those letters. *Id.* at 36:12-18, 40:7-14. Instead, he testified that he stayed in a cell with Pena for weeks after he sent his first grievance to Rabideau. *Id.* at 52:23 – 53:16.

Even more, Plaintiff testified that, in at least one of his grievances, he explained to Rabideau that he was still wrongfully celled with Pena, and that Pena "did stuff" to him, meaning that Pena sexually assaulted him. *Id.* at 39:2-7, 40:15-17; *see also id.* at 39:3-7 ("I'm writing you to let you know that I'm still in seg with this Satan Disciple. I'm a protective custody inmate. I wrote to you on or about October 25, 26, 27, 28th asking for your help and to be moved. He did stuff. Please help me."). The jury saw a copy of that grievance. *See* Pl.'s Ex. 63, Letter from Kyles to Rabideau.

To be sure, Rabideau testified that she only briefly reviewed the cell placement of Plaintiff with Pena upon her return to Stateville. *See* Trial Tr., at 236:21-24 (Dckt. No. 591); *see also* Trial Tr., at 236:10-19 (Dckt. No. 593). And she told the jury that she never received Plaintiff's letters. *See* Trial Tr., at 261:24 – 262:6; 263:22 – 264:5 (Dckt. No. 591).

But her denial alone doesn't mean that a reasonable jury couldn't find for Plaintiff. Evidence that a prisoner wrote and mailed grievance letters is sufficient for a reasonable jury to infer receipt of those letters. *See Horshaw v. Casper*, 910 F.3d 1027, 1029 (7th Cir. 2018) ("Placing the note in the prison mail system supports an inference of receipt.").

Here, Plaintiff testified that he wrote, addressed, and mailed several grievances to Rabideau explaining his dire situation. And the jury also heard testimony from Pena

19

corroborating the notion that Plaintiff sent several letters to Rabideau. Pena testified that he recalled seeing Plaintiff write and send more than one grievance in the institutional mail system. *See* Trial Tr., at 223:3 – 224:4 (Dckt. No. 593) ("Q: And he was not happy that he was in that cell, right? A: Yes, sir. Q: In fact, you recall seeing him write grievances and put them in the institutional mail, right? A: Yes, sir. Q: You recall seeing him put letters or other writings in the institutional mail? . . . A: Yes, sir. . . . Q: And you saw Mr. Kyles do this on multiple times while you were in segregation together? . . . A: Yes, I did.").

In his rebuttal testimony, Plaintiff confirmed that those grievances – meaning the ones that Pena saw him write and mail – included the numerous letters that he wrote to Rabideau. *See* Trial Tr., at 170:24 – 171:9 (Dckt. No. 595).

Putting it all together, Plaintiff testified that he sent grievances and letters to Rabideau, asking for help. Pena confirmed that he saw Plaintiff send grievances (but he didn't testify about the content). And according to Plaintiff, Rabideau didn't help him.

All of this evidence is enough for a reasonable jury to find that Plaintiff alerted Rabideau to an excessive risk to his safety, and that she did nothing in response. That's enough for liability. *See Perez v. Fenoglio*, 792 F.3d 768, 782 (7th Cir. 2015) ("An inmate's correspondence to a prison administrator may thus establish a basis for personal liability under § 1983 where that correspondence provides sufficient knowledge of a constitutional deprivation. . . . Indeed, once an official is alerted to an excessive risk to inmate safety or health through a prisoner's correspondence, refusal or declination to exercise the authority of his or her office may reflect deliberate disregard.") (citation omitted).

Maybe a reasonable jury could have reached a different conclusion. The jury wasn't required to take Plaintiff at his word. The jury wasn't required to believe Plaintiff. But it did. The jury didn't have to do what it did, but the jury heard enough to do what it did.

Accordingly, the Court concludes that there was a sufficient evidentiary basis for the jury to find that Rabideau knew about the threat that Pena posed to Plaintiff in the cell, but turned a blind eye to the danger.

### B.    Defendant Williams

Defendants also argue that the jury lacked a sufficient evidentiary basis to find Williams liable for the Eighth Amendment violation. *See* Defs.' Mem., at 7–8 (Dckt. No. 553).

Williams was the head warden at Stateville, also known as the "chief administrative officer." *See* Trial Tr., at 61:2-4 (Dckt. No. 593). In this role, Williams's daily duties included "plenty of paperwork" and "administrative duties." *Id.* at 83:3-5. Williams's days were "filled with meetings" and he supervised four assistant wardens, the business administrator, and the chief engineer, among others. *Id.* at 83:5-7. As warden, Williams was "ultimately responsible for the entire facility" and its roughly 1,200 employees. *Id.* at 83:17-22.

Defendants make two arguments. First, Defendants argue that Williams was not personally aware of the risk to Kyles. *See* Defs.' Mem., at 7 (Dckt. No. 553). Second, Defendants assert that Kyles's attempts to notify Williams were insufficiently specific. *See* Defs.' Reply, at 5 (Dckt. No. 583).

Defendants point out that Williams denied ever receiving a grievance from Kyles, and that Kyles could not confirm that Williams ever read it. *Id.* at 3. And, even assuming that Kyles sent a grievance, Defendants point out that the evidence shows that one of Williams's designees

21

– not Williams – reviewed it.  In short, Defendants urge that if Kyles was in danger, there was insufficient evidence showing that Williams knew about it.

Liability under section 1983 is direct, not vicarious.  Section 1983 requires personal responsibility to establish personal liability.  That is, only a defendant's direct, personal involvement in a constitutional violation can result in liability.  *See Perez v. Fenoglio*, 792 F.3d 768, 781 (7th Cir. 2015) ("It is well established that '[f]or constitutional violations under § 1983 . . . a government official is only liable for his or her own misconduct.'") (quoting *Locke v. Haessig*, 788 F.3d 662, 669 (7th Cir. 2015)); *see also Kuhn v. Goodlow*, 678 F.3d 552, 555–56 (7th Cir. 2012) ("[Section] 1983 liability is premised on the wrongdoer's personal responsibility."); *Jenkins v. Keating*, 147 F.3d 577, 583 (7th Cir. 1998) ("Section 1983 creates a cause of action based upon personal liability and predicated upon fault.  An *individual* cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation.") (emphasis in original) (quoting *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983)).

The same rule applies to officials at the top of the managerial pyramid.  "[T]o recover damages against a prison official acting in a supervisory role, a § 1983 plaintiff may not rely on a theory of respondeat superior and must allege that the defendant, through his or her own conduct, has violated the Constitution."  *Perez*, 792 F.3d at 781 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)); *see also Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011) ("[A] plaintiff claiming a violation of § 1983 must produce evidence that the defendant caused or participated in [the] constitutional deprivation.") (quotation marks omitted).

In the Eighth Amendment context, that rule means that the defendant must have actual, personal knowledge of a risk to a prisoner.  *See, e.g.*, *Sinn*, 911 F.3d at 419; *Stockton v.*

*Milwaukee County*, 44 F.4th 605, 619 (7th Cir. 2022) ("Stockton must demonstrate Madden's injury occurred at Clarke, Schmidt, and Evans's direction or with their knowledge and consent and that the defendants acted 'either knowingly or with deliberate, reckless indifference.'") (quoting *Backes v. Village of Peoria Heights*, 662 F.3d 866, 870 (7th Cir. 2011)); *Willis v. Williams*, 2022 WL 4599260, at *9 (N.D. Ill. 2022) (Dow, J.) ("[W]here a prison official is actually aware of 'an excessive risk to inmate health or safety,' he may not shrug it off and turn a blind eye.") (quoting *Farmer*, 511 U.S. 825, 837 (1994)); *Hardy v. Hardy*, 2013 WL 12394908, at *4 (N.D. Ill. 2013) (Durkin, J.) ("A deliberate indifference claim has two elements: an objectively serious risk of harm and a subjectively culpable state of mind. . . .  To satisfy the subjective state of mind element, an inmate does not have to show that the prison official actually intended or wanted to harm him; it is enough that the official 'knew of a substantial risk of harm to the inmate and disregarded the risk.'") (quoting *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007)).

Defendants assert that the jury lacked a sufficient evidentiary basis to find actual knowledge on the part of Williams.  The thrust of the argument is that Williams never personally saw the paperwork – meaning Kyles's grievances, and the double-cell forms for Kyles and Pena – that could have given rise to actual knowledge.

As Williams testified at trial, "[i]t would be impossible for one warden to be able to sign every document that is generated in the Illinois Department of Corrections."  *See* Trial Tr., at 84:17-19 (Dckt. No. 593).  Williams may have been the warden, but he didn't personally review everything that came across his desk.

Williams delegated a number of his tasks to designees, who would review and sign certain materials on his behalf. *Id.* at 84:6-11. That delegation doesn't mean that Williams knew about them. And unless he did, Williams can't be vicariously liable for his designee's actions.

To be sure, the evidence at trial showed that Williams's designees reviewed and signed both Kyles's and Pena's double-cell forms, and signed Kyles's incident report. Williams's name was on some of these forms. But the evidence at trial showed that a designee – not Williams – signed each on his behalf. *Id.* at 244:9-13.

As to the emergency grievance, there was no evidence that any of Williams's designees reviewed or received it. And no witness could confirm whether Williams himself reviewed it. *See* Trial Tr., at 75:2-8 (Dckt. No. 591).

For his part, Williams testified that he could not recall ever seeing any of these forms, and that it would be unusual for a designee to bring them to his attention. *See* Trial Tr., at 68:8-11, 69:9-19, 241:22 – 242:23, 244:9 – 245:7, 246:20 – 247:14 (Dckt. No. 593). This was routine business, and Williams's designees were there to take things off his plate, not burden him with the substance of every form they signed on his behalf.

But Kyles put forward circumstantial evidence on the other side of the ledger showing that Williams knew about his dangerous circumstances. Kyles testified that he placed an emergency grievance in the institutional mail soon after his double-cell placement with Pena. *See* Trial Tr., at 27:18-20 (Dckt. No. 591). He testified that such grievances went directly to the warden. *Id.* at 27:9-10; 29:6-7.

Pena's testimony corroborated this account. At trial, Pena stated that he saw Kyles write grievances and put them in the institutional mail. *See* Trial Tr., at 223:5-13 (Dckt. No. 593). The jury therefore could reasonably conclude that Warden Williams received the grievance. *See*

24

*Horshaw*, 910 F.3d at 1029; *Perez*, 792 F.3d at 782; *Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996) (holding that "an inmate's letters to prison administrators may establish a basis for § 1983 liability" where "the communication, in its content and manner of transmission, gave the prison official sufficient notice to alert him or her to an excessive risk to inmate health or safety") (internal quotation marks omitted).

Even so, Defendants distinguish receipt from actual knowledge. *See* Def.'s Reply, at 3 (Dckt. No. 583). Defendants think that even if Williams received the grievance, there was insufficient evidence to find that he – as opposed to one of his designees – actually read it.

Defendants rely on *McNeil v. Estate of Obaisi*, 2020 WL 6392999, at *6 (N.D. Ill. 2020) (Rowland, J.), for this proposition. There, the plaintiff filed multiple grievances with the warden, seeking medical attention. *See* 2020 WL 6392999, at *6. But the warden had no recollection of ever reviewing the plaintiff's grievance, and he further testified that his designees would review *all* grievances. *Id.*

Judge Rowland found that it was appropriate to infer that the grievances had been sent and received. *Id.* But the reasonable inferences stopped there. The court found that there was no evidence to suggest that the warden *himself* personally reviewed the grievance, or was otherwise aware of its existence. *Id.* Nothing tied the warden to the contents of the grievance.

Here, in contrast, there was room for the jury to reasonably infer that Williams, not one of his designees, reviewed the grievance. For starters, in contrast to *McNeil*, Warden Williams did not testify that designees reviewed *all* grievances at the time Kyles was in Segregation.

The evidence at trial instead showed that although Williams's designees reviewed some grievances, *so too would Williams*. Emergency grievances went directly to the warden, and either he or one of his designees would review them. *See* Trial Tr., at 27:9-10, 29:6-7 (Dckt. No.

25

591); Trial Tr., at 84:6-11 (Dckt. No. 593). Williams's personal review of Kyles's grievance was therefore not out of the question, as it was in *McNeil*.

The jury also heard evidence supporting the reasonable inference that Williams's designees brought the issue to his attention. That is, even assuming that a designee reviewed the emergency grievance, that's not the end of the story.

Kyles testified that he spoke with several of Williams's designees after entering Segregation. Each suggested that he would look into the situation, and work with other Stateville officials to remedy it.

For example, Kyles testified that he spoke with Nicholas Lamb, the number two warden at Stateville:

> Lamb came around and did his round walking around the unit, and I stopped him at the door. And I told him – I say, "Lamb, you know me." He say, "Yeah, I know who you are." I say, "I've been knowing you for years. You know I ain't did nothing wrong." He's like, "Well, we working on it. You talk to Dr. Larry. We working on it. We going to get this situation straightened out."

*See* Trial Tr., at 26:14-22 (Dckt. No. 591).

Kyles also testified that he spoke with Kevin Senor and James Laris, each a designee of Williams, the day he entered Segregation. *Id.* at 23:10 – 24:23; Trial Tr., at 169:3-18 (Dckt. No. 595). He told Senor that he was a Protective Custody inmate in a cell with a general population inmate. Senor responded, "Oh, no, no, this is not supposed to happen. Let's fix this." *See* Trial Tr., at 24:18-20 (Dckt. No. 591). Senor then told Kyles he was going to alert someone to resolve the situation. *Id.* at 312:20-21 ("And he said he was going to talk to someone to get it fixed. By him being the warden's secretary, right to him, I figured that he would go talk to the warden personally.").

Kyles reported similar concerns to Laris. *See* Trial Tr., at 168:14-17 (Dckt. No. 595). Laris told Kyles that he would look into his situation, and into getting him out. *Id.* at 169:18-21 ("Q: And did these individuals indicate to you – did they tell you that they were going to look into your situation about why you're in there and about getting you out? A: Yes, they told me that.").

So, Kyles spoke with three authorized designees of Warden Williams. He told all three about his Protective Custody status, about the fact that he was housed with a general population inmate, and about his concerns for his safety. All three responded that they would look into the situation.

The jury heard evidence that "looking into it" meant informing Warden Williams. On redirect, Williams testified that his staff would bring matters to his attention when they felt like there was something he needed to be aware of. *See* Trial Tr., at 94:1-4 (Dckt. No. 593) ("Q: So when your staff felt like there was something you needed to know or be aware of, they would bring it to your attention, right? A: Yes, sir."). The jury could have reasonably inferred Kyles's safety concerns would have been one of those matters.

In sum, given the designees' knowledge, their promises to follow up, and Williams's testimony that his assistants would bring important matters to his attention, the jury reasonably inferred that Williams was aware of Kyles's situation. The jury was entitled to disbelieve Williams's denial, and this Court may not now second-guess that conclusion.

Defendants next argue that even if Williams knew about Kyles's emergency grievance, or his double-celling with Pena, that information was insufficiently specific to give rise to deliberate indifference. *See* Defs.' Reply, at 5 (Dckt. No. 583). In Defendants' view, Kyles's

warnings were too vague to put Williams on notice of a specific threat to his safety. *Id.* (citing *Grieveson v. Anderson*, 538 F.3d 763, 776–77 (7th Cir. 2008)).

This argument also fails to move the needle. Kyles's grievances may not have identified Pena by name, but they provided all the relevant details for the jury to conclude that Williams was on notice of a specific threat to Kyles's safety.

Kyles was a Protective Custody inmate. IDOC approved him for that status because it recognized a credible threat to his safety from within the general prison population. He was housed separately, and for good reason: he faced heightened safety risks from general population inmates – specifically, members of the Gangster Disciples and affiliated gangs. That kind of vulnerability raises red flags, and can give rise to notice. *See Weiss v. Cooley*, 230 F.3d 1027, 1032 (7th Cir. 2000) ("Sometimes the heightened risk of which the guards were aware comes about because of their knowledge of the victim's characteristics, not the assailant's.").

The jury heard evidence that Williams knew of Kyles's Protective Custody status and the reasons behind it. For starters, Williams was copied on a letter approving Kyles's Protective Custody application. *See* Trial Tr., at 242:7 – 244:25 (Dckt. No. 590). That letter conveyed that Kyles could enter Protective Custody because the Gangster Disciples had placed a hit on him after he turned in knives belonging to the gang. *See* Trial Tr., at 41:13 – 42:4 (Dckt. No. 594).

Kyles also testified that his emergency grievance to Williams conveyed that he was a Protective Custody inmate celled with an inmate who threatened his safety. He testified that "[the grievance] stated my name, my identification number and the details of – I'm a PC inmate approved by the director and I was placed in segregation in the cell with a general population inmate and I fear for my life." *See* Trial Tr., at 28:21-25 (Dckt. No. 591) He told Laris, Lamb, and Senor – all Williams's designees – the very same thing. *Id.* at 25:18-20.

28

Kyles's Protective Custody status and Williams's knowledge of it differentiates this case from *Grieveson*. There, the plaintiff told jail officials only in general terms that he was afraid and wanted to be moved. *See Grieveson*, 538 F.3d at 776. He never informed jail officers of a specific threat to his life, or why he was at risk. *Id.*

Here, Kyles communicated why he was at risk, and from whom. He stated that he was a Protective Custody inmate, placed in a cell with a general population inmate. As Williams's own designees observed, that was "not supposed to happen." *See* Trial Tr., at 24:18-20 (Dckt. No. 591).

Moreover, Kyles's assailant was readily identifiable, even if Kyles failed to identify him by name. Kyles's shared a cell in the Segregation Unit with one person, and one person only: Jorge Pena. And Williams was on notice that Pena was a general population inmate who posed a threat to Kyles based on his Protective Custody status. Kyles did not need to be any more specific. *See Farmer,* 511 U.S. at 843 (noting that a custodial official cannot "escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault," and that "it does not matter whether the risk comes from a single source or multiple sources"); *see also Sinn*, 911 F.3d at 421 ("'[I]t is well settled' that plaintiffs can adequately establish deliberate indifference in circumstances where 'the *specific* identity of the ultimate assailant is not known in advance of assault.'") (emphasis in original) (quoting *Brown*, 398 F.3d at 915).

Under these circumstances, Williams was on notice of a specific threat to Kyles's safety. Kyles was a vulnerable inmate placed in a cell with a member of the general prison population from whom IDOC had specifically separated him. The jury heard enough to conclude that Kyles

informed Williams of his Protective Custody status, and that his cellmate posed a threat for that reason. That is enough to impose liability. *See Langston v. Peters,* 100 F.3d 1235, 1238–39 (7th Cir. 1996) (recognizing that deliberate indifference can be based upon a jailer's knowledge of inmates likely to be targeted by gangs); *Walsh v. Mellas,* 837 F.2d 789, 796 (7th Cir. 1988) (upholding finding of deliberate indifference where "plaintiff was known to be . . . a targeted inmate and therefore a member of an identifiable group of prisoners for whom risk of assault was a serious problem").

In sum, there was a sufficient evidentiary basis for the jury to find that Williams was deliberately indifferent to an excessive risk to Kyles's safety. Viewing all the evidence in the light most favorable to Kyles, the jury could reasonably conclude that Williams had actual knowledge of a substantial risk of serious harm to Kyles. The Court therefore denies judgment as a matter of law as to Williams on the Eighth Amendment claim.

### C. Defendants Brown and Durrett

The Court next turns to Defendants Brown and Durrett. Defendants argue that they are entitled to judgment as a matter of law because Kyles suffered no injury after they became aware of the threat that Pena posed to his safety. *See* Defs.' Mem., at 8–9 (Dckt. No. 553).

Defendant William Brown was a lieutenant in F-House, which housed the Segregation Unit. *See* Trial Tr., at 71:21-25 (Dckt. No. 594). His duties included providing security and ensuring custody of the inmates celled in F-House. *Id.* at 72:14-15. As Brown put it: "basically, [he] was responsible for the safety of the staff and inmates assigned under me." *Id.* at 72:15-16.

Defendant Tralon Durrett was one of those subordinates. Durrrett was the unit sergeant in F-House, working the 7 to 3 shift. *Id.* at 153:10-13, 15-16. He reported directly to Brown. *Id.* at 153:12-14. As a sergeant, Durrett was "primarily responsible" for "the regular correctional

officers assigned to each gallery." *Id.* at 154:12-15. He gave the officers "their immediate assignments" each day, including overseeing mealtimes and inmate recreation. *Id.* at 154:18-24. Durrett conducted rounds of the unit "all the time." *Id.* at 154:25 – 155:4.

Kyles acknowledged at trial that he suffered no physical assaults at the hands of Pena *after* he told Brown and Durrett about the rape. *See* Defs.' Reply, at 6–7 (Dckt. No. 583). The rapes and physical abuse happened before Brown and Durrett knew about the danger that Kyles faced. As Defendants see it, that lack of physical injury forecloses liability. *Id.* ("[T]here can be no failure to protect claim without a subsequent assault.").

Typically, an Eighth Amendment failure-to-protect claim for damages requires the plaintiff to have suffered a physical injury. *Id.* at 272 ("[I]t is the reasonably preventable assault itself, rather than any fear of assault, that gives rise to a compensable claim under the Eighth Amendment."); *see also Doe v. Welborn*, 110 F.3d 520, 524 (7th Cir. 1997) ("An allegation that prison officials exposed a prisoner to a risk of violence at the hands of other inmates, does not implicate the Eighth Amendment's Cruel and Unusual Punishments Clause.") (citation and quotation marks omitted). A failure to protect a prisoner from a risk that doesn't materialize usually isn't enough.

Psychological injuries generally don't cut it when it comes to the Eighth Amendment. The fear that something *might* happen "does not reflect the deprivation of the minimal civilized measures of life's necessities that is the touchstone of a conditions-of-confinement case." *Babcock*, 102 F.3d at 272 (quotation marks and citations omitted). The Eighth Amendment protects against a failure to *prevent* harm, not a failure to prevent exposure to a risk of harm. *Id.*; *see also Farmer*, 511 U.S. at 834.

But the Seventh Circuit has not entirely foreclosed Eighth Amendment claims based on psychological injury alone. The Court of Appeals has suggested that "extreme and officially sanctioned psychological harm" might support an Eighth Amendment failure-to-protect claim. *Welborn*, 110 F.3d at 524 (holding that the plaintiff in a failure-to-protect case had neither shown "physical harm nor the kind of extreme and officially sanctioned psychological harm that might support a claim for damages under the Eighth Amendment"); *see also Age v. O'Brien*, 2000 WL 307396, at *2 (7th Cir. 2000) ("Though [the plaintiff] may fear an assault by the Mexican Mafia or others, a successful claim for damages under the Eighth Amendment requires proof of obvious physical injury *or of extreme and officially-sanctioned psychological harm*, neither of which is present here.") (emphasis added); *Tyson v. Bedwell*, 2021 WL 878653, at *2 (S.D. Ind. 2021) (holding that Seventh Circuit case law did not "entirely foreclose claims where no physical injury occurred"); *Czapiewski v. Thomas*, 2017 WL 1274160, at *3 (E.D. Wis. 2017) ("A prisoner can maintain an Eighth Amendment claim, even in the absence of physical injury, based on prison officials' malicious or sadistic exposure of the prisoner to risk of harm because the Eighth Amendment prohibits 'the wanton infliction of psychological pain.'") (quoting *Calhoun v. DeTella*, 319 F.3d 936, 939 (7th Cir. 2003)); *but see Saunders v. Tourville*, 97 F. App'x 648, 649 (7th Cir. 2004) ("The standard in this circuit is clear: an inmate who suffers only a risk of physical harm has no compensable claim under the Eighth Amendment.").

Not any psychological harm will do. The psychological harm stemming from fear of assault must be both "extreme" and "officially sanctioned." *Welborn*, 110 F.3d at 524. Fear of assault alone is insufficient. *Id.*; *Babcock*, 102 F.3d at 272.

The Seventh Circuit has suggested that the standard presents a high bar. Only "egregious" official misconduct resulting from an official's "malicious or sadistic intent" clears

32

the hurdle. *Babcock*, 102 F.3d at 270–73 (holding that the plaintiff's "allegations of deliberate indifference do not exemplify the egregious conduct" causing psychological harm "sufficient to entitle him to damages under the Eighth Amendment"); *see also id.* at 270 ("This case thus squarely presents the question whether or not a federal prisoner who was not assaulted by, and who is no longer at risk from, fellow inmates may nevertheless maintain a *Bivens* claim for money damages based solely on prison officials' past failure to take measures to protect the prisoner from inmates known to pose a danger to the prisoner. Our answer is 'no,' *at least where, as here, exposure to risk of harm cannot be said to result from an official's malicious or sadistic intent*.") (emphasis added); *Whiteside v. Pollard*, 481 F. App'x 270, 272 (7th Cir. 2012) (holding that the plaintiff did not present evidence that the defendants exposed him to a risk of contracting HIV "out of malice, which [he] needed to demonstrate in order to establish a failure-to-protect claim").

But however high the bar, the long and short of it is that the lack of subsequent physical injury does not foreclose Kyles's failure-to-protect claim. Seventh Circuit case law suggests that psychological injuries can, at times, suffice. So Kyles may prevail based on his psychological injury alone, so long as he suffered an "extreme and officially sanctioned psychological harm." *Welborn*, 110 F.3d at 524.

The jury reasonably concluded that Kyles suffered such harm in this case. Viewing the evidence in the light most favorable to Kyles, both Brown and Durrett chose to leave Kyles with his attacker despite his pleas for help. The jury heard evidence that each knew that Pena had raped Kyles, and each responded that Kyles either had it coming, or could fend for himself.

Kyles testified that he reported the sexual assaults to both Durrett and Brown. *See* Trial Tr., at 41:5-6; 330:20 – 332:4 (Dckt. No. 591). As Durrett was making his rounds, and with

33

Pena out of the cell momentarily, Kyles reached out for help. He testified to the following exchange:

> And I told him, I said, "Hey, you've got to get me out of here.
> This guy sexually assaulted me." Well, I say, "He raped me."

*Id.* at 42:25 – 43:2. Previously, Kyles had told Durrett, "I can't handle a cell[mate], man. You know I'm PC." *See* Trial Tr., at 258:5-6 (Dckt. No. 590).

Not only did Durrett ignore Kyles's pleas, he said the assaults were deserved. Kyles testified that Durrett responded, "This is what happens to PC motherfuckers who would try to have my officers investigated." *See* Trial Tr., at 43:3-5 (Dckt. No. 591).

Kyles had a similar exchange with Brown. Around the same time that he spoke with Durrett, Kyles confronted Brown. He testified to the following:

> And I told him, I say, "Man, this guy, he's doing stuff. He raped
> me in here, man. He taking my food."

*Id.* at 44:1-2. Like Durrett, Brown blamed Kyles, and did nothing. Kyles testified that Brown responded, "As big as you are, you need to fight back and stop lying." *Id.* at 44:3-4. He left Kyles in his cell with Pena – after hearing that Pena had raped Kyles – for several more days.

Pena's testimony corroborated both encounters. Pena testified that he saw Kyles talk to Durrett and Brown multiple times while the two shared a cell. As Pena told it, Kyles repeatedly told the officers that he was a PC inmate and wasn't supposed to be in Segregation. *See* Trial Tr., at 224:5 – 225:4 (Dckt. No. 593) ("Q: I think you testified before you recall him talking to Lieutenant Brown. . . . And you recall seeing him talk to Lieutenant Brown multiple times about how he wasn't supposed to be in seg, he was a PC inmate? A: Yes. Q: And you saw him talk to Sergeant Durrett multiple, multiple times about [how] he shouldn't be in that – in the

segregation double-celled with you, should he? A: I seen him talk to him about him wanting to go to PC and him – yes. Yes, I did.").

Brown and Durrett's conduct, and the degree of psychological harm that it inflicted on Kyles, is thus distinguishable from *Babcock* and *Welborn*. Unlike those cases, Kyles *was assaulted just days earlier*. He was raped not once, but twice – and was forced to remain with his attacker and subject to the constant threat of a third rape. Defendants knew about the attacks, but nonetheless left Kyles in his cell as retribution.

Based on that evidence, a reasonable jury could find Defendants Durrett and Brown liable under these circumstances. *See Gibson v. Donaldson*, 2018 WL 731957, at *9 (S.D. Ind. 2018) (denying summary judgment where defendant "intentionally helped create the fear of assault" by telling other inmates that plaintiff was an informant).[1]

---

[1] The Prison Litigation Reform Act precludes recovery of compensatory damages for mental and emotional injuries. *See Calhoun*, 319 F.3d 936, 940–41 (7th Cir. 2003) ("We agree that, absent a showing of physical injury, § 1997e(e) would bar a prisoner's recovery of compensatory damages for mental and emotional injury."). If a prisoner alleges psychological injury alone, he may recover only nominal and punitive damages. *Id.*; *see also Gray v. Hardy*, 826 F.3d 1000, 1007 (7th Cir. 2016) ("[W]e have recognized that [a]lthough § 1997e(e) would bar recovery of compensatory damages 'for' mental and emotional injuries suffered, the statute is inapplicable to awards of nominal or punitive damages for the Eighth Amendment violation itself.") (cleaned up) (alteration in original). The Seventh Circuit has read the statute "to apply only to compensatory damages, not nominal or punitive damages involving no physical injury." *Lisle v. Welborn*, 933 F.3d 705, 719 (7th Cir. 2019). "[W]hile the Prison Litigation Reform Act denies recovery for mental or emotional injury suffered while in custody without a prior showing of physical injury, *psychological harms alone may still give rise to an Eighth Amendment violation and provide a basis for a civil action for nominal and punitive damages and/or injunctive relief.*" *Smith v. Godinez*, 2023 WL 358792, at *5 (N.D. Ill. 2023) (Tharp, J.) (cleaned up) (emphasis added). So, even when "any claim for compensatory damages is barred . . . if a jury finds that Plaintiff suffered psychological harm, he may recover nominal or punitive damages." *Stanton v. Dart*, 2018 WL 1240479, at *6 (N.D. Ill. 2018) (Lee, J.). The Court adequately instructed the jury on this point. *See* Jury Instructions, at 49 (Dckt. No. 568) ("If you find that Plaintiff did not suffer a physical injury and was not subjected to a sexual act, you may not award damages for mental or emotional injury. Whether or not Plaintiff proves a physical injury or a sexual act, you may award nominal damages and punitive damages, so long as you find that Plaintiff has met the standard for obtaining those damages."). To the extent that the jury awarded compensatory damages against Defendants Durrett and Brown, the Court concludes that those damages stemmed from Defendants' liability under state law for the intentional infliction of emotional distress. *See* Jury Verdict, at 2–5 (Dckt. No. 579).

In sum, based on Seventh Circuit case law, a prisoner can prevail on an Eighth Amendment claim based on psychological injury alone if the injury is both extreme and officially sanctioned. And here, the record included a sufficient evidentiary basis for the jury to find that Brown and Durrett inflicted that kind of injury on Kyles by leaving him in a cell with his rapist for days after he asked for their help. The Court therefore denies judgment as a matter of law on the Eighth Amendment claims against Defendants Brown and Durrett.

## III.    Intentional Infliction of Emotional Distress

Kyles also brought claims under Illinois law for intentional infliction of emotional distress ("IIED") against Defendants Beaugard, Brown, Durrett, Rabideau, Turner, and Williams. Those claims were tried to verdict.

The jury returned verdicts in favor of Defendants Beaugard and Rabideau, but against Defendants Brown, Durrett, Turner, and Williams. *See* Jury Verdict, at 3 (Dckt. No. 579). So, Defendants' arguments for judgment as a matter of law in favor of Beaugard and Rabideau are now moot.

The Court will consider whether Defendants Brown, Durrett, Turner, and Williams are entitled to judgment as a matter of law on Kyles's IIED claims.

### A.    Sovereign Immunity

Defendants argue that the claims of intentional infliction of emotional distress are barred by the doctrine of sovereign immunity under Illinois law. *See* Defs.' Mem., at 10–14 (Dckt. No. 553). That is, Defendants do not raise a federal constitutional argument under the Eleventh Amendment. *See Murphy v. Smith*, 844 F.3d 653, 656, 658 (7th Cir. 2016) (distinguishing Illinois state-law sovereign immunity from immunity under the Eleventh Amendment). Instead,

Defendants argue that Illinois law about sovereign immunity bars the state-law IIED claims. *See* Defs.' Mem., at 11.

The argument requires a little unpacking, both procedurally and substantively. The Court will proceed in three steps. First, the Court will summarize Judge Lee's ruling at the summary judgment stage. Second, the Court will summarize the applicable standard for sovereign immunity under Illinois law. Finally, the Court will address whether Defendants waived the issue at trial.

### 1.     Waiver at the Summary Judgment Stage

The Court begins by summarizing Judge Lee's ruling on the issue of sovereign immunity at the summary judgment stage.

The Court will tell the backstory because Plaintiff points out that Judge Lee ruled that the issue of sovereign immunity was waived at the summary judgment stage. In his response, Kyles relegates a discussion of Defendant's sovereign immunity argument to a footnote, noting that Judge Lee held that "Defendants abandoned the sovereign immunity argument in the reply in support of their Motion for Summary Judgment." *See* Pl.'s Resp. to Rule 50(a) Mtn., at 13 n.7 (Dckt. No. 582). Kyles responds briefly to the merits of the sovereign immunity argument only in his sur-reply brief. *See* Pl.'s Sur-Reply to Rule 50(a) Mtn., at 7–8 (Dckt. No. 587).

It is important to understand what Judge Lee did, and what Judge Lee didn't do. Basically, Judge Lee held that Defendants touched on the argument in their opening brief, but abandoned the argument in their reply brief. So, as Judge Lee saw it, Defendants waived any argument based on sovereign immunity for purposes of a motion for summary judgment. Sovereign immunity was left for trial.

In their opening brief in support of their motion for summary judgment, Defendants argued that the intentional infliction of emotional distress claims were "barred by sovereign immunity." *See* Defs.' Mem. in Supp. of Summ. J., at 20–21 (Dckt. No. 325). Defendants acknowledged that Kyles had sued them in their individual capacities – he did not directly sue the State of Illinois. But Defendants contended that "[u]nder Illinois law, the applicability of sovereign immunity does not depend on the formal designation of the defendants in the action." *Id.* at 21 (citing *Jackson v. Alverez*, 831 N.E.2d 1159, 1164 (Ill. App. Ct. 2005)). In Defendants' view, "Plaintiff's state law claims are based on duties imposed as [a] result of Defendants' state employment," so "sovereign immunity bars the state law claims." *Id.*

Kyles then responded to the sovereign immunity issue in his response brief. *See* Pl.'s Resp., at 33–34 (Dckt. No. 340). Kyles argued that Defendants' sovereign immunity argument failed because "sovereign immunity is inapplicable where, as here, the relationship between Plaintiff and Defendants would not have had a source outside of Defendant's employment status." *Id.* at 33. He also contended that "Illinois courts have . . . held that sovereign immunity is inapplicable where state officials allegedly violate constitutional rights," and that "a defendant who exercises his authority to further personal animosity towards a prisoner cannot rely on sovereign immunity." *Id.* at 33–34.

Defendants' reply brief touched on the claim. But it was a light touch. The reply brief devoted only two sentences to the subject. And they did not address sovereign immunity. *See* Defs.' Reply, at 13–14 (Dckt. No. 349) ("As stated in their motion for summary judgment, Plaintiff's claims for Intentional Infliction of Emotional Distress ('IIED') fail because Plaintiff has failed to show there was any deliberate indifference or willful and wonton [sic] conduct on the part of Defendants. Consequently, because Defendants are entitled to judgment as a matter

of law on Plaintiff's First and Eighth Amendment claims, they are also entitled to summary judgment on Plaintiff's IIED claim.").

So, as things stood after summary judgment briefing, Defendants raised sovereign immunity in their opening brief, and Kyles responded to the issue in his response. But Defendants did not mention sovereign immunity in their reply brief.

At summary judgment, Judge Lee declined to address Defendants' sovereign immunity argument on the merits because "they abandoned that argument in their reply brief." *See* 11/18/20 Mem. Opin. & Order, at 20 n.5 (Dckt. No. 367) (citing *United States v. Farris*, 532 F.3d 615, 618–19 (7th Cir. 2008)). The issue was not otherwise addressed in the summary judgment ruling.

Based on that ruling, Judge Lee allowed the claim of intentional infliction of emotional distress to go to trial. But sovereign immunity wasn't out of the picture and out of the case. Defendants were free to raise sovereign immunity *at trial*.

One might question whether a failure to return to an argument in a reply brief is, in fact, a waiver. Typically, when courts consider waiver in the context of reply briefs, the waiver involves a new argument that makes an appearance for the first time in a reply brief.[2] *See Int'l Ass'n of Fire Fighters, Loc. 365 v. City of East Chicago*, 56 F.4th 437, 452 (7th Cir. 2022) ("The appellants fail to address this point in their opening brief. And although they discuss the issue in their reply brief, by that point, their arguments are waived."); *Williams v. Bd. of Educ.*, 982 F.3d

---

[2] Though state-law sovereign immunity is an issue of state law, waiver is a procedural issue governed by federal law. *See Murphy v. Smith*, 844 F.3d 653, 657 (7th Cir. 2016). "Like the parties, we rely on Eleventh Amendment case law to address waiver. This is our usual approach under the *Erie* doctrine because procedural issues are governed by federal law in federal courts, and waiver is generally treated as procedural." *Id.* at 657 n.1. The Seventh Circuit also noted that "[e]ven if Illinois law governed the waiver issue, there would be no waiver. Illinois appears to permit sovereign immunity waivers only by statute, not by litigation conduct." *Id.*

495, 507 n.30 (7th Cir. 2020) ("[A]rguments raised for the first time in a reply brief are waived.").

"It is well established in [Seventh Circuit] precedents that skeletal arguments may be properly treated as waived, as may arguments made for the first time in reply briefs." *Hernandez v. Cook Cnty. Sheriff's Off.*, 634 F.3d 906, 913 (7th Cir. 2011) (citation omitted). When a party waits to raise an argument until the reply brief, "[t]he underlying concern is to ensure that the opposing party is not prejudiced by being denied sufficient notice to respond to an argument." *Id.*

A reply brief also can waive an argument by failing to respond to the opposing party's *counterarguments* or *new arguments* raised in the response brief. *See Bradley v. Village of University Park*, 59 F.4th 887, 897 (7th Cir. 2023) ("An appellant may waive a non-jurisdictional issue or argument in many ways, such as by . . . failing to respond in a reply brief to a new argument raised by appellee."); *Webb v. Frawley*, 906 F.3d 569, 582 (7th Cir. 2018) ("Yet because Webb did not respond to this point in his reply brief, he waived any counterarguments he could have raised.").

A failure to return to an issue in a reply brief is not necessarily a basis for a finding of waiver. *See Blackwell v. Cole Taylor Bank*, 152 F.3d 666, 673 (7th Cir. 1998) ("[I]n its brief in this court the [appellee] argued that anyway there is no evidence of racial discrimination – and in their reply brief the plaintiffs [appellants] do not discuss the issue. This is not a waiver (!), as we have explained in another case concerning the significance of not replying in a reply brief to an argument made in the appellee's brief."); *Hardy v. City Optical Inc.*, 39 F.3d 765, 771 (7th Cir. 1994) ("When an appellee advances an alternative ground for upholding a ruling by the district judge, and the appellant does not respond in his reply brief or at argument (the issue did not

come up at argument either), he no more concedes the correctness of the ruling than an appellee by failing to file any brief at all consents to have the judgment in his favor reversed.").

Here, Defendants raised state sovereign immunity in their opening summary judgment brief, and Kyles responded. Defendants simply did not return to the argument a second time in the reply. One wonders if Defendants really had to address the argument again in their reply brief to keep it alive.[3]

As a general matter, it is asking a lot of movants to repeat and defend every argument advanced in an opening brief, or else risk a finding of abandonment. After all, reply briefs are shorter than response briefs. There is less real estate to work with.

From a practical standpoint, requiring movants to hit each argument again – just to keep it alive – would incentivize repetition and girth. It would encourage defensive briefing. And in any event, effective reply briefs focus on the key points, not every point under the sun. Why address it again, if there is nothing left to say?

Maybe there is room for debate about whether Defendants waived any sovereign immunity argument at the summary judgment stage. At this point, that debate is academic.

---

[3] The summary judgment decision relied on the Seventh Circuit's decision in *Farris*. But *Farris* does not support the blanket proposition that a party must address an issue in a reply brief or risk abandoning it. *See Farris*, 532 F.3d at 618–19. In *Farris*, a criminal defendant argued on appeal that the evidence was insufficient to convict him at trial. *Id.* at 618. In its response brief on appeal, the government made a waiver argument. The government argued that the defendant had waived any sufficiency of the evidence argument by failing to renew his motion for a judgment of acquittal in the district court. *Id.* And then, in his reply brief, the defendant failed to respond to the government's waiver argument, and so he "waived his sufficiency of the evidence challenge." *Id.* at 619. So, in *Farris*, there were two levels of waiver. The defendant failed to raise an argument in the district court (level one), and the defendant's reply brief failed to respond to the government's argument in its response brief about waiver (level two). That is, the defendant made an argument in his opening brief, and the government responded that the defendant had waived it. In reply, the defendant said nothing. In effect, he waived the argument by failing to respond to the government's argument about waiver.

Judge Lee held that they did. So, Defendants were left to raise the defense of sovereign immunity at trial.

Defendants seem to acknowledge that they were free to raise the issue at trial. They mentioned sovereign immunity as an affirmative defense in the joint status report after the case was transferred to this Court. *See* Joint Case Status Summary Statement, at ¶ 6 (Dckt. No. 478) ("Defendants bring three affirmative defenses: (1) the Court lacks subject matter jurisdiction over the state law claims as they are barred by sovereign immunity . . . ."). So, Defendants seemed to understand that Judge Lee's ruling did not remove the defense from the case.

Here's the key point. Judge Lee did not hold that Defendants had waived sovereign immunity as an affirmative defense. Sovereign immunity was not out of the case. Instead, Judge Lee ruled that Defendants had waived any sovereign immunity argument *for purposes of a motion for summary judgment*. Defendants were free to develop the argument before the jury.

## 2. The Standard for Sovereign Immunity

Sovereign immunity remained in play as an affirmative defense, and Defendants could have raised it at trial. But before diving in to the argument at hand under Rule 50(a), the Court pauses to summarize the standard for sovereign immunity under Illinois law.

"Under the *Erie* doctrine, 'state rules of immunity govern actions in federal court alleging violations of state law." *T.S. v. County of Cook*, 67 F.4th 884, 890 (7th Cir. 2023) (quoting *Benning v. Bd. of Regents of Regency Univs.*, 928 F.2d 775, 777 (7th Cir. 1991)). Under Illinois law, "the State of Illinois shall not be made a defendant or party in any court." *See* 745 ILCS 5/1. Instead, the Illinois Court of Claims has exclusive jurisdiction over "[a]ll claims against the State founded upon any law of the State of Illinois." *See* 705 ILCS 505/8(a).

So, state-law sovereign immunity applies if the plaintiff brings an Illinois state-law claim against the State of Illinois. But it also can apply if the plaintiff sues an agent or employee of the State under state law. Sovereign immunity under Illinois state law may still apply even if, as here, the plaintiff sues a state employee in his individual capacity.

"The prohibition 'against making the State of Illinois a party to a suit cannot be evaded by making an action nominally one against the servants or agents of the State when the real claim is against the State of Illinois itself and when the State of Illinois is the party vitally interested.'" *T.S.*, 67 F.4th at 891 (quoting *Sass v. Kramer*, 381 N.E.2d 975, 977 (Ill. 1978)). The "formal identification of the parties as they appear in the record is not dispositive." *Leetaru v. Bd. of Trs. of Univ. of Illinois*, 32 N.E.3d 583, 595 (Ill. 2015). Instead, "[w]hether an action is in fact one against the State, and hence one that must be brought in the Court of Claims, depends . . . on the issues involved and the relief sought." *Healy v. Vaupel*, 549 N.E.2d 1240, 1247 (Ill. 1990).

"That an action is nominally one against the servants or agents of the State does not mean that it will not be considered as one against the State itself." *Leetaru*, 32 N.E.3d at 595. Likewise, "[s]overeign immunity does not automatically attach as a result of a defendant's state employment." *Jackson*, 831 N.E.2d at 1165.

Instead, under Illinois law, "the formal identification of the parties is not dispositive," and the court must decide whether the claim is merely "nominally one against" the state employee and instead one "against the State." *T.S.*, 67 F.4th at 892 (quoting *Sass*, 381 N.E.2d at 977). Put simply, "substance takes precedence over form." *Leetaru*, 32 N.E.3d at 595.

Illinois courts have developed a three-part test to determine whether an action is brought only nominally against a state employee and is instead one against the State itself. "An action

43

brought against a state employee is considered one against the state when: '[T]here are (1) no allegations that an agent or employee of the State acted beyond the scope of his authority through wrongful acts; (2) the duty alleged to have been breached was not owed to the public generally independent of the fact of State employment; and (3) where the complained-of actions involve matters ordinarily within that employee's normal and official functions of the State.'" *T.S.*, 67 F.4th at 892 (quoting *Healy*, 549 N.E.2d at 1247). All three criteria must be met for the court to find that a suit against a state employee is instead one against the State. *Id.*

At step one, the court must determine whether the "agent or employee of the State acted beyond the scope of his authority." *Healy*, 549 N.E.2d at 1247. To do so, the court must determine whether "the employee intended to perform some function within the scope of his or her authority when committing the legal wrong." *Jackson*, 831 N.E.2d at 1164. The focus is on the employee's intent, not on whether the employee was prohibited from wronging the plaintiff.

An allegation that the defendant employee caused the plaintiff harm "does not mean that he acted outside the scope of his authority." *T.S.*, 67 F.4th at 892. "Obviously, no state employee has authority to commit a tort." *Jackson*, 831 N.E.2d at 1164. An employee who commits a tort does not necessarily act outside the scope of his authority.

"Sovereign immunity presupposes the possibility of a legal wrong by a state employee. And legal wrongs are, *per se*, unauthorized, so the relevant question cannot be whether the employee had authority to commit the legal wrong. Instead, the question is whether the employee intended to perform some function within the scope of his or her authority when committing the legal wrong." *T.S.*, 67 F.4th at 892 (cleaned up).

So, even if an employee "break[s] workplace rules or perform[s] their duties with willful and wanton indifference," the employee does "not necessarily act outside the scope of their state

employment." *Jackson*, 831 N.E.2d at 1164; *see also id.* at 1165 ("Alverez's supervision of patients, even if grossly careless, still falls within the scope of her authority as an employee of the Center."). A district court must ask whether the employee's "job" encompassed the allegedly tortious acts. *Id.* at 1165.

At step two, a district court must "consider whether the 'duty alleged to have been breached was not owed to the public generally independent of the fact of State employment.'" *T.S.*, 67 F.4th at 892 (quoting *Healy*, 549 N.E.2d at 1247). "An 'independent duty' is understood as one imposed 'by the employee's status as *something other than* an employee.'" *People v. Davis*, 196 N.E.3d 663, 368 (Ill. App. Ct. 2021) (emphasis in original) (quoting *Brandon v. Bonell*, 858 N.E.2d 465, 480 (Ill. App. Ct. 2006)).

"Where the alleged wrongful conduct 'arose out of the State employee's breach of a duty that is imposed on him *solely* by virtue of his State employment,' sovereign immunity bars the action in circuit court." *T.S.*, 67 F.4th at 892 (emphasis in original) (quoting *Currie v. Lao*, 592 N.E.2d 977, 980 (Ill. 1992)). But "where the employee is charged with breaching a duty imposed on him independently of his state employment, sovereign immunity will not attach." *Jinkins v. Lee*, 807 N.E.2d 411, 420 (Ill. 2004).

"The Illinois Supreme Court has recognized a few instances in which a state employee's duty arose independently of state employment." *T.S.*, 67 F.4th at 892. For one, "[s]overeign immunity will not bar a claim of a state employee's negligent driving." *Id.* at 892–93. Even when an employee is driving as part of his employment, the duty to drive safely "arose from the [employee's] status as an automobile driver." *Id.* at 893.

Likewise, "doctors working for state government are not shielded by sovereign immunity for violating a duty 'inherent in the doctor-patient relationship.'" *Id.* (quoting *Jinkins*, 807

45

N.E.2d at 421).  Duties based on the doctor-patient relationship "exist[] regardless of employment by the state." *Id.*

Finally, state employees who violate the Illinois criminal code are not entitled to sovereign immunity.  *Id.*  "All citizens – regardless of their status as state employees – must abide by the state's criminal statutes." *Id.*; *see also Mitchell v. Dumais*, 2021 WL 860359, at *3 (N.D. Ill. 2021) ("The duty not to commit battery is independent of a state trooper's employment.").

At step three, the court must determine whether the breach involved matters "ordinarily within" the defendant's "normal and official functions." *Healy*, 549 N.E.2d at 1247.  This factor "overlaps to some extent" with the first factor (whether the defendant employee acted within the scope of his authority).  *T.S.*, 67 F.4th at 893 (cleaned up).  When analyzing the third factor, "motives do not factor into whether [the employee] acted within his normal functions." *Id.*

Illinois courts do recognize an exception to state sovereign immunity.  But recent case law from both the Illinois Supreme Court and the Seventh Circuit makes clear that the exception applies only in cases seeking injunctive relief, not damages.  So, it does not apply here.

"The officer suit exception – also called the 'prospective injunctive relief exception' – allows a plaintiff to sue a state officer without offending sovereign immunity principles, so long as the plaintiff seeks to prospectively enjoin the unlawful conduct of the officer." *Peirick v. Dudek*, 2020 WL 6682891, at *2 (N.D. Ill. 2020); *see also Mitchell v. Dumais*, 2021 WL 860359, at *3 (N.D. Ill. 2021).  The exception "is premised on the principle that while legal official acts of state officers are regarded as acts of the State itself, illegal acts performed by the officers are not." *Leetaru*, 32 N.E.3d at 596.  So, if "a plaintiff alleges that the State officer's conduct violates statutory or constitutional law or is in excess of his or her authority, such

46

conduct is not regarded as the conduct of the State." *Parmar v. Madigan*, 106 N.E.3d 1004, 1009 (Ill. 2018). "In these instances, a 'suit may therefore be maintained against the officer without running afoul of sovereign immunity principles.'" *T.S.*, 67 F.4th at 894 (quoting *Leetaru*, 32 N.E.3d at 596).

Crucially, "the officer suit exception does not apply in a damages suit." *Id.* Recently, "the Illinois Supreme Court affirmed that 'a complaint seeking damages for a past wrong does not fall within the officer suit exception to sovereign immunity.'" *Id.* (quoting *Parmar*, 106 N.E.3d at 1010). Instead, the exception applies only "when a plaintiff *seeks to enjoin state officials* from ongoing statutory or constitutional violations." *Id.* (emphasis added).

Because Kyles seeks damages, not injunctive relief, the officer suit exception does not apply. Instead, the Court must apply "the *Healy* factors . . . in this personal capacity suit for damages" to determine if state sovereign immunity applies. *Id.* at 895. And if the *Healy* factors are satisfied, a state employee who committed a statutory or constitutional violation will still be entitled to sovereign immunity on the state-law claim. *Id.* at 893–94.

Applying the *Healy* factors, some courts have held that IIED claims are barred by state sovereign immunity. *See Wells v. Spencer*, 2014 WL 1013864, at *4 (C.D. Ill. 2014) (finding that IIED claim was barred by state sovereign immunity); *Grainger v. Harrah's Casino*, 18 N.E.3d 265, 270–71 (Ill. App. Ct. 2014); *Giovenco-Pappas v. Berauer*, 179 N.E.3d 815, 821–22 (Ill. App. Ct. 2020) (dismissing IIED claim as barred by sovereign immunity). But this is not a bright-line rule.

Instead, the test under Illinois law is fact specific. As a result, courts have held that there can be factual disputes in the state-law sovereign immunity test. *See T.S.*, 67 F.4th at 892 (noting on review of a summary judgment order that "nothing in the record indicates that Dixon acted

outside of the scope of his authority"); *Bernard v. Baldwin*, 2022 WL 847628, at *9 (N.D. Ill. 2022) ("At this preliminary stage, the Court declines to dismiss Plaintiff's state law claims against the IDOC Defendants. *Here, Plaintiff has alleged that IDOC Defendants' conduct, which serves as the basis for his IIED claim, violated the Eighth Amendment and there is a factual issue concerning whether the IDOC Defendants were acting within the scope of their employment.*") (emphasis added); *Mitchell v. Dumais*, 2021 WL 860359, at *3 (N.D. Ill. 2021) ("Here, there is a material dispute about whether Mitchell's claim is against the state, because Mitchell might establish a breach of a general duty."); *id.* ("Mitchell raises a material dispute about whether Dumais and Reyes acted within their authority, so his state-law claims survive summary judgment.").

Notably, Judge Ellis denied a motion to dismiss an IIED claim on sovereign immunity grounds because whether the defendants were acting within the scope of their authority was a question of fact. *See Taylor v. Wexford Health Sources, Inc.*, 2016 WL 3227310, at *6 (N.D. Ill. 2016) (Ellis, J.) ("Here, despite the fact that Taylor alleges throughout the First Amended Complaint that the IDOC Defendants acted within the scope of their employment, the Court need not accept this legal conclusion as true on a motion to dismiss. Taylor also alleges, however, that the IDOC Defendants' actions were rooted in an abuse of power or authority, *at least raising a question of fact concerning whether they acted within the scope of their authority*.") (emphasis added) (citations omitted).

For example, it is a question of fact whether a defendant state employee acted within his authority when committing the allegedly wrongful acts. Likewise, it is a question of fact whether the allegedly wrongful acts were within the defendant state employee's official job functions.

### 3. The Road(block) Ahead

Summarizing the standard for sovereign immunity is a lot easier than applying it at this late stage. Trial is now over. The procedural posture changes the ballgame, and substantially limits any relief that the Court can provide.

Basically, Defendants may not have waived sovereign immunity at the summary judgment stage. But Defendants could have raised the sovereign immunity defense at trial. They didn't. And now that trial is over, the sovereign immunity ship has sailed.

Judge Lee's summary judgment ruling did not remove the issue of sovereign immunity from the rest of the case. Judge Lee ruled that Defendants had waived any argument based on sovereign immunity for purposes of the motion for summary judgment. The ruling was limited to that procedural posture. Judge Lee did not foreclose Defendants from raising a sovereign immunity defense at trial.

After that ruling, Defendants had plenty of options. They could have filed a motion for reconsideration before Judge Lee. Or they could have filed a motion for reconsideration before this Court, after reassignment. Defendants could have made efforts to put sovereign immunity back on the front burner.

More importantly, Defendants could have raised sovereign immunity as a defense at trial. They could have presented evidence that addressed each of the elements of sovereign immunity. They could have requested a jury instruction about sovereign immunity. They could have proposed special interrogatories on the issue of sovereign immunity. They could have proposed a verdict form that required the jury to award separate damages by count. And they could have expressly invoked sovereign immunity in their oral motion for a directed verdict at the close of Plaintiff's case.

Defendants did none of those things. They did not present much, if any, evidence on the elements of sovereign immunity. They did not request a jury instruction on sovereign immunity. *See* Proposed Jury Instructions (Dckt. No. 492-1); Proposed Jury Instructions (Dckt. No. 514-1); Supplement to Defs.' Proposed Jury Instructions (Dckt. No. 551); Defendants' Objections and Additions to the Court's Jury Instructions (Dckt. No. 564). They did not propose special interrogatories. For example, they did not ask the jury to find that the Defendants acted within the scope of their authority, or that the actions Kyles complained of were within Defendants' normal and official functions. They did not offer a verdict form that separated the damages by count. And they did not flag the issue of sovereign immunity at the close of Plaintiff's evidence.

As a result, the jury did not hear any argument based on sovereign immunity. So, the jury did not find any facts to support that defense. The jury was not asked to decide the issue. There is no way to figure out what the jury would have thought of a defense based on sovereign immunity.

Moreover, even if the undisputed facts showed that Defendants were entitled to sovereign immunity, the jury's verdict did not award damages in a way that would allow the Court to excise the damages related to the intentional infliction of emotional distress claims. The jury returned a verdict that decided the issue of liability by defendant, by claim. But the jury's verdict then awarded lump-sum compensatory damages against each defendant.

The jury gave a bottom-line compensatory damages number, without saying how much it awarded for each claim. So even if Defendants hypothetically were entitled to sovereign immunity, there is no way to surgically remove the award of damages for intentional infliction of emotional distress from the rest of the damages award.

At this point, there is no way to know how much damages the jury awarded for the claim of intentional infliction of emotional distress. The jury found for Plaintiff and against Defendants Williams, Turner, Durrett, and Brown on that claim. *See* Verdict (Dckt. No. 579). The jury then awarded lump compensatory damages – for *all* claims – totaling $600,000 for Williams, $250,000 for Turner, $550,000 for Durrett, and $650,000 for Brown. *Id.*

For three of the four Defendants, the jury found liability on more than one claim. For Defendants Williams, Durrett, and Brown, the jury found against them on *both* the failure-to-protect claim under the Eighth Amendment (Claim II) and the intentional infliction of emotional distress claim under state law (Claim III). *Id.*

For Defendant Williams, the lump sum damages award reflects damages for two claims, not simply one. How much did the jury award for each claim? How much did the jury award for the Eighth Amendment claim, and for the intentional infliction of emotional distress claim? It's anyone's guess.

For Defendants Brown and Durrett, the Court has already determined that the jury's compensatory damages corresponded to the intentional infliction of emotional distress claim. The jury may have awarded nominal damages against Brown and Durrett on the Eighth Amendment claim (at most, because it involved only a psychological injury for those two Defendants, so compensatory damages were not available on that claim). If so, that would mean that all but $1 of the compensatory damages were awarded for the intentional infliction of emotional distress claim. So, the Court could get close to determining the exact amount of compensatory damages.[4]

---

[4] Earlier, this Court ruled that the jury awarded no compensatory damages against Brown and Durrett on the Eighth Amendment claim. *See* footnote 1, *supra.* They learned about the situation with Kyles after the physical attacks were over, so from that moment forward, Kyles suffered only an emotional or

51

The only sure thing is that the jury awarded $250,000 on the intentional infliction of emotional distress claim against Turner. That's knowable because Turner was found liable on only one claim. Does that mean that the jury found each Defendant liable for $250,000 for intentional infliction of emotional distress? Again, no one knows.

This Court does not have the tools to divine what the jury did. And this Court cannot ask a second jury to second-guess what the first jury did. That exercise would raise Seventh Amendment problems.

The Seventh Amendment provides that "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact

psychological injury. And under the Prison Litigation Reform Act, emotional or psychological injuries cannot give rise to compensatory damages. Instead, they can give rise to nominal damages, and punitive damages. That ruling potentially could affect the jury's award of punitive damages. Punitive damages are not available for intentional infliction of emotional distress claims. *See* Jury Instructions, at 52 (Dckt. No. 568); *Wordlow v. Chicago Bd. of Educ.*, 2018 WL 6171792, at *14 n.9 (N.D. Ill. 2018). So, any punitive damages awarded against Brown and Durrett *must* have been for the Eighth Amendment claim. Again, the Prison Litigation Reform Act does not preclude recovery for nominal or punitive damages. As the Seventh Circuit noted, "[a]lthough § 1997e(e) would bar recovery of compensatory damages 'for' mental and emotional injuries suffered, the statute is inapplicable to awards of nominal or punitive damages for the Eighth Amendment violation itself." *Gray v. Hardy*, 826 F.3d 1000, 1007 (7th Cir. 2016). The Seventh Circuit has held that "§ 1997e(e) does not preclude claims for punitive damages for violations of the Eighth Amendment." *Calhoun v. DeTella*, 319 F.3d 936, 942 (7th Cir. 2003). This Court's jury instructions reflected that rule. For the constitutional claims, the instruction stated: "Whether or not Plaintiff proves a physical injury or a sexual act, you may award nominal damages and punitive damages, so long as you find that Plaintiff has met the standard for obtaining those damages." *See* Jury Instructions, at 49; *see also* Seventh Cir. Pattern Instruction 7.27 (Compensatory Damages in Prisoner Cases). The comments to the Seventh Circuit Pattern Instruction notes that "[e]ven if the plaintiff does not prove a physical injury, he may still recover nominal damages, punitive damages or any kind of compensatory damages other than those for mental or emotional injury." *See* Seventh Cir. Pattern Instruction 7.27 cmt. f. So, as things stand, the jury awarded nominal damages (at most) to Kyles on the Eighth Amendment claims against Durrett and Brown (because the jury *couldn't* award compensatory damages against them, given the lack of a physical harm after they gained knowledge), plus $700,000 in punitive damages on the Eighth Amendment claims (because the jury *couldn't* award punitive damages against them on the IIED claim, which was the only other claim against them). Awards of punitive damages cannot be excessive. *See State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003) ("We decline again to impose a bright-line ratio which a punitive damages award cannot exceed. Our jurisprudence and the principles it has now established demonstrate, however, that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process."). That issue is not in play in the motion at hand.

tried by a jury, shall be otherwise re-examined." *See* U.S. Const. amend. VII. To comply with the Amendment, "questions in a single suit can only be tried by different juries if they are 'so distinct and separable from the others that a trial of [them] alone may be had without injustice.'" *Houseman v. U.S. Aviation Underwriters*, 171 F.3d 1117, 1126 (7th Cir. 1999) (alteration in original) (quoting *Gasoline Prods. Co. v. Champlin Refining Co.*, 283 U.S. 494, 500 (1931)).

"In other words, the district court must not divide issues between separate trials in such a way that the same issue is reexamined by different juries." *Id.* (quotation marks omitted). Although "both juries can examine overlapping evidence, they may not decide factual issues that are common to both trials and essential to the outcome." *Id.*

The Seventh Circuit has noted that "the judge must not divide issues between separate trials in such a way that the same issue is reexamined by different juries." *In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1303 (7th Cir. 1995). "The right to a jury trial in federal civil cases, conferred by the Seventh Amendment, is a right to have juriable issues determined by the first jury impaneled to hear them (provided there are no errors warranting a new trial), and not reexamined by another finder of fact." *Id.*

So a second jury cannot figure out what the first jury did. Even if Defendants had a meritorious defense based on sovereign immunity, there is no way at this point to separate the damages awarded on the Eighth Amendment claim from the damages awarded on the intentional infliction of emotional distress claim. It is too late to unscramble the egg. You can't unbake the cake.

The only other option is to throw the whole thing out, and start over. That is, the Court conceivably could order a new trial on the issues of sovereign immunity and damages (only). But the Court is not inclined to do that, by a long shot.

Defendants did not present any facts to support their sovereign immunity defense at trial. And this Court isn't aware of any errors that would justify a new trial on damages. This Court is not inclined to allow a new trial on damages – which would replicate much of the trial – to give Defendants a second chance to make an argument that they failed to raise the first time.

The Court is mindful that sovereign immunity is a defense that is not lightly waived. *See Murphy*, 844 F.3d at 657 (collecting cases); *Nunez v. Ind. Dep't of Child Servs.*, 817 F.3d 1042, 1044 (7th Cir. 2016) ("The 'test for determining whether a State has waived its immunity from federal-court jurisdiction is a stringent one.'") (quoting *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 241 (1985)). "No magic words are required, but implicit waivers won't do; the court must be highly confident that the state really did intend to allow itself to be sued in federal court." *Mueller v. Thompson*, 133 F.3d 1063, 1064 (7th Cir. 1998) (citation omitted).

Even so, every argument has a season. And hard to waive is not the same thing as un-waivable. *See Murphy*, 844 F.3d at 656 ("[S]overeign immunity is a waivable affirmative defense.") (alteration in original) (quoting *Park v. Ind. Univ. Sch. of Dentistry*, 692 F.3d 828, 830 (7th Cir. 2012)). "If a state does not raise the immunity defense, 'a court can ignore it.'" *Id.* at 657 (quoting *Wis. Dep't of Corr. v. Schact*, 524 U.S. 381, 389 (1998)).

Defendants did not do enough to preserve the defense because they waited to raise the issue of sovereign immunity until the trial was over. State-law sovereign immunity is a fact-bound affirmative defense. To prove their case, Defendants had to present facts to the jury and

argue that sovereign immunity applied.  They failed to do so.  Raising the argument after the jury has returned a verdict is too little, too late.

In the end, it is too late in the day for Defendants to raise the issue of sovereign immunity.  Defendants could have preserved the issue at trial, and preserved the record.  But they didn't.  So the book on sovereign immunity is officially closed.

### B.      Failure to Prevail on the Constitutional Claims

Finally, Defendants make an argument about the claims of intentional infliction of emotional distress, based on the evidence about the Eighth Amendment claim.  The idea is that Plaintiff did not present sufficient evidence on the Eighth Amendment claim, so he did not offer enough evidence on the state law claim, either.

The reason involves deliberate indifference.  Defendants contend that Plaintiff failed to prove "deliberate indifference or willful and wonton [sic] conduct on the part of Defendants." *See* Defs.' Mem., at 9 (Dckt. No. 553).  And if there was no deliberate indifference (as required for a constitutional claim), then there was no intentional infliction of emotional distress, either. The standard for constitutional claims "is a lower bar than the 'extreme and outrageous' standard" for the intentional infliction of emotional distress claim.  *Id.*  So, "if Plaintiff cannot meet the lower bar, he surely cannot satisfy the higher bar."  *Id.*

The jury found against four of the six Defendants on the intentional infliction of emotional distress claim:  Defendants Williams, Turner, Durrett, and Brown.  The jury found in favor of Defendants Rabideau and Beaugard on that claim.  So, the argument is moot for the latter two Defendants.

As explained above, this Court concludes that Plaintiff presented sufficient evidence to support the jury's verdict on the Eighth Amendment claims against Defendants Williams, Durrett, and Brown. So Plaintiff overcame the Eighth Amendment hurdle after all.

That leaves Defendant Turner. And there is an added wrinkle. Plaintiff did *not* bring an Eighth Amendment claim against Turner. *Id.* Plaintiff did bring a First Amendment retaliation claim against Turner (and Turner prevailed).

Defendants do not make any argument that a failure to prove a First Amendment retaliation claim would mean anything for an intentional infliction of emotional distress claim. (As an aside, linking the state law claim to the constitutional claim in this manner is more trouble than it is worth. It would be cleaner and simpler to argue whether the evidence is sufficient to support a finding of liability on the state law claim, without linking it to the constitutional claim.)

All of Defendants' cases are about the Eighth Amendment (or a similar claim under the Fourteenth Amendment), not the First Amendment. *See* Defs.' Mem., at 9–10 (Dckt. No. 553) (collecting cases); *see also Harrison v. County of Cook*, 2011 WL 4036115, at *10 (N.D. Ill. 2011); *Wells v. Bureau County*, 723 F. Supp. 2d 1061, 1088–89 (C.D. Ill. 2010); *Perez v. Town of Cicero*, 2011 WL 4626034, at *9 (N.D. Ill. 2011).

The standard is not the same. Unlike claims under the Eighth Amendment, retaliation claims under the First Amendment do not use the deliberate indifference standard. Instead, a plaintiff must show that the defendant *intentionally retaliated* against him for exercising his First Amendment rights. *See* Jury Instructions, at 35–36 (Dckt. No. 568); Seventh Cir. Pattern Jury Instruction 6.03; *Pearson v. Welborn*, 471 F.3d 732, 738 (7th Cir. 2006) ("To succeed on his retaliation claim, it was necessary for Pearson to demonstrate that prison officials retaliated against him for exercising a constitutionally protected right.").

So, Plaintiff's First Amendment claim did not require him to prove that Turner was deliberately indifferent.  Instead, it required him to prove that Turner intentionally retaliated against him for filing a complaint against Officer Jaburek.

And in any event, there were other ways for Plaintiff to lose on the First Amendment claim, too.  For example, Kyles had to prove intentional retaliation.  But then, the jury could have found for Turner if he carried his burden to prove "by a preponderance of the evidence that another reason would have led Defendant Turner to act in the alleged retaliatory manner, even if Plaintiff had not engaged in protected speech."  *See* Jury Instructions, at 35 (Dckt. No. 568); *see also* Seventh Cir. Pattern Jury Instruction 6.03.

In sum, the Court rejects the argument that the jury's verdict in Turner's favor on the First Amendment claim precludes an intentional infliction of emotional distress claim.  The First Amendment claim against Turner did not require Plaintiff to prove that Turner was deliberately indifferent.

## Conclusion

For the foregoing reasons, Defendants' motion for judgment as a matter of law under Rule 50(a) is hereby denied.

Date:   August 16, 2023

Steven C. Seeger
United States District Judge