**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| TIMOTHY KYLES, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 15-cv-8895 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| FRED BEAUGARD, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Timothy Kyles was a protective custody inmate at Stateville Correctional Center. He needed protection after he disavowed his former gang, the Gangster Disciples, and turned in their contraband. Sometime later, after Kyles complained about a guard, correctional officers gave him a disciplinary ticket and put him in a cell with a violent inmate in the segregation unit.

That inmate, it turns out, was a member of the Maniac Latin Disciples, a gang aligned with the Gangster Disciples. Over the next two weeks, that inmate allegedly abused Kyles repeatedly, including raping him twice.

Kyles sued six correctional officers, alleging that they played a role in putting and keeping him in the cell with his attacker. He brought a collection of claims, including a retaliation claim under the First Amendment, a failure-to-protect claim under the Eighth Amendment, and a claim of intentional infliction of emotional distress under state law.

The case went to trial, and the jury listened to evidence for about two weeks. Kyles testified, and so did his alleged attacker.

The jury returned a mixed verdict.  Defendants prevailed on the First Amendment claim.  But Kyles prevailed on the Eighth Amendment claim, and he largely prevailed on the claim of intentional infliction of emotional distress.

The jury awarded a separate amount of damages for each liable Defendant.  The jury awarded a total of $2,250,000 in compensatory damages against five of the six Defendants.  The jury also awarded a total of $700,000 in punitive damages against two Defendants.

This Court later denied Defendants' motion for judgment as a matter of law under Rule 50(a), and entered final judgment.  *See* 8/16/23 Order (Dckt. No. 599).  Defendants have now returned with a motion for judgment under Rule 50(b), or in the alternative, a new trial under Rule 59(a).

For the reasons stated below, Defendants' motion is denied.

## Background

The Court assumes that any interested reader is familiar with the background of the case.  Anyone who wants a refresher can take a look at this Court's opinion on the Rule 50(a) motion.  *See Kyles v. Beaugard*, 2023 WL 5277882 (N.D. Ill. 2023).

The gist of the story is that correctional officers at Stateville allegedly retaliated against Kyles for complaining about a guard.  They moved Kyles to the segregation unit, and put him in a cell with a violent inmate from a hostile gang.  Abuse followed.

## I.      The Claims

The story begins with Kyles gaining protective custody status.  At another prison, Kyles told Internal Affairs that the Gangster Disciples were hiding knives.  That revelation put his personal safety at risk, so the IDOC designated him as a protective custody inmate.

Kyles was later transferred to Stateville Correctional Center, but he kept his status as a protective custody inmate.

Sometime later, Kyles complained to Officer Beaugard about misconduct committed by another guard, Officer Jaburek (a non-defendant). Kyles said that Jaburek allegedly threatened to plant contraband in his cell. *See* 2/13/23 Trial Tr., at 249:12 – 251:22 (Dckt. No. 590).

That complaint didn't go over well. Several correctional officers allegedly retaliated against Kyles. Officer Beaugard wrote Kyles a disciplinary ticket, which landed him in the segregation unit. Other officers assigned Kyles to a cell with a violent gang member. As it turns out, that gang member was aligned with the Gangster Disciples – the gang that Kyles had previously exposed. Assaults followed.

Kyles brought a number of claims against several correctional officers and other prison officials, alleging that they set him up to get attacked. Kyles sued six individuals: Fred Beaugard, Leslie Turner, William Brown, Karen Rabideau, Tarry Williams, and Tralon Durrett.

Each Defendant played a different role in the story.

**Fred Beaugard** was a correctional officer who worked "on and off in X-House," where Kyles was initially housed in protective custody. *See* 2/14/23 Trial Tr., at 344:19-25 (Dckt. No. 591); *see also id.* at 341:17-21. Kyles and Beaugard had a good relationship. *See* 2/13/23 Trial Tr., at 250:9-23 (Dckt. No. 590).

Beaugard allegedly wrote the disciplinary ticket that landed Kyles in the segregation unit. *Id.* at 256:8-13; 2/14/23 Trial Tr., at 338:13-22 (Dckt. No. 591). When Kyles asked why he was getting a disciplinary ticket, Beaugard allegedly responded: "It's bigger than me." *See* 2/13/23 Trial Tr., at 257:13 (Dckt. No. 590).

3

At trial, counsel for Kyles used that statement to suggest that something bigger was afoot. Counsel interpreted that statement to mean that higher-ups in the chain of command directed Beaugard to write the disciplinary ticket. *See* 2/22/23 Trial Tr., at 1680:17-21 (Dckt. No. 596).

The jury heard different stories about what Kyles said to Beaugard before the disciplinary ticket. According to Kyles, he simply told Beaugard: "Jaburek threatened to put something in my cell." *See* 2/13/23 Trial Tr., at 251:13-14 (Dckt. No. 590). Kyles also testified that he previously had seen Officer Jaburek plant contraband in the cells of other inmates, which had landed them in segregation. *Id.* at 249:24 – 250:4.

The disciplinary ticket written by Beaugard told a different story. The ticket read: "On the above date and approximate time inmate Kyles B11702 stated, 'Man, I think I am going to explode! I am a walking time bomb right now.' I asked inmate Kyles B11702 what's the problem? 'Man I think I might explode on Officer Jaburek (x house officer). I take psych meds.'" *See* Pl.'s Ex. 41; *see also* 2/17/23 Trial Tr., at 1358:7-19 (Dckt. No. 594).

**Leslie Turner** was the chief investigator in the Internal Affairs division at Stateville. *See* 2/17/23 Trial Tr., at 1182:18 – 1183:18 (Dckt. No. 594).

Turner allegedly told Kyles that he was getting sent to segregation. *See* 2/13/23 Trial Tr., at 256:8-11 (Dckt. No. 590); 2/14/23 Trial Tr., at 369:1-7 (Dckt. No. 591). Turner also gave the reason. Turner explained to Kyles that Beaugard had written the disciplinary ticket for allegedly threatening Officer Jaburek.

Turner admonished Kyles: "you can't be threatening people." *See* 2/14/23 Trial Tr., at 368:23-25 (Dckt. No. 591).

**William Brown** was a lieutenant in F-House, which housed the segregation unit. *See* 2/17/23 Trial Tr., at 1238:21 – 1240:3 (Dckt. No. 594).

4

Brown (or possibly Tralon Durrett) escorted Kyles to segregation. *See* 2/13/23 Trial Tr., at 256:17-25 (Dckt. No. 590). Brown knew that Kyles was a protective custody inmate. *See* 2/17/23 Trial Tr., at 1266:7-16 (Dckt. No. 594).

Later, Kyles told Brown that he had been raped. According to Kyles, Brown responded: "As big as you are, you need to fight back and stop lying." *See* 2/14/23 Trial Tr., at 332:3-4 (Dckt. No. 591).

Brown testified that no such conversation ever took place. *See* 2/17/23 Trial Tr., at 1267:15-20 (Dckt. No. 594).

Brown also testified that he did not know why Kyles was in segregation. *Id.* at 1262:2-10. And Brown said that Kyles was not listed as a vulnerable inmate. *Id.* at 1262:14-15.

**Karen Rabideau**, the placement officer, allegedly played a role in putting and keeping Kyles in the cell with the gang member. Rabideau was generally responsible for cell assignments. *See* 2/14/23 Trial Tr., at 507:1 – 509:17 (Dckt. No. 591). Based on that role, Kyles argued at trial that Rabideau was responsible for his cell assignment.

Kyles also testified that he sent letters to Rabideau on October 25, October 26, October 28, and November 3 about the risk of harm from his cellmate. *Id.* at 317:10 – 318:6, 327:2-22. But she didn't respond. *Id.*

Kyles testified that his disciplinary ticket was expunged on November 5, 2014. *Id.* at 340:12 – 341:19. But Rabideau did not remove him from segregation until five days later, on November 10. *Id.* at 553:10 – 554:19.

Rabideau testified that she had nothing to do with placing Kyles in the cell with his assailant. In fact, she wasn't even at work that day. *Id.* at 522:3-6, 526:8-10. And the person who did the assignments in her absence forgot to write down Kyles's move in the prison records,

so Rabideau didn't know that Kyles had been moved into a cell with his assailant. *Id.* at 526:19-22, 548:17 – 549:15.

Rabideau also testified that she didn't receive any letters from Kyles. *Id.* at 549:24 – 550:6, 551:22 – 552:5. And she testified that she didn't delay his release. She learned on November 10, 2014, that the disciplinary ticket was expunged, and when she learned about the expungement, she promptly released him. *Id.* at 553:10 – 554:19.

**Tarry Williams**, the Warden, allegedly signed the double-cell assessment form, which approved the placement of Kyles in a double cell (*i.e.*, a cell with another inmate). *See* Pl.'s Ex. 42; *see also* 2/16/23 Trial Tr., at 1135:16 – 1137:12 (Dckt. No. 593).

Warden Williams also allegedly failed to act on an emergency grievance from Kyles about his cell assignment. *See* 2/14/23 Trial Tr., at 315:1 – 317:9 (Dckt. No. 591). But Kyles testified that he did not know whether Warden Williams ever saw the emergency grievance. *Id.* at 363:2-8.

In general, Warden Williams disclaimed knowledge of any of the issues about Kyles, because he used designees to sign off on all such documents. *See* 2/16/23 Trial Tr., at 960:10 – 961:19, 1136:19 – 1137:12, 1138:11-23 (Dckt. No. 593).

**Tralon Durrett** was the unit sergeant at F-House (again, where the segregation unit was). *See* 2/17/23 Trial Tr., at 1320:11 (Dckt. No. 594). He reported directly to Brown. *Id.* at 1320:12-14.

Durrett allegedly knew that Kyles was a protective custody inmate and needed to be housed alone. *See* 2/13/23 Trial Tr., at 258:3-17 (Dckt. No. 590). Also, when Kyles told him about the rapes, Durrett allegedly responded: "that is what happens to PC motherf*ckers who try and have my officers investigated." *See* 2/14/23 Trial Tr., at 331:3-5 (Dckt. No. 591).

Durrett didn't remember talking to Kyles after he arrived in segregation about his status as a protective custody inmate. But he didn't deny that such a conversation might have happened. *See* 2/17/23 Trial Tr., at 1329:22 – 1332:8 (Dckt. No. 594). "I don't recall. I will say, I'm not going to say it didn't happen." *Id.* at 1330:7-8.

But Durrett was sure that he never spoke with Kyles about any sexual assault. *Id.* at 1332:12-14. "That did not happen." *Id.* at 1332:14.

The trial involved three claims.

The first claim was a retaliation claim under the First Amendment. Kyles brought that claim against only three Defendants (Turner, Beaugard, and Durrett).

The second claim was a failure-to-protect claim under the Eighth Amendment. Kyles brought that claim against only four Defendants (Rabideau, Williams, Durrett, and Brown).

The third claim was a claim for intentional infliction of emotional distress under Illinois law. Kyles brought that claim against all six Defendants (Rabideau, Williams, Turner, Beaugard, Durrett, and Brown).

The facts were hotly contested at trial. Kyles testified, and so did each of the Defendants.

Defendants also called the alleged attacker, Jorge Pena, to the stand. He was incarcerated for first-degree murder. *See* 2/16/23 Trial Tr., at 1112:9-16 (Dckt. No. 593). He offered lively testimony.

Pena denied that he sexually assaulted Kyles. *Id.* at 1110:18-19. Pena's gang banned homosexuality. *Id.* at 1108:15 – 1109:25.

But Pena's testimony did corroborate other parts of Kyles's story.

Pena wasn't exactly shy about depicting himself as a violent person. In fact, he bragged about his fights in prison. He beat up inmates who were larger than him, such as a person who

disrespected him by calling him a b*tch and commenting on his shirt.  *Id.* at 1112:20 – 1114:23.  So Pena "beat on him like a drum board."  *Id.* at 1113:19-21.

Pena also knew that Kyles came from protective custody.  *Id.* at 1114:24 – 1115:2.  And critically, Pena confirmed that Kyles wrote grievances about getting double celled with Pena, and put those grievances in the institutional mail multiple times.  *Id.* at 1115:5 – 1116:4.

Pena testified that Kyles tried to get the attention of any guard who walked by the cell, complaining that he wasn't supposed to be in there.  *Id.* at 1116:5 – 1117:4.  Kyles complained to the guards so often that Pena got tired of it.  *Id.*

## II.    The Proposed Verdict Forms

The motion at hand challenges the jury verdict form.  So, this Court will offer a deep dive, and tell the backstory about how the verdict form came into existence.

Before trial, the parties filed competing versions of the jury verdict form as part of the final pretrial order.  *See* Final Pretrial Order (Dckt. No. 514).

Defendants proposed a verdict form with three sections:  liability, nominal damages, and compensatory damages.  *See* Defs.' Proposed Verdict Form (Dckt. No. 514-3).

Defendants proposed that the verdict form ask the jury to award a lump-sum amount of damages for all Defendants (collectively).  "State the amount of compensatory damages, if any, necessary to fairly compensate the Plaintiff for any injury that you find he sustained as a result of the conduct for which you have found Defendant(s) liable."  *Id.*  The form then included the following sentence, with a line to fill in the amount of damages:  "We fix Plaintiff's compensatory damages against Defendant(s) as $_____."  *Id.*

Notice the word "Defendant(s)." Defendants did not propose a verdict form that asked the jury to award different amounts of damages *per claim*. Defendants also did not propose a verdict form that asked the jury to award different amounts of damages *per Defendant*.

Instead, Defendants proposed asking the jury to award one lump-sum amount of damages for all "Defendant(s)" on all claims. *Id.* In other words, Defendants proposed putting all Defendants, and all claims, in one big pot, and asking the jury to assign one number.

Defendants did not file anything on the docket explaining why they wanted a verdict form with one lump-sum amount of damages for all Defendants on all claims.

Kyles proposed a jury verdict form with three sections: liability, compensatory damages, and punitive damages. *See* Pl.'s Proposed Verdict Form (Dckt. No. 514-2).

Unlike Defendants, Kyles proposed that the jury give separate amounts of damages for each Defendant. For example, the first question asked about Defendant Beaugard: "Plaintiff is awarded $_____ for compensatory damages against Defendant Beaugard." *Id.* at 4. The next five questions covered the other five Defendants.

Neither side proposed a jury verdict form that asked the jury to award a separate amount of damages for each Defendant on each claim. *See* Defs.' Proposed Verdict Form (Dckt. No. 514-3); Pl.'s Proposed Verdict Form (Dckt. No. 514-2). Instead, Defendants wanted the jury to award one damages number for all Defendants combined. And Kyles wanted the jury to award a separate amount of damages for each separate Defendant.

Near the end of trial, this Court directed the parties to refile their proposed jury verdict forms. *See* 2/20/23 Order (Dckt. No. 554). This Court issued a separate order "direct[ing]

9

the parties to double check their proposed jury verdict forms, and confirm that they include all pending claims against the right Defendants (and nothing else)." *See* 2/20/23 Order (Dckt. No. 555).

As directed, the parties refiled their proposed verdict forms. The parties did not change course. Once again, Defendants proposed a jury verdict form with one lump-sum amount of damages, for all claims against all "Defendant(s)." *See* Defs.' Proposed Verdict Form (Dckt. No. 556). Kyles proposed a verdict form with a separate award of damages against each Defendant, without separating the claims. *See* Pl.'s Proposed Verdict Form (Dckt. No. 558).

This Court presided over a jury instructions conference over two days. *See* 2/22/23 Order (Dckt. No. 566). Most of the discussion about the jury verdict form took place on the morning of February 22, 2023, the last day of trial. *See* 2/22/23 Trial Tr. (Dckt. No. 596).

Before that hearing, this Court circulated an updated draft of the jury verdict form. The draft did not adopt wholesale either side's proposal.

When it came to compensatory damages, the structure of the Court's version was closer to Kyles's version than to Defendants' version. That is, the Court's verdict form separated the Defendants when it came to compensatory damages (as Kyles had proposed).

For example, the first question asked the following: "We, the jury, award compensatory damages to Plaintiff Kyles and against Defendant Karen Rabideau in the sum of $_____." The next five questions covered the other five Defendants.

The Court's verdict form did not include separate questions about compensatory damages for each separate claim.

10

At the hearing, this Court asked whether any party had any "objections, corrections, concerns or otherwise" to the section of the verdict form that covered compensatory damages. *Id.* at 1669:5-7.

In response, defense counsel did not go to bat for the idea of asking the jury to award one lump-sum amount of damages for all Defendants. Defense counsel did not explain why they had made that proposal in their proposed jury verdict form. And defense counsel didn't say that the suggestion was important, either. It didn't come up.

If anything, defense counsel did the opposite. Defense counsel questioned whether the verdict form should ask the jury to award one amount of damages for the two constitutional claims, and another amount of damages for the state-law claim.

Defense counsel stated: "Your Honor, I'm wondering if we need separate compensatory damages lines for the two constitutional claims versus the IIED claim because of the different standards for awarding those damages." *Id.* at 1669:9-12.

Defense counsel explained that it might be difficult to figure out how much the jury awarded for each separate claim, unless the form separated the constitutional claims from the state-law claim of intentional infliction of emotional distress. "As I explained yesterday, there could be a situation where – excuse me – the jury finds defendants guilty for, say, retaliation but finds no physical injury, which would limit his compensatory damages to a dollar. It would be – they could also then find in favor of the IIED claim, but it would be impossible to tease out, I guess, what – what award went to which claim." *Id.* at 1669:13-19.

This Court expressed reluctance to ask the jury to award different amounts of damages for different claims. That is, the Court hesitated to ask the jury to figure out damages for each separate claim for each separate Defendant. This Court gave several reasons.

11

First and foremost, the Court's verdict form adopted the approach that each side had proposed in the final pretrial order. None of the parties had proposed a verdict form that broke down the damages by claim. The Court's verdict form was "consistent with the proposals that [the Court] received from the parties." *Id.* at 1669:21.

Second, the Court thought it would be "cumbersome and too long to have separate compensatory damages awards lines for each of the defendants in each of their claims." *Id.* at 1669:25 – 1670:2.

It seemed unnecessarily cumbersome to break down the damages by claim, in addition to breaking it down by Defendant. The Court's jury verdict form already included a separate damages question for each of the six Defendants. That's six questions. Asking the jury to award a separate damages amount for each Defendant for each claim would have required the jury to answer 13 damages questions (because Kyles sued three Defendants on the first claim, four Defendants on the second claim, and six Defendants on the third claim).

Asking the jury to combine the two constitutional claims – and then to award one damages amount for those two claims, and a different damages amount for the state-law claim – could have created problems, too. The first claim was a First Amendment claim, and the second claim was an Eighth Amendment claim. Awarding one damages amount for the two constitutional claims (combined) could have created problems if the evidence was sufficient for one constitutional claim, but not the other.

For example, what if the jury had found in favor of Kyles on both constitutional claims, and awarded a total of $100 in damages? And then, what if this Court found that the evidence was insufficient on one of the two constitutional claims? Then what? It would be hard to unravel what the jury did, and it would create risk of a do-over.

12

Third, from a tactical perspective, the Court questioned whether it might actually *hurt* Defendants to include lots of questions about damages. *Id.* at 1670:4-7. Under one school of thought, asking lots of questions about damages might prompt the jury to award more damages.

Fourth, breaking out the damages by claim seemed unnecessary in light of the jury instructions. The Court assured Defendants that the Court would properly "instruct the [jurors] on how to award damages for the constitutional claims and how to award damages on the intentional infliction of emotional distress claim." *Id.* at 1670:8-12.

That said, this Court did not fully close the door on the idea. This Court invited counsel to push back if the issue was important. "I'm just not sure the juice is worth the squeeze on that. If you think it's important, I'll hear you, but I'm just not sure it's necessary." *Id.* at 1670:25 – 1671:2.

Defense counsel responded: "I think we can move on, Your Honor." *Id.* at 1671:3.

Defense counsel raised another issue. Counsel reiterated the view that punitive damages were not recoverable, so the verdict form should not ask about them. (This Court held otherwise.) *Id.* at 1671:16-21.

Before ending the conference, this Court invited counsel to make any final comments or objections. The Court asked: "Anything else on the jury verdict form? Any objections? Anyone?" *Id.* at 1703:10-13.

Defense counsel responded: "No, Your Honor." *Id.* at 1703:15.

The jury instructions conference came to an end. Defense counsel did not say anything about using a verdict form with one lump-sum amount of damages for all Defendants.

### III. The Verdict

The jury returned a mixed verdict. Kyles prevailed on some, but not all, of the claims. *See* Jury Verdict (Dckt. No. 579).

The jury found in favor of all three Defendants (Turner, Beaugard, and Durrett) on the First Amendment retaliation claim.

The jury found against all four Defendants (Rabideau, Williams, Durrett, and Brown) on the failure-to-protect claim under the Eighth Amendment.

The jury found against four Defendants (Williams, Turner, Durrett, and Brown), and found in favor of two Defendants (Rabideau and Beaugard), on the claim of intentional infliction of emotional distress.

Putting it all together, the jury found against Williams, Durrett, and Brown on both the Eighth Amendment claim and the state-law claim of intentional infliction of emotional distress. The jury found against Rabideau on the Eighth Amendment claim (only). And the jury found against Turner on the state-law claim (only).

The jury awarded compensatory damages against five of the six Defendants. The jury awarded $200,000 against Rabideau, $600,000 against Williams, $250,000 against Turner, $550,000 against Durrett, and $650,000 against Brown. The jury sided in favor of Beaugard, so it awarded Kyles $0 in damages against Beaugard.

The jury did not award punitive damages against Rabideau, Williams, Turner, or Beaugard. But the jury did award $300,000 in punitive damages against Durrett, and $400,000 in punitive damages against Brown.

Later, this Court issued a ruling on Defendants' motion for judgment as a matter of law under Rule 50(a).

14

At that point, Defendants filed the motion at hand, a motion for judgment under Rule 50(b) or a new trial under Rule 59(a). That motion covers some of the same ground as the motion under Rule 50(a).

## Legal Standard

Under Rule 50(b), "after a jury verdict . . . a district court may direct the entry of 'judgment as a matter of law' if 'a reasonable jury would not have a legally sufficient evidentiary basis to find' in the nonmovant's favor." *Bowers v. Dart*, 1 F.4th 513, 519 (7th Cir. 2021) (quoting Fed. R. Civ. P. 50(b)). Rule 50(b) "imposes 'a high bar.'" *Id.* (quoting *Ruiz-Cortez v. City of Chicago*, 931 F.3d 592, 601 (7th Cir. 2019)). "Only if no rational jury could have found for the nonmovant may [a court] disturb the jury's verdict." *Ruiz-Cortez*, 931 F.3d at 601.

The district court must "give the nonmovant 'the benefit of every inference' while refraining from weighing for [itself] the credibility of evidence and testimony." *Id.* (quoting *EEOC v. Costco Wholesale Corp.*, 903 F.3d 618, 621 (7th Cir. 2018)). A district court "review[s] the entire trial." *Bowers*, 1 F.4th at 519. But it "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000).

## Analysis

Defendants make three arguments. First, Defendants argue that sovereign immunity bars the state-law claim of intentional infliction of emotional distress. *See* Defs.' Mem., at 5 (Dckt. No. 607). Second, Defendants argue that the jury verdict form was improper, and led to double recoveries. *Id.* at 10. And third, Defendants argue that the jury awarded an excessive amount of punitive damages. *Id.* at 14.

## I.      Sovereign Immunity

The first argument is a repeat of an argument that this Court heard on Defendants' motion under Rule 50(a).  Defendants argue that sovereign immunity bars the state-law claim of intentional infliction of emotional distress.

This Court previously ruled that Defendants waived the argument because they failed to raise it at trial.  *See Kyles*, 2023 WL 5277882, at *19–29.  "And now that trial is over, the sovereign immunity ship has sailed."  *Id.* at *26.

Defendants give this Court no new reason to change course in their motion under Rule 50(b).  So the Court lands in the same place.[1]

## II.     The Verdict Form

The next argument involves the jury verdict form.

The verdict form asked the jury to award a separate amount of damages for each Defendant.  One question asked about damages against Defendant Rabideau, and another question asked about damages against Defendant Williams, and so on.

Defendants argue that the verdict form should have asked the jury to award one lump-sum amount of damages for all Defendants on all claims (combined).  As they see things, the verdict form allowed the jury to award multiple recoveries for the same injury.

This Court disagrees, and in any event, the argument comes too late in the day.

---

[1]  And it makes no difference that Defendants' arguments are now in a Rule 50(b) motion rather than a Rule 50(a) motion.  The standard is the same whether the motion falls under Rule 50(a) or 50(b).  *See* 9B Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 2537 (3d ed. 2008) ("The standard for granting a renewed motion for judgment as a matter of law under Rule 50(b) is precisely the same as the standard for granting the pre-submission motion under Rule 50(a)."); *see also Baugh v. Cuprum S.A. De C.V.*, 2015 WL 9304338, at *2 n.2 (N.D. Ill. 2015) ("The same standard governs both types of Rule 50 motions.").

The crux of the argument is that Kyles suffered one indivisible injury. A plaintiff is entitled to only one recovery for one injury. *See Transcraft, Inc. v. Galvin, Stalmack, Kirschner & Clark*, 39 F.3d 812, 821 (7th Cir. 1994) ("Where, as in this case, the injury to the plaintiff is indivisible, the jury should be asked to assess the damages caused by the injury, unless (as was not the case here) the jury is asked to assess the relative fault of the defendants for purposes of contribution among joint tortfeasors.").

The presence of multiple tortfeasors can't lead to more than one recovery for one indivisible injury. A plaintiff "is entitled to only one recovery when [he] seeks damages for the same harm from multiple defendants." *Id.*

"A tort victim can obtain only one recovery for his harm, no matter how many tortfeasors inflicted it." *See Bosco v. Serhant*, 836 F.2d 271, 280 (7th Cir. 1987). "This principle is seen most clearly in cases where a group of tortfeasors inflicts an indivisible harm, as for example where one tortfeasor places a bucket under the plaintiff's chair, another fills it with gasoline, and a third drops a match into it, causing it to explode and injure the plaintiff. Because the injury is indivisible each tortfeasor is liable for the full harm." *Id.*

As Defendants see things, Kyles suffered one indivisible injury, but the verdict form allowed the jury to award damages more than once. By asking the jury to award different amounts of damages for each separate Defendant, the verdict form opened the door for multiple recoveries for the same injury.

The argument runs into a few problems. For starters, Defendants never made that argument before or during trial.

To be fair, in the final pretrial order, defense counsel did propose a jury verdict form with one lump-sum amount of damages for all Defendants. But defense counsel never explained why

they wanted a verdict form with one lump-sum amount. And they didn't explain why it was important, either.

Before and during trial, defense counsel did not argue that the jury needed to award one lump-sum amount of damages because Kyles suffered one indivisible injury. They did not argue that asking the jury to award different amounts of damages for different Defendants would open the door for double recoveries.

If there was any downside to awarding separate amounts of damages against separate Defendants, this Court never heard it from defense counsel. It never came up.

At the jury instructions conference, this Court repeatedly invited the parties to make any objections to the verdict form. In response, defense counsel never raised the issue of asking the jury to award one lump-sum amount of damages for everyone on every claim.

If anything, defense counsel did the opposite. At that conference, defense counsel floated the possibility of breaking down the damages questions, to separate the two constitutional claims from the state-law claim. *See* 2/22/23 Trial Tr., at 1669:9-19 (Dckt. No. 596).

Instead of asking this Court to combine the damages awards, defense counsel suggested splitting the damages awards even more than this Court's verdict form did. Defense counsel never went to bat for the notion that the jury should decide one amount of damages for all claims against all Defendants.

So Defendants waived the objection. They did not preserve the challenge to the jury verdict form because they did not make any argument in favor of a lump-sum damages award before the jury received the case. Quietly proposing a verdict form with one line for damages, without saying anything else, isn't enough to preserve the point.

The Federal Rules require timely objections to jury instructions, including the jury verdict form. The objections must be specific, too. "A party who objects to an instruction or the failure to give an instruction must do so on the record, stating distinctly the matter objected to and the grounds for the objection." *See* Fed. R. Civ. P. 51(c)(1). A party must "distinctly" object, and must give the "grounds for the objection." *Id.*; *see also* 9C Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 2554 (3d ed. 2008) ("The grounds [for an objection] must be stated with sufficient clarity so that the trial judge may follow and understand them if they are well taken.").

"The objection must be specific enough that the nature of the error is brought into focus. The party must also explain what is wrong with the proposed instruction; it is not enough simply to submit an alternative instruction." *See Schobert v. Illinois Dept. of Transp.*, 304 F.2d 725, 729 (7th Cir. 2002); *see also* 9 Moore's Federal Practice § 51.32[3] (3d ed. 2024) ("[T]he mere submission of a proposed instruction will not be considered an objection to the instruction given.").

"There are no formal requirements, but pragmatically speaking the district court must be made aware of the error prior to instructing the jury, so that the judge can fix the problem before the case goes to the jury." *Schobert*, 304 F.2d at 729–30; *see also* 9 Moore's Federal Practice § 51.32[3] (3d ed. 2024) ("[C]ounsel voicing an objection to the court's charge must take care that the court is aware that counsel has an objection to the charge, and not merely a preference for a different one.").

If a party doesn't blow the whistle, they can't expect the district court judge to hear it.

When it comes to objections, the same rules apply to jury instructions and to jury verdict forms. "It is well-established under Seventh Circuit law that, as with any other jury instruction, a

party must object to the verdict form at trial in order to preserve its objection." *Moore v. Hamilton Se. Sch. Dist.*, 2014 WL 12755906, at *3 (S.D. Ind. 2014) (citing *MMG Fin. Corp. v. Midwest Amusement Park, LLC*, 630 F.3d 651, 658–59 (7th Cir. 2011)); *see also Robinson v. Perales*, 2016 WL 4249172, at *3 (N.D. Ill. 2016) ("In civil cases, a failure to object to jury instructions waives a post-verdict argument that they were given in error.") (citing *Chestnut v. Hall*, 284 F.3d 816, 819–20 (7th Cir. 2002)); *Frazer v. City of East St. Louis*, 2011 WL 5325602, at *3 (S.D. Ill. 2011) ("The defendants waived any objection to the verdict form . . . by failing to state distinctly the matter objected to and the grounds for the objection.") (cleaned up); *Walker v. City of Milwaukee*, 2024 WL 4471537, at *2 (E.D. Wis. 2024) ("Defendants' failure to object to either the jury instructions and/or the special verdict form constitutes a waiver.").

The need to object to a jury verdict form is no less important than the need to object to jury instructions. If anything, it's more important. At the end of the day, and at the end of trial, the jury verdict form is where all the action is. The verdict is the whole point of the trial.

Waiver rules exist for good reason. The judicial process depends on the adversarial system. It is up to the parties to advocate for themselves, make their best arguments, and explain why an issue is important.

District court judges have more than enough on their overflowing, ever-spinning plates. The judiciary does not shoulder the burden of making arguments for the parties, brainstorming potential pitfalls, or figuring out why an issue is important.

If an argument requires special divination powers by the district court judge to figure out what the argument is, and why it's important, it's not an argument. Unspoken arguments are even worse. The phrase "speak now or forever hold your peace" is true in a lot of places. But it especially rings true in a courtroom.

Defendants also could have proposed a jury instruction about avoiding duplicative damages awards. That is, they could have proposed an instruction telling the jury that they cannot award damages more than once for the same injury.

They didn't. *See* Proposed Jury Instructions (Dckt. No. 492-1); Proposed Jury Instructions (Dckt. No. 514-1); Defs.' Proposed Suppl. Jury Instructions (Dckt. No. 551); Defs.' Objections and Additions to the Court's Jury Instructions (Dckt. No. 564).

So it's waived. *See Sunny Handicraft (H.K.) Ltd. v. Envision This! LLC*, 66 F.4th 1094, 1098 (7th Cir. 2023) ("[Defendant] did not propose jury instructions directed to the subject . . . The district judge treated the matter as forfeited, and understandably so."); *see also Bentz v. Lindenberg*, 854 F. App'x 55, 58 (7th Cir. 2021) ("[Plaintiff] did not timely request an adverse-inference instruction, so that argument is waived."); *Thompson v. Mem'l Hosp. of Carbondale*, 625 F.3d 394, 407 (7th Cir. 2010); *Republic Tobacco Co. v. N. Atlantic Trading Co., Inc.*, 381 F.3d 717, 733 (7th Cir. 2004); *Rodesky v. Pfister*, 2023 WL 1475057, at *3–4 (C.D. Ill. 2023); *Lewis v. City of Chicago*, 563 F. Supp. 2d 905, 916 (N.D. Ill. 2008); *Hoopes v. Gulf Stream Coach Inc.*, 2017 WL 6884317, at *2 (N.D. Ind. 2017); *Petkus v. Richland Cnty.*, 2013 WL 5726203, at *5 (W.D. Wis. 2013).

The jury did hear instructions about how to calculate damages for each claim. *See* Jury Instructions, at 49, 51 (Dckt. No. 568). Courts presume that juries follow jury instructions. *See Soltys v. Costello*, 520 F.3d 737, 743 (7th Cir. 2008); *Chlopek v. Fed. Ins. Co.*, 499 F.3d 692, 702 (7th Cir. 2007).

On the failure-to-protect claim under the Eighth Amendment, this Court instructed the jury to "determine the amount of money that will fairly compensate Plaintiff for any injury that you find he sustained and is reasonably certain to sustain in the future as a direct result of

21

Defendants' . . . failure to protect Plaintiff when he was in the Segregation Unit at Stateville." *See* Jury Instructions, at 49 (Dckt. No. 568). Damages "include both the physical and mental aspects of injury, even if they are not easy to measure." *Id.*

This Court added that the jury needed to decide "whether Plaintiff suffered a physical injury or was subjected to a sexual act." *Id.* If so, then the jury "may award damages for any mental or emotional injury Plaintiff suffered as well." *Id.*

The Court directed the jury to consider "[t]he physical, mental, and emotional pain and suffering that Plaintiff has experienced and is reasonably certain to experience in the future." *Id.* "No evidence of the dollar value of physical or mental and emotional pain and suffering has been or needs to be introduced. There is no exact standard for setting the damages to be awarded on account of pain and suffering. You are to determine an amount that will fairly compensate the Plaintiff for the injury he has sustained." *Id.*

On the claim of intentional infliction of emotional distress, this Court explained what to do if the jury found for Kyles. This Court instructed the jury that it must "fix the amount of money which will reasonably and fairly compensate him for the emotional distress experienced and reasonably certain to be experienced in the future. You must take into consideration the nature, extent and duration of the injury and the aggravation of any pre-existing ailment or condition." *Id.* at 51. And Court instructed the jury that it "must consider the claims against each Defendant separately." *Id.* at 46.

The jury heard instructions on how to calculate damages for each claim. If Defendants wanted something more, they could have requested an additional instruction.

Overall, Defendants waived any argument about the need for a lump-sum damages award in the jury verdict form. But even if they had preserved it, the argument did not have much going for it.

The argument rests on the premise that Kyles suffered one, indivisible injury. That position is tough sledding on the record at hand.

Defendants played different roles, took different actions, and said different things. They injured Kyles in different ways at different times.

The existence of separate injuries is especially visible when it comes to the claim of intentional infliction of emotional distress. Rabideau, the placement officer, inflicted an injury by ignoring his letters crying for help. *See* 2/14/23 Trial Tr., at 317:10 – 318:6, 327:2-22 (Dckt. No. 591). Brown inflicted a separate injury by telling Kyles to shut up and fight: "As big as you are, you need to fight back and stop lying." *Id.* at 332:3-4. Durrett inflicted a separate harm when he learned about the rapes, telling Kyles "that is what happens to PC motherf*ckers who try and have my officers investigated." *Id.* at 331:3-5.

Rabideau turned a deaf ear while Kyles was in the cell. Brown and Durrett said something after the attacks. They inflicted different injuries at different times.

The issue is a closer call when it comes to the Eighth Amendment claim. Kyles claims that different correctional officers played different roles in putting and keeping Kyles in the cell with a gang member. Maybe their collective efforts led to one harm – setting him up for violence.

Still, it is unclear whether each separate attack is a separate injury. Some Defendants played a role in putting him there, and other Defendants played a role in keeping him there. At

23

the very least, the issue is close enough that defense counsel should have raised it, if the issue was important.

In sum, the Court concludes that Defendants waived their objection to the verdict form by failing to make the argument before the jury began deliberations. The argument fails on the merits, too.[2]

## III.    Punitive Damages

The third and final argument is a challenge to the punitive damages.

The jury awarded punitive damages against only two Defendants: Durrett and Brown. Durrett and Brown now challenge that award of punitive damages, arguing that it was excessive under the Due Process Clause. *See* Defs.' Mem., at 14 (Dckt. No. 607).

This Court will start with a summary of what the jury decided, before addressing whether that award passes constitutional muster.

### A.    The Jury Verdict

It isn't hard to figure out the amount of damages awarded by the jury. The numbers speak for themselves. It takes a little more work to figure out which claims the jury awarded the punitive damages and the compensatory damages *for*, meaning what damages came from which claims.

Taking a step back, the jury awarded $650,000 in compensatory damages and $400,000 in punitive damages against Brown. *See* Jury Verdict (Dckt. No. 579). And the jury awarded $550,000 in compensatory damages and $300,000 in punitive damages against Durrett. *Id.*

---

[2] Along the way, Defendants repeat an argument about whether the verdict against Brown and Durrett on the intentional infliction of emotional distress claim was against the manifest weight of the evidence. *See* Defs.' Mem., at 14 (Dckt. No. 607); Defs.' Reply, at 7 (Dckt. No. 618). This Court already rejected that argument in its ruling on the Rule 50(a) motion, and sees no reason to change course.

24

Oftentimes, punitive damages are a multiple of the compensatory damages. But here, the punitive damages were a fraction of the compensatory damages. Doing a little math, the punitive damages were 61.5% of the compensatory damages against Brown ($400,000 ÷ $650,000), and were 54.5% of the compensatory damages against Durrett ($300,000 ÷ $550,000).

As Defendants read the verdict, the punitive damages were disproportionate to the compensatory damages. The crux of their argument depends on the allocation of compensatory and punitive damages to each of Kyles's claims, meaning what damages the jury awarded on each claim. It's helpful to figure out that allocation, but it doesn't control the outcome.

Defendants believe that the jury awarded all of the compensatory damages ($1,200,000) on the state-law claim, except for $2 in nominal damages for the Eighth Amendment claim. *See* Defs.' Mem., at 15 (Dckt. No. 607). And Defendants believe that the jury awarded all of the punitive damages ($700,000) for the Eighth Amendment claim.

Putting those numbers together, Defendants believe that the jury awarded $2 in nominal damages on the Eighth Amendment claim, and $700,000 in punitive damages on the Eighth Amendment claim. That's a whopping ratio. As Defendants see things, "a 350,000x multiplier in punitive damages" is "irrational" and "grossly exceeds constitutional limits." *See* Defs.' Mem., at 15 (Dckt. No. 607).

Unpacking how the jury allocated the damages – meaning what damages the jury awarded for which claim – takes a little work. The verdict form did not ask the jury to award damages by claim. So the allocation of damages for each claim does not jump off the page.

Figuring out which claim gave rise to the punitive damages is the easy part.

The jury found against Durrett and Brown on both the Eighth Amendment claim and the state-law claim of intentional infliction of emotional distress. But only one of the claims could have given rise to punitive damages.

Punitive damages are available for an Eighth Amendment claim under the Prison Litigation Reform Act. *See Calhoun v. DeTella*, 319 F.3d 936, 942 (7th Cir. 2003) ("[Section] 1997e(e) does not preclude claims for punitive damages for violations of the Eighth Amendment."). But punitive damages are not available for intentional infliction of emotional distress under Illinois law. *See Wordlow v. Chicago Bd. of Educ.*, 2018 WL 6171792, at *14 n.9 (N.D. Ill. 2018).

This Court instructed the jury that it could award punitive damages for the Eighth Amendment claim, but not the state-law claim of intentional infliction of emotional distress. *See* Jury Instructions, at 52 (Dckt. No. 568) ("If you find for Plaintiff Kyles, and find against one or more Defendants, on the First Amendment claim or the Eighth Amendment claim, then you may assess, but are not required to assess, punitive damages. Punitive damages are not available for the claim of intentional infliction of emotional distress.").

Putting it all together, the jury *must* have awarded punitive damages against Durrett and Brown *only* for the Eighth Amendment claim. Punitive damages were on the table for the Eighth Amendment claim, but were off the table for the state-law claim.

Untangling the compensatory damages poses a bigger challenge.

The Prison Litigation Reform Act precludes compensatory damages for mental and emotional injuries, unless there is a physical injury. "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a

sexual act." *See* 42 U.S.C. § 1997e(e); *see also Calhoun*, 319 F.3d 936, 940–41 (7th Cir. 2003)

("We agree that, absent a showing of physical injury, § 1997e(e) would bar a prisoner's recovery

of compensatory damages for mental and emotional injury.").

     The Seventh Circuit has read the statutory ban "to apply only to compensatory damages,

not nominal or punitive damages involving no physical injury." *Lisle v. Welborn*, 933 F.3d 705,

719 (7th Cir. 2019); *see also Smith v. Godinez*, 2023 WL 358792, at *5 (N.D. Ill. 2023)

("[W]hile the Prison Litigation Reform Act denies recovery for mental or emotional injury

suffered while in custody without a prior showing of physical injury, psychological harms alone

may still give rise to an Eighth Amendment violation and provide a basis for a civil action for

nominal and punitive damages and/or injunctive relief.") (cleaned up).

     If a prisoner alleges a psychological injury alone, he may recover nominal and punitive

damages, but not compensatory damages. *Id.*; *see also Gray v. Hardy*, 826 F.3d 1000, 1007 (7th

Cir. 2016) ("[W]e have recognized that although § 1997e(e) would bar recovery of compensatory

damages 'for' mental and emotional injuries suffered, the statute is inapplicable to awards of

nominal or punitive damages for the Eighth Amendment violation itself.") (cleaned up).

     This Court instructed the jury that they could not award compensatory damages on the

Eighth Amendment claim, absent a physical injury. *See* Jury Instructions, at 49 (Dckt. No. 568)

("If you find that Plaintiff did not suffer a physical injury and was not subjected to a sexual act,

you may not award damages for mental or emotional injury. Whether or not Plaintiff proves a

physical injury or a sexual act, you may award nominal damages and punitive damages, so long

as you find that Plaintiff has met the standard for obtaining those damages.").

     So, the jury could not have awarded compensatory damages on the Eighth Amendment

claim, *unless* Durrett and Brown had responsibility for a physical injury or a sexual assault

against Kyles. That raises a question – did the jury have an evidentiary basis to hold Durrett and Brown liable for the physical attacks against Kyles?

This Court touched on that question in passing when it issued its ruling on the Rule 50(a) motion. *See* 8/16/23 Mem. Opin. (Dckt. No. 599). Along the way, this Court dropped a few footnotes and mused about what the jury did, in the spirit of trying to explain things. *Id.* at 35 n.1, 51 n.4. But this Court made clear that the issue of punitive damages was "not in play in the [Rule 50(a)] motion at hand." *Id.* at 52 n.4.

In its ruling on the Rule 50(a) motion, this Court surmised that the jury must have awarded the compensatory damages on the claim of intentional infliction of emotional distress – not the Eighth Amendment claim – because Durrett and Brown were not responsible for any physical injury. Under one reading of the record, Durrett and Brown didn't know about the risks to Kyles before the attacks took place. *Id.* at 52 n.4 ("So, as things stand, the jury awarded nominal damages (at most) to Kyles on the Eighth Amendment claims against Durrett and Brown (because the jury *couldn't* award compensatory damages against them, given the lack of a physical harm after they gained knowledge), plus $700,000 in punitive damages on the Eighth Amendment claims (because the jury *couldn't* award punitive damages against them on the IIED claim, which was the only other claim against them).").

In his brief on the 50(b) motion, Kyles pushes back on that interpretation of the record. *See* Pl.'s Resp., at (Dckt. No. 614). And candidly, he might have a point.

The most explosive testimony about Durrett and Brown involved their post-attack comments. The timing of those comments poses an issue. Saying something that is derogatory, insensitive, callous, or skeptical after an attack isn't enough to give rise to compensatory

damages under the Prison Litigation Reform Act. The fact that someone said something cruel after an attack does not create responsibility *for* the attack.

But if the *content* of the post-attack comments suggest *pre*-attack knowledge, that would be a different story.

Here, maybe the jury drew an inference from the *content* of the comments made by Durrett and Brown. Maybe the jury inferred from their comments *after* the attacks that Durrett and Brown knew about the risk of an attack *before* the attacks took place.

Again, Kyles testified that he told Durrett that he needed to be celled alone, given his status as a protective custody inmate. *See* 2/13/23 Trial Tr., at 258:3-17 (Dckt. No. 590). Later, when Kyles told him about the rapes, Durrett allegedly responded: "that is what happens to PC motherf*ckers who try and have my officers investigated." *See* 2/14/23 Trial Tr., at 331:3-5 (Dckt. No. 591).

That testimony could support an inference that Durrett knew about the risk of an attack from day one. One possible reading of Durrett's language is that Durrett knew what Kyles had coming. That's not the only possible inference. But it seems like a plausible inference, especially given the record as a whole.

The record is different when it comes to Brown. Standing alone, Brown's statement after the attacks did not suggest knowledge of a risk of harm *before* the attacks.

Again, Kyles testified that he told Brown that he had been raped. In response, Brown said: "As big as you are, you need to fight back and stop lying." *Id.* at 332:3-4.

If that conversation had taken place before an assault, then it could support an inference that Brown bears responsibility for a later assault. That is, imagine if Kyles told Brown about an

29

attack, and Brown did nothing, and then Kyles got attacked again. In that case, Brown might have responsibility for a later attack.

But that's not what happened. Kyles testified that the conversation with Brown took place *after* the assaults. *Id.* at 377:2-17. Kyles and Brown talked about the assaults, and after that conversation, Pena never touched him again. *Id.*

So, Brown's comments after the attacks don't support an inference that Brown knew about the risk of an attack.

Still, other facts in the record do support an inference that Brown knew about a risk of harm, and could have done something about it. Three facts jump out.

First, Brown knew that Kyles was in protective custody. *See* 2/17/23 Trial Tr., at 1266:7-10 (Dckt. No. 594).

Second, Brown was responsible for confirming the compatibility of inmates for double-celling. *Id.* at 1283:12-22, 1295:1-8. But Brown did not confirm the compatibility of Kyles and Pena. *Id.* at 1283:22 – 1284:11. He had the ability to check, too. Brown could have called the intelligence unit and asked whether it was acceptable to put Pena and Kyles in the same cell. *Id.* at 1290:21-25. But Brown didn't take those steps because he "was very familiar with Kyles." *Id.* at 1290:25.

Brown did not inquire about why Kyles was in protective custody, either.[3] *Id.* at 1286:6-16. The reason for protective custody might affect an inmate's compatibility with other inmates.

---

[3] At times, Kyles overstates the evidence about Brown in his response brief. For example, his brief says that "the jury heard that Brown's assessment was that [Kyles] was big and strong enough to defend himself and he proceeded to double-cell Kyles with Pena in cell F-206." *See* Pl.'s Mem., at 15 (Dckt. No. 614). That sounds explosive, but when a reader looks at the transcripts, that testimony isn't there. In the cited passage, Brown testified: "I don't know if he can fight or not, but I wasn't concerned that he would be hurt. If I thought he would have been hurt, I wouldn't have put him in that cell. . . . I didn't think there was going to be any type of issue or else I wouldn't have put him in that cell." *See* 2/17/25 Trial Tr., at

30

But Brown testified that he saw no reason to look into Kyles's protective custody status any further, since he "didn't have any information that [Kyles] was an informant." *Id.* at 1296:25 – 1297:9 (cleaned up).

The jury didn't have to believe Brown's explanation. Based on the record as a whole, a jury could infer that Brown knew about the risk of harm, and deliberately turned a blind eye to the safety of Kyles.

Third, another cell was empty when Kyles was placed in a cell with his attacker. *Id.* at 1278:15 – 1280:18. So Brown had other options at his disposal. He could have placed Kyles in a cell by himself to keep him safe.

Viewing it anew, maybe the jury awarded compensatory damages for the Eighth Amendment claim against Durrett and Brown after all.

After marching through all of that evidence, a reader could be forgiven for thinking that pinning down what the jury did is essential to resolving the motion at hand. At the risk of bursting expectations, it isn't.

Figuring out the jury's decision provides context, and informs the analysis. But as explained below, the ratio between the compensatory damages and the punitive damages on the Eighth Amendment claim does not control whether the punitive damages pass constitutional muster.

---

1285:25 – 1286:5 (Dckt. No. 594). Basically, counsel didn't get the answer that he wanted at trial, so he is citing the question (about whether Kyles could "fight for himself") instead of the answer.

**B.    Due Process**

The jury awarded $700,000 after hearing two weeks of evidence about Kyles getting raped in prison. On that record, the Due Process Clause did not prevent the jury from returning that verdict.

An award of punitive damages violates the Due Process Clause of the Fourteenth Amendment "only if it is 'grossly excessive' in relation to a state's legitimate interest 'in punishing unlawful conduct and deterring its repetition.'" *See Sommerfield v. Knasiak*, 967 F.3d 617, 623 (7th Cir. 2020) (quoting *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 568 (1996)).

Three guideposts light the way when evaluating the constitutionality of an award of punitive damages. *Id.* "[T]he district court should consider: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the harm (or potential harm) suffered by the plaintiff and the punitive-damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Id.* (citing *Gore*, 517 U.S. at 574–75).

**1.    Reprehensibility**

"The first and most important guidepost is the reprehensibility of the defendant's conduct." *Saccameno v. U.S. Bank Ass'n*, 943 F.3d 1071, 1086 (7th Cir. 2019). That guidepost has a number of factors.

Courts "consider whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or

deceit, or mere accident." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003) (citing *Gore*, 517 U.S. at 575).

"If none of these factors weigh in favor of the plaintiff, the award is 'suspect.' But if even one of the factors weighs in the plaintiff's favor, that may be enough to sustain the punitive award." *Bolden v. Pesavento*, 2024 WL 1405041, at *3 (N.D. Ill. 2024) (citing *Epic Sys. Corp. v. Tata Consultancy Servs. Ltd.*, 980 F.3d 1117, 1141 (7th Cir. 2020)). Courts do not lightly call into question a jury's verdict, so "all five factors must be absent to render a punitive award suspect." *See Synnott v. Burgermeister*, 2024 WL 108784, at *2 (7th Cir. 2024).

Several factors weigh in favor of Kyles.

The first factor is the existence of physical harm, and it heavily supports the punitive damages. The jury heard evidence that Durrett and Brown put Kyles at risk of an attack by a violent cellmate.

The next reprehensibility factor is whether the conduct showed a reckless disregard for the safety of others. *See State Farm*, 538 U.S. at 419 (citation omitted). Again, that factor heavily favors Kyles.

The reaction of Durrett and Brown *after* the attacks could support an inference about their attitude *before* the attacks. Kyles reported the sexual assaults to both Brown and Durrett. *See* 2/14/23 Trial Tr., at 330:20 – 332:2 (Dckt. No. 591). According to Kyles, Brown responded: "As big as you are, you need to fight back and stop lying." *Id.* at 332:3-4. Durrett showed no sympathy either, saying: "This is what happens to P[rotective] C[ustody] motherf*ckers who would try to have my officers investigated." *Id.* at 331:3-5.

Those reactions showed a high level of indifference to the well-being of Kyles. Brown responded with skepticism and callousness. Durrett responded with malice, suggesting that

Kyles had it coming to him. That's more than enough to show reckless disregard for the personal safety of Kyles.

Another factor is evidence of malice, and once again, the record supports the award of punitive damages. Kyles was raped not once, but twice. He was forced to remain in a cell with his attacker, placing him in constant threat of more physical harm. Defendants knew about the risks, but left Kyles in a cell with a violent gang member.

Viewed as a whole, the jury heard evidence that could support a finding that Durrett and Brown engaged in reprehensible conduct. The jury didn't have to reach that conclusion. But the jury heard *enough* to reach that conclusion.

### 2. Disparity

The second guidepost is the disparity between the harm (or the potential harm) and the punitive damages. *See Sommerfield*, 967 F.3d at 622 (citation omitted).

The Supreme Court "has been reluctant to provide strict rules regarding the calculation of this ratio." *See Saccameno*, 943 F.3d at 1088 (citing *State Farm*, 538 U.S. at 425). "[I]n practice, few awards exceeding a single-digit ratio" will satisfy due process. *See State Farm*, 538 U.S. at 425. But "the ratio is flexible." *See Saccameno*, 943 F.3d at 1088.

Defendants believe that this Court must throw out the punitive damages, because the jury awarded no compensatory damages on the Eighth Amendment claim. *See* Defs.' Mem., at 18 (Dckt. No. 607).

That assumption isn't necessarily right. Again, the record could support a finding that Durrett and Brown placed Kyles at risk of physical injury, which could give rise to compensatory damages under the PLRA.

34

But even if the jury awarded only nominal damages (and not compensatory damages) on the Eighth Amendment claim, the jury could have awarded punitive damages, too.

The Seventh Circuit solidified the point in *Sommerfield*. There, the jury returned a verdict in the plaintiff's favor on a few discrimination claims. The jury awarded $540,000 in punitive damages and $0 in compensatory damages. *See Sommerfield*, 967 F.3d at 624. The district court later entered final judgment and awarded $54,315.24 in economic damages.

On appeal, the defendant challenged the award of punitive damages because the jury awarded no compensatory damages. The Seventh Circuit held that awards of punitive damages "are not conditioned upon the presence of compensatory damages." *Id.*

The question is the relationship between the *harm* and the punitive damages. "Under *Gore*, a court analyzes the ratio of punitive damages to the *actual harm* inflicted on the plaintiff." *Id.* (emphasis added) (citing *Gore*, 517 U.S. at 580). So "[t]he jury's award of punitive damages without compensatory damages is thus not suspect, at least, not on that basis." *Id.*

*Sommerfield* demonstrates that a district court must analyze the ratio of punitive damages to actual harm. Actual harm isn't always measured in terms of compensatory damages. In *Sommerfield* itself, the Seventh Circuit found actual harm, even when there were *no* compensatory damages.

Here, it is hard to avoid the conclusion that the ratio between the harm to Kyles and the punitive damages is fair game. Imagine, for the sake of argument, that Defendants are right, and that the jury awarded Kyles only $2 in nominal damages for the Eighth Amendment claim. That number makes the award of $700,000 look big.

But the award of $700,000 looks much smaller when the focus is on what Kyles endured. Kyles was in a cell with a violent gang member for two weeks. And that gang member repeatedly assaulted him. By any yardstick, Kyles suffered a terrible harm.

Overall, the Court concludes that the amount of punitive damages is not out of line when compared to the nature and extent of the harm suffered by Kyles.

### 3. Comparable Cases

The third guidepost looks to civil penalties in comparable cases. *Id.* at 620 (citing *Gore*, 517 U.S. at 574–75). "[T]his guidepost generally deserves less weight than the other two." *Rainey v. Taylor*, 941 F.3d 243, 255 (7th Cir. 2019) (Sykes, J.).

Sometimes courts compare punitive damages to statutory penalties. *See, e.g.*, *Curry v. Revolution Lab'ys, LLC*, 124 F.4th 441, 462 (7th Cir. 2024) ("The parties agree that the Lanham Act is the appropriate comparator."). And sometimes courts compare punitive damages to punitive damages in other cases. *See, e.g.*, *Synnott*, 2024 WL 108784, at *2 (collecting cases).

Defendants propose the latter route. They ask the Court to consider punitive damages awarded in similar cases. *See* Defs.' Mem., at 18–19 (Dckt. No. 607).

Defendants cites a few cases, but they don't offer much help. One case involved a prisoner who had no running water or sanitation in his cell for a week. *See Gevas v. Harrington*, 2014 WL 4627689, at *7 (S.D. Ill. 2014). Another case involved a refusal to move an asthmatic inmate to a smoke-free part of a prison. *See Reilly v. Grayson*, 157 F. Supp. 2d 762, 774 (E.D. Mich. 2001). Those cases aren't in the same ballpark as the case at hand.

Overall, the Court concludes that the awards of punitive damages pass constitutional muster. After considering all of the guideposts, the punitive damages were not "'grossly

excessive' in relation to a state's legitimate interest 'in punishing unlawful conduct and deterring its repetition.'" *See Sommerfield*, 967 F.3d at 623 (citation omitted).

**IV.    The Motion for a New Trial**

At the end of their brief, Defendants also ask in the alternative for a new trial. They do not offer any additional reason for a new trial, above and beyond the arguments for judgment under Rule 50(b). So this Court denies the motion for a new trial on the same grounds.

**Conclusion**

For the foregoing reasons, Defendants' motion for judgment as a matter of law under Rule 50(b), or in the alternative, for a new trial under Rule 59(a), is hereby denied.


Date:   March 14, 2025                                   _____

                                                        Steven C. Seeger
                                                        United States District Judge